**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| BLUEWORKS CORPORATION, | Case No. 24-30494 (LTB) |
| Debtor.[1] | Re: Docket Nos. 146, 147 |

**HAYWARD INDUSTRIES, INC.'S**
**OBJECTION TO DISCLOSURE STATEMENT FOR**
**PLAN OF REORGANIZATION OF BLUEWORKS CORPORATION**

Hayward Industries, Inc. ("Hayward") hereby objects (this "Objection") to the *Disclosure Statement for Plan of Reorganization of Blueworks Corporation* (Docket No. 147) (the "Disclosure Statement") filed by the above-captioned debtor (the "Debtor"). In support of this Objection, Hayward states as follows:

**PRELIMINARY STATEMENT**

1. Approval of the Disclosure Statement must be denied because the Disclosure Statement supports a Plan which is patently unconfirmable. At its core, the Plan is premised on an impermissible gerrymandering of classes of similarly situated unsecured creditors (Class 2, Class 3, Class 4 and Class 5) for the sole (and improper) purpose of achieving an impaired accepting class under sections 1129(b) and 1126(c) of the Bankruptcy Code. Properly classified, the Plan cannot achieve confirmation absent the assent of Hayward, a creditor whose allowed

---

[1] Debtor is the following entity (the last four digits of its taxpayer identification number follow in parentheses): Blueworks Corporation (3957). The Debtor's address is 8408 Channel Way, Waxhaw, North Carolina 28173.

(liquidated portion of its claim) constitutes at least approximately 93%[2] of the Debtor's unsecured claims pool of non-insider creditors entitled to vote on the Plan. Because Hayward will not vote in favor of a Plan that contravenes the Bankruptcy Code and appliable law, and the Debtor is unable to propose an acceptable Plan, the Court should not approve the Disclosure Statement but, instead, either dismiss the case or convert it into chapter 7.

2.      Also, the Plan cannot be confirmed because it violates the absolute priority rule, a cornerstone of the Bankruptcy Code. Under the Plan, through Class 6, Mr. Chen is slated to retain his equity interest in the Debtor (and become the sole equity holder upon emergence) while most creditors are slated to receive a *de minimis* recovery, if any. While the Debtor may argue that the Plan is a "new value" plan based on Mr. Chen's supposed agreement to reduce his future salary (*i.e.*, "sweat equity"), forgo a portion of an illusory Plan distribution, and waive his rights to any equity distribution during the Plan payment period, the Disclosure Statement is devoid of any analysis supportive of a new value exception to the absolute priority rule. In contravention to the mandates of the Supreme Court's holding in *LaSalle* and its progeny, the Debtor has not market-tested the value of its business by seeking potential purchasers, equity investors, or by other means.

3.      Further, the Plan unfairly discriminates amongst the various Classes, is not fair and equitable, and impermissibly provides disparate treatment to similarly situated unsecured creditors by elevating the treatment of Class 2 (Allowed Professional Claims) over Class 4 (Hayward's Judgment Claim) and Class 5 (Allowed Unsecured Claims) creditors.[3]

---

[2] *See* **Exhibit A** hereto, summarizing filed and scheduled unsecured claims asserted against the Debtor. For the avoidance of doubt, many of those claims are objectionable and, thus, cannot be considered Allowed under the Plan.

[3] Potentially over Class 3 (NBCF Claim) creditor as well, although that Class provides for $0 distribution in light of the potential assertion of setoff rights, if any. NBCF likely is not permitted to now setoff its trade claim against the

a) The proposed Class 2 distributions are in direct contravention of SLK's and Platinum's retention orders entered by this Court, which prohibit the application of "TRO funds" to pre-petition obligations.

b) The proposed Class 3 impermissibly seeks to limit NBCF's obligation on account of the Judgment to one-third whereas NBCF, as alter ego and independently, is liable for the entire amount of the Judgment. Further, as an insider (Section 101(31)(E)), NBCF is <u>not</u> entitled to vote on the Plan, Section 1129(a)(10)). Similarly, to the extent an insider holds an allowed claim in Class 5, such insider is <u>not</u> entitled to vote on the Plan.

4.    Critically, the Plan also does not take into account the District Court's finding that NBCF and the other non-debtor affiliate defendants are alter egos of the Debtor. Being alter egos, their value/assets (which is substantial) must be offered as part of the Plan for distribution to the Debtor's legitimate creditors.[4]

---

funds the Debtor paid to professionals on NBCF's behalf. Setoff is not a defense to a chapter 5 claim that should be brought against NBCF for recovery of those payments which were made for NBCF's benefit.

[4] In addition, and to the extent necessary, to avoid further prejudice to creditors, the Court may substantively consolidate the Debtor's estate with its non-debtor affiliates, which the District Court has already found to be alter egos. Courts in this Circuit, and elsewhere, recognize the Court's ability to substantively consolidate the debtor's estate with its non-debtor affiliates. *See, i.e., Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 765 (9th Cir. 2000); *In re Alico Mining, Inc.*, 278 B.R. 586, 589 (Bankr. M.D. Fla. 2002) (concluding that the court had subject-matter jurisdiction to consolidate debtor and non-debtor entities under its general equitable power); *In re No Rust Rebar, Inc.*, 2023 Bankr. LEXIS 1748, at *32-33 (Bankr. S.D. Fla. July 12, 2023); *In re Munford, Inc.*, 115 B.R. 390 (Bankr. N.D. Ga. 1990) (denying motion to dismiss complaint seeking substantive consolidation of debtor and non-debtor and discussing factors for such substantive consolidation ); *Bracaglia v. Manzo (In re United Stairs Corp.)*, 176 B.R. 359 (Bankr. D.N.J. 1995); *Simon v. New Ctr. Hosp. (In re New Ctr. Hosp.)*, 187 B.R. 560, 568 (E.D. Mich. 1995) ("[D]etermination of whether [entities] are alter egos of one another is critical" to finding non-debtor substantive consolidation.); *In re Convalescent Ctr. of Roanoke Rapids, Inc.*, 2006 Bankr. LEXIS 4484, at *6 (Bankr. E.D.N.C. Aug. 7, 2006) ("Substantive consolidation has even been applied to consolidate a debtor with a non-debtor party in unusual circumstances.") (citations omitted); *Fort v. Tyrone Clear View Grp., LLC (In re AuditHead, LLC)*, 624 B.R. 134, 146 (Bankr. D.S.C. 2020); *Campbell v. Cathcart (In re Derivium Cap., LLC)*, 380 B.R. 429, 442 (Bankr. D.S.C. 2006). Substantive consolidation test is reinforced by the Fourth Circuit's holding in *Stone v. Eacho* (*In re Tip Top Tailors, Inc.)*, 127 F.2d 284 (4th Cir. 1942), which "did not set forth a specific test for substantive consolidation, [but] its general approach of focusing on equity to creditors and refusing to 'be blinded by corporate forms,' has been widely noted and followed.". *First Owners Assoc. of Forty Six Hundred Condo. v. Gordon Props., LLC (In re Gordon Props., LLC)*, 478 B.R. 750, 757 (E.D. Va. 2012). Hayward reserves its rights with respect thereto.

5.      The Plan also impermissibly seeks to enjoin Hayward's collection efforts against the Non-Debtor Defendants, even though each of them is independently liable on the Judgment. And, any discharge the Debtor may obtain must not impact the Non-Debtor Defendants' liability to Hayward.

6.      The future Plan distributions, if any, are illusory. The Debtor proposes to make distributions based on future Net Income.  This concept is ripe for manipulation and deceit, for which the Debtor's insiders have a high propensity.  Simply put, a fox cannot guard the henhouse! Any future distributions, and material business decisions impacting Net Income, must be made subject to Hayward's oversight and the Court's ability to resolve disputes.  For the same reason, re-vesting of assets under Section 1141(b) is not appropriate until all distributions under the Plan are completed.

7.      The Plan suffers from additional, fatal, defects, warranting the Court's disapproval of the Disclosure Statement:

a) The Plan violates section 1129(a)(3) of the Bankruptcy Code because it was not proposed in good faith. The totality of the circumstances surrounding the Debtor's pre-petition conduct, and the contents of its Plan, evidence that the Plan clearly serves only one purpose—the favorable treatment of the Debtor, its insiders, its non-Debtor affiliates, and professionals in the District Court Action, all at the expense of other creditors, primarily Hayward.

b) The Plan violates 1129(a)(1) of the Bankruptcy Code because it proposes an end-around in expansive discharge and injunction language that results in a *de-facto* grant of impermissible non-consensual third-party releases of Debtor's insiders and non-Debtor affiliates.

c) The Plan violates section 1129(a)(7) of the Bankruptcy Code and does not satisfy the best interests of the creditors test because (i) the Hypothetical Liquidation Analysis fatally flawed; and (ii) the Plan purports to remove Hayward's right to enforce its Judgment against Non-Debtor Defendants due to the Judgement's joint and several nature despite these "alter ego" Non-Debtor Defendants lack of any meaningful contribution to the estate.

    d) The Plan violates section 1129(a)(11) of the Bankruptcy Code because it is not feasible based on unreasonable and incomplete projections.

    e) The Plan contains numerous other provisions that violate the Bankruptcy Code and the Code's objectives. For instance, (i) the structure and timing of the Administrative Claims Bar Date does not capture the full scope of administrative claims to be accounted for through the Effective Date; (ii) the Plan prohibits parties in interest from filing claim objections despite their explicit right to do so pursuant to section 502 of the Bankruptcy Code; and (iii) the lack of an independent plan administrator to avoid post-confirmation impropriety (which may be likely given the Debtor's management's history), including with respect to the matters affecting Net Income and the prosecution of estate claims and causes of action.

Because of these deficiencies, the Plan is patently unconfirmable and, therefore, the Disclosure Statement should not be approved.

    8. In addition to shortcomings regarding the Plan which make it patently uncomfortable, the Disclosure Statement does not contain adequate information as required under the Bankruptcy Code because, *inter alia*, it (a) fails to accurately reflect the Judgment and other obligations to Hayward as set forth in Hayward's timely filed proof of Claim, including unliquidated claims based on pre and ongoing post-petition patent infringement by the Debtor and its affiliates, a material portion of which may constitute an administrative expense under *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), and its progeny, (b) fails to provide any valuation of each non-debtor alter ego affiliate, including NBCF, and description of their assets which, under appliable law, are *now* available to fund the Debtor's Pla distributions, (c) fails to explain why separate classification and treatment of the Allowed NBCF Claim is appropriate, why NBCF is entitled to a setoff, and why NBCF as a joint-tortfeasor and alter ego is entitled to indemnification and subrogation rights, (d) fails to define the Pro Rata Share in a way that creditors can adequately understand their potential distributions, (e) fails to adequately describe the Debtor Causes of Action and Chapter 5 causes of actions that are being preserved in

the Plan and the potential value of those claims, as well as any details or mechanism pursuant to which of those claims will be pursued, and when, and fails to designate an independent third-party to pursue insider claims, (f) fails to explain why separate and superior treatment of Chen's Equity Interests and his claims are appropriate, is devoid of information to properly value Chen's emergence equity, and fails to provide a basis for why Chen, an insider, should be paid certain fees as an administrative priority claim, (g) fails to explain why separate classification and treatment of Class 2 professional claims is appropriate and not foreclosed by the Retention Orders, (h) fails to address any potential breach of fiduciary duty claims held by the Debtor against Chen and Zhoujing "Gina" Lu ("Lu") for their conduct as officers of the Debtor, including for their use of the Debtor and its assets as their personal bank account, and fails to address the alter ego claims that the Debtor's estate holds against Chen and Lu—which, if successful, could result in Chen's and Lu's direct liability for all non-insider claims asserted against the Debtor, (i) and the Hypothetical Liquidation Analysis annexed thereto is flawed and does not provide creditors with an accurate view of the Debtor's financials, and (j) proposes to assume all non-rejected executory contracts, including alleged oral leases for two cars—a 2018 Tesla Model 3 and a 2018 Lexus RX 450H, without mentioning or discussing them.

## **RELEVANT HISTORY**

### **Pre-Petition Litigation and Judgment Awarded to Hayward**

9.      Hayward is a judgment creditor of the Debtor on account of a money judgment entered on May 28, 2024 in the amount of $16,021,736.303 (the "Judgment") in the case titled *Hayward Industries, Inc. v. Blueworks Corporation; Blueworks Innovation Corporation; Ningbo C.F. Electronic Tech Co. Ltd.; and Ningbo Yishang Import and Export Co., Ltd.*, pending in the

United States District Court for the Western District of North Carolina (Charlotte Division) (the "District Court") before Judge Max Cogburn; Case No. 3:20-cv-710-MOC-DSC (the "District Court Action").

10.     During the pendency of the District Court Action, the District Court entered a Temporary Restraining Order ("TRO") which, among other things, ordered that "Defendants and their agents, employees, and representatives are ENJOINED from facilitating or allowing any withdrawal, transfer, or disposition of assets presently held in any bank accounts owned or controlled by Defendants" District Court Action, Docket No. 393.

11.     After almost three and half years of litigation (including unsuccessful counterclaims and numerous other procedural and other roadblocks thrown up by the Debtor and Non-Debtor Defendants), a jury found the Debtor and the Non-Debtor Defendants jointly and severally liable for (1) making false or misleading statements in commercial advertising that deceived or were likely to deceive consumers in a material way that harmed Hayward, in violation of 15 U.S.C. §1125(a) (the Lanham Act), and (2) violating the North Carolina Unfair and Deceptive Trade Practices Act (N.C. GEN. STAT. § 75-1.1). The Judgment entered by the District Court also included a finding that "[b]ecause the four Defendants are alter egos, Defendants are jointly and severally liable for this [Judgment] amount." *See* Judgment, 3.

12.     As of the date of the Petition Date, the Debtor owed Hayward $17,248.507.90 on the judgment, comprised of:

      i.     $16,021,736.30, which is the amount of the Judgment; plus

      ii.    $31,771.32, which is post-Judgment interest from and after May 28, 2024 until the Petition Date at the post-Judgment interest rate of 5.17% pursuant to 28 U.S.C. § 1961 or the per diem rate of interest of $2,269.38; plus

       iii.     $1,195,000.28 in recoverable attorneys' fees. *Hayward Indus., Inc.*
*v. Blueworks Corp., et al.*, 2024 WL 3930968 (W.D.N.C. Aug. 23,
2024).

*See* Hayward Claim, Claim No. 8.

13.     Additionally, Hayward asserted an unliquidated claim against the Debtor for
trademark and patent infringement. *Id*.

14.     Hayward also filed an action against Lu, which action was removed by the Debtor
to this Court and is subject to a pending Rule 9019 motion and Hayward's objection thereto.
Hayward's asserted claims against Lu, and other potential claims against Lu and Chen, are set
forth in Hayward's objection to the Debtor's Rule 9019 motion. *See Hayward Industries, Inc.'s
Objection To Joint Motion To Approve Settlement Pursuant To Bankruptcy Rule 9019* [Docket No.
154] (the "9019 Objection").

**The Debtor's Bankruptcy Case and Proposed Plan and Disclosure Statement**

15.     On June 11, 2024 (the "Petition Date"), the Debtor Blueworks Corporation filed a
voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the
Bankruptcy Court for the Western District of North Carolina (this "Court").

16.     Upon filing for bankruptcy, the Debtor filed an adversary complaint against
Hayward seeking injunctive and declaratory relief to extend the Debtor's automatic stay to the
Non-Debtor Defendants and enjoin Hayward from prosecuting the District Court Action, and
enforcing the Judgment, against the Non-Debtor Defendants. *See* Adv. Pro. No. 24-30494, Docket
No. 1 (the "Adversary Complaint").

17.     Hayward's request to withdraw the reference of the Adversary Proceeding to the
District Court was granted on July 16, 2024. *See* Adv. Pro. No. 24-30494, Docket No. 9.

18.     This adversary proceeding is now pending before the District Court at Case
No. 24-00571, where the Debtor's *Motion for an Order (I) Declaring that the Automatic Stay
Applies to Certain Actions Against Non-Debtors, and (II) Preliminarily Enjoining Such Actions*
[Docket No. 9] (the "<u>Stay Extension and Injunction Motion</u>") and Hayward's objection thereto
[Docket No. 12, 15], are fully briefed and pending.

19.     On October 4, 2024, the Debtor filed the *Plan of Reorganization of Blueworks
Corporation* [Docket No. 146] (the "<u>Plan</u>") and Disclosure Statement.

## <u>OBJECTION</u>

### I.     The Disclosure Statement Should Not Be Approved Because The Plan Is Unconfirmable As A Matter Of Law.[5]

20.     A disclosure statement cannot be approved if, as a matter of law, the underlying
plan is unconfirmable.  *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 153–54 (3d Cir. 2012).
Where a plan is patently unconfirmable, approval of the disclosure statement should be denied in
order to avoid the waste of time and expense associated with the distribution of, review of, and
voting on the plan.  *See In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, on the face of
the plan, the plan could not be confirmed, then the Court will not subject the estate to the expense
of soliciting votes and seeking confirmation."); *see also In re GSC, Inc.*, 453 B.R. 132, 157 n. 27
(Bankr. S.D.N.Y. 2011) ("An unconfirmable plan is grounds for rejection of the disclosure
statement; a disclosure statement that describes a plan patently unconfirmable on its face should
not be approved.") (citing *In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007)); *In re*

---

[5] While this Objection includes objections to the Plan, should the Disclosure Statement and Plan be approved for
solicitation, Hayward reserves its right to assert any such objections to the Plan at confirmation, as well as to bring
additional objections not contained herein.

*Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001); *In re E. Me. Elec. Coop., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991); *In re Kaiser Gypsum Co., Inc.*, Case No. 16-31602 (Bankr. W.D.N.C. Oct. 7, 2019)[6].

21.     Here, the Debtor's proposed Plan is patently unconfirmable because it is based on blatant violations of the Bankruptcy Code and applicable law, including sections 1129(a)(1), (3), (7) and (11), 1129(b)(1) and (2), and 524(e) of the Bankruptcy Code.   These issues permeate the entire Plan and do not depend upon (nor are they curable by) any particular evidence that could be established at confirmation.   Therefore, the Plan is patently unconfirmable as a matter of law, mandating the Court's disapproval of the proposed Disclosure Statement.   Simply put, the Debtor's case (which is a poster child of "two-party" dispute cases that are frequently dismissed) should be dismissed or converted to chapter 7.   *See, e.g.*, *In re Sacks Weston LLC*, 2024 WL 2152115, at *6 (Bankr. E.D. Pa. Apr. 25, 2024) (dismissing a bankruptcy case after finding that a creditor would refuse to assent to a plan satisfying the debtor's goal and that confirmation of such plan was impossible without such assent); *In re Who Dat?, Inc.*, 2024 WL 1337453 (Bankr. E.D. La. Mar. 27, 2024) (denying plan confirmation and converting case);.*In re Dunes Hotel Assocs.*, 1997 WL 33344253, at *13, *18-19 (Bankr. D.S.C. Sept. 26, 1997), *aff'd*, 245 B.R. 492 (D.S.C. 2000) (dismissing case).

22.     A court may confirm a plan if it meets all of the requirements of section 1129(a) of the Bankruptcy Code, other than paragraph (15) of that section.   If not all classes of creditors whose

---

[6] See *Order (1) Denying Fifth Amended Disclosure Statement For Fifth Amended Chapter 11 Plan Of Reorganization For Kaiser Gypsum Company, Inc. And Hanson Permanente Cement, Inc., Proposed By Truck Insurance Exchange And (2) Denying Disclosure Statement For Third Amended Joint Plan Of Reorganization Of Kaiser Gypsum Company, Inc. And Hanson Permanente Cement, Inc.*, Docket No. 1834, pg. 2.

claims are impaired accept the Plan, a court may still confirm a plan but only if the plan satisfies

the requirements under section 1129(a), with the exceptions of paragraph (8) of that section, and

does not discriminate unfairly and is fair and equitable with respect to the impaired classes that

reject the plan.  *See* 11 U.S.C. § 1129(b).  Insiders are not permitted to vote on the Plan. *See*

11 U.S.C. § 1129(a)(10).  As presently structured, Hayward would reject the Plan; therefore, the

Debtor would need to meet the "cram down" requirements of section 1129(b) for the Plan to be

confirmed.  Because it is clear that the Debtor will not be able to satisfy its burden for confirmation

of the currently proposed Plan (or any Plan, for that matter, that Hayward does not support), the

Disclosure Statement should not be approved.

### a. <u>Section 1129(a)(1) – The Plan Does Not Comply With The Applicable Provisions Of Title 11.</u>

23.     The Plan does not comply with the applicable provisions of title 11.  In addition to

the plethora of ways in which this Plan violates the Bankruptcy Code, the Plan is contrary to the

objectives and purposes of the Bankruptcy Code and is fundamentally unfair to Hayward and other

non-insider unsecured creditors.  Accordingly, the Plan is patently unconfirmable for all of the

reasons set forth herein and must be rejected on its face.

### b. <u>Section 1129(a)(3) – The Plan Has Not Been Proposed In Good Faith.</u>

24.     Section 1129(a)(3) requires that a plan be proposed in good faith.  The term "good

faith" is not defined by the Bankruptcy Code. A bankruptcy plan fails the good-faith test unless

the plan is reasonably likely to "achieve a result which is consistent with the objectives and

purposes of the Bankruptcy Code" and "provide[s] for fundamental fairness in dealing with

creditors." *In re Eagan*, 2013 WL 237812, at *4 (Bankr. W.D.N.C. Jan. 22, 2013) (citation and

quotation omitted); *see also In re Renegade Holdings, Inc.*, 429 B.R. 502, 518 (Bankr. M.D.N.C.

2010) ("It is generally held that a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result which is consistent with the objectives and purposes of the Bankruptcy Code.") (citation omitted); *In re Jorgensen*, 66 B.R. 104, 108-09 (9th Cir. BAP 1986) (a showing of "[g]ood faith requires a fundamental fairness in dealing with one's creditors.").  "In order to determine if a plan has been filed in good faith, a court should consider the totality of the circumstances." *In re RADCO Properties, Inc.*, 402 B.R. 666, 673 (Bankr. E.D.N.C. 2009).  The debtor has the burden of proof to establish good faith by a preponderance of the evidence.  *See In re Faison*, 556 B.R. 728, 737 (Bankr. E.D.N.C. 2016) (citation omitted).

25.     The Debtor cannot satisfy the good faith standard.  The totality of the circumstances demonstrates that the Plan serves one purpose and one purpose only: to preserve the interests of the Debtor's insiders (Chen and Lu), professionals, and to provide favorable treatment to Debtor's insider non-debtor affiliates, including NBCF, at the expense of Hayward as the largest unsecured creditor.   There are at least five ways in which this Plan demonstrates that the Plan was proposed out of the Debtor's self-interest: (i) the Plan effectively waives claims and causes of action against Non-Debtor Defendant "alter egos" for no value; (ii) the Plan treats insider claims in favorable manner, including the offset of 100% claims against unsecured and priority claims, significantly decreasing estate value (and without adequate description of the rationale for this treatment); (iii) the Plan seeks to improperly establish indemnification rights by Debtor affiliates; (iv) the Plan improperly insulates professionals from preference and fraudulent transfer liability by the unexplained assumption of retention agreements, and allows professionals to reduce their administrative claims by pre-petition retainers transferred to them in violation of the pre-petition

TRO and the Retention Orders; and (v) the Plan grants full management control over the Reorganized Debtor to Chen, despite his suspect management of the Debtor.

26.     First, no value is being provided in return for the Debtor's apparent waiver of alter ego rights related Non-Debtor Defendants.  The Debtor purposefully did not seek to bring value of the assets of the Non-Debtor Defendants as an asset of the estate,[7] does not provide in the Plan for such actions, and the Non-Debtor Defendants alter egos are not providing any value to the Debtor's estate in connection with the Plan.  These alter ego rights may be the most valuable estate assets of the Debtor, and the Debtor has a fiduciary duty to make sure that the assets are made available to satisfy creditor claims, including Hayward's claim.  To the contrary, the Debtor is attempting to simply release the estate's alter ego rights for no consideration.

27.     The Debtor is likely to argue that a reduction in claims held by the alter ego NBCF, as reflected in the proposed treatment of the Allowed NBCF Claim, is sufficient value given to the estate in exchange for the waiver of alter ego claim/rights against NBCF.  First, the Debtor says nothing about the alter ego rights related to the other alter egos Non-Debtor Defendants, such as Blueworks Innovation and Ningbo Yishang Import and Export Co., Ltd.  There is no reason why the Debtor is not seeking to pay its claims from the assets of all alter ego Non-Debtor Defendants.  Second, the proposed reduction in the Allowed NBCF Claim is illusory and benefits primarily NBCF to the detriment of the Debtor's unsecured creditors.  There are also substantial claims and

---

[7] The Debtor in its Schedules of Assets and Liabilities [Docket No. 92] fails to list any such rights. Instead of seeking to add value to the estate from the Debtor's alter ego rights stemming from the Judgment, the Debtor has taken multiple overt steps to instead shield the Non-Debtor Defendants' and their assets from Hayward's collection efforts.  *See*, *e.g.*, Adversary Complaint; Stay Extension and Injunction Motion.

causes of action held by the Debtor's estate against Lu and Chan, insider individuals,[8] including

significant preferences and fraudulent transfer claims based on hundreds of thousands, if not

millions, of dollars of transfers from the Debtor during the ten years prior to the Petition Date.

28.    Specifically, the Plan's treatment of the Allowed NBCF Claim proposes to reduce

NBCF claim to $0 claim by offsetting NBCF's alleged $3,481,068.49 general unsecured claim

against monies owed by NBCF to the Debtor for legal fees the Debtor paid to NBCF's

professionals, and NBCF's alleged 1/3 share of the Hayward Judgment.    The Debtor does not

explain why a setoff is appropriate here.    First, NBCF is responsible for the entire Judgment, not

just 1/3 of it, and NBCF has not shown that it has valid indemnification rights against the Debtor.[9]

So, apportionment is improper.    Second, setoff between the Debtor and NBCF may not be

appropriate given that NBCF was found to be an alter ego.[10]    Third, setoff may be improper

because the Debtor can assert chapter 5 claims against NBCF for, *inter alia*, fees paid to

---

[8] Some of these Debtor claims and causes of action against insider Lu are set forth in the 9019 Objection, which Hayward incorporates herein by reference.  Similar claims are held by the Debtor against Chen.

[9] *See generally, Anahuac Mgmt. v. Mazer*, 2011 WL 1131392 (D. Nev. Mar. 24, 2011) (disallowing setoff and noting "that as a general rule unmatured, unliquidated, or contingent claims and debts cannot be used for setoff."). *See also Ingram v. Smith*, 16 N.C. App. 147, 151 , 191 S.E.2d 390, 393 (1972) ("As a general rule of common law, one joint tort-feasor may not sue another for indemnity.").  NBCF also does not have any contribution rights under the Uniform Contribution Among Tort-Feasors Act, codified in N.C.G.S. § 1B-1.

[10] The Court has the authority to deny approval of a setoff, as the concept of setoff is based on equity. *See In re Lehman Brothers Holdings, Inc.*, 404 B.R. 752, 757 (Bankr. S.D.N.Y. 2009); *In re Surtronics, Inc.*, 2013 Bankr. LEXIS 5753, *5-6 (Bankr. E.D.N.C. Dec. 5, 2013).  Because alter egos are considered to be one party, mutuality does not exist between them for setoff purposes and, as such, alter ego setoffs are not permitted.  *See, e.g., State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 443, 666 S.E.2d 107, 115 (2008) (treating alter egos as the same party for purposes of tolling the statute of limitations); *Strategic Outsourcing, Inc. v. Stacks*, 176 N.C. App. 247, 254, 625 S.E.2d 800, 805 (2006) (treating an alter ego Arkansas corporation as one and the same entity as its president for personal jurisdiction analysis); *Estate of Hurst v. Moorehead I, LLC*, 228 N.C. App. 571, 572, 748 S.E.2d 568, 570 (2013) (treating the sole member of a limited liability company as the same party as the limited liability company and imposing liability even though the member did not individually commit fraud and no punitive damages were awarded against the member); *In re Ingersoll*, 90 B.R. 168, 171 (Bankr. W.D.N.C. 1987) (discussing mutuality requirement).

professionals on the behalf of NCBF.  Setoff is not a defense to a chapter 5 action and should not be permitted.[11]  By the suggested setoff, the Debtor is proposing to offset "bankruptcy dollars" of NBCF's $3.4 million unsecured trade claim (which under the Plan is unlikely to see any distribution) against real 100 cents dollars which NBCF is required to return to the Debtor for the Debtor's payment of its professional fee expenses.

29.     Another flaw with the Plan's proposed offsetting of the Allowed NBCF Claim is that the Debtor has not established the total legal fees paid by the Debtor on behalf of all of the Defendants in the District Court Action, and NBCF's portion of those payments.  Therefore, the amount of the offset may be insufficient based on the amount proposed to be offset, not just the value of such dollars.

30.     This same unequal offset of a bankruptcy claim against 100-cent dollars is also proposed by the Plan to benefit the Debtor's insider, Chen.  The Plan would allow Chen, an insider with a 30% interest in the Debtor, to assert his Priority Unsecured Claim in the amount of $15,150.00 and his General Unsecured Claim in the amount of $197,350.00 "as an offset to or defense to any Cause of Action brought by the Debtor against [himself]."  Plan, Art. 1, Sec. 26. Again, offsets against contingent claims are not permitted, and it would be unequitable to allow an insider offset resulting in 100% distribution where other creditors may receive nothing.

31.     Further evidence of the Debtor's bad faith in proposing the terms of this Plan are evidenced by the Plan's improper attempt to establish indemnification claims by the Non-Debtor Defendants.  Specifically, section 4.2 of the Plan provides that the Debtor's obligations "to

---

[11] *Off. Comm. of Unsecured Creditors ex rel. Bankr. Est. of the Great Atl. & Pac. Tea Co. v. McKesson Corp. (In re Great Atl. & Pac. Tea Co.)*, 657 B.R. 572 (Bankr. S.D.N.Y. 2024).

indemnify its respective former and present shareholders, directors, or officers, in such capacity or as plan administrators, or any person serving at the request of the Debtor as a director or officer of any other entity pursuant to the Debtor's Articles of Incorporation or Bylaws, or pursuant to applicable state law or specific agreement, or any combination of the foregoing," shall be assumed on the Effective Date and not discharged. Such indemnification, however, is improper. First, the Debtor has not identified any indemnification rights based on contract, and the NBCF claim does not evidence any. As such, Non-Debtor Defendants do not have any indemnification rights against the Debtor, and the Debtor should not create them under the Plan.[12] In addition to being disputed, any indemnification claim by NBCF (the other Non-Debtor Defendants did not file any claims against the Debtor by the bar date) is subject to disallowance under section 502(e)(1)(B) of the Bankruptcy Code. *See Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 219 L. Ed. 2d at 739, n 7 (2024) (rejecting argument that potential indemnification claims would deplete the estates' resources).

32.     The proposed treatment of the Professional Claims (SKL and Platinum) further demonstrates the bad faith filing of the Plan. Those claims are not secured, and the prepetition "retainers" cannot be used to reduce them. Instead, as required by Retention Orders, retainers can only be applied to post-petition allowed claims.[13] There is also no basis for the Debtor to assume

---

[12] Moreover, similar to identification claims, co-obligors or tortfeasors subject to joint and several liability are not entitled to assert subrogation claims against each other under the Bankruptcy Code or North Carolina law. S*ee generally*, *In re Smith*, 2014 WL 13121393, at *4 (Bankr. M.D.N.C. June 3, 2014) (no subrogation claims exist between parties subject to joint and several liability).

[13] Specifically, the orders entered by this Court authorizing the Debtor to retain Platinum and SLK provide: "The Retainer is property of the Debtor's bankruptcy estate and may not be used to pay or satisfy any prepetition invoice absent further order of the Court. Further, the Retainer may not be used for any purpose other than the payment of post-petition invoices that have been approved by the Court. To the extent any of the Retainer remains at the conclusion of the Chapter 11 Case, such amounts must be returned to the Debtor's bankruptcy estate." *See Amended* Ex Parte

its retention agreements with professionals, and such request is unprecedented.  Those agreements

may also not be executory, and thus not capable of assumption.  The obvious goal of the Debtor's

request to assume professional retention agreements is to make those professionals immune from

preference exposure and to reduce the pool of funds available for other creditors.

33.     Fourth, the Debtor proposes to pay Chen a post-Effective Date annual salary of

$150,000 and give him full management control over the Reorganized Debtor.  That would give

Chen the ability to cause Net Income (the proposed sole source of a distribution under the Plan) to

be manipulated to zero, such that Hayward and other creditors would have no recourse and no

recovery under the Plan.  This is unacceptable.  The proposal that Chen reduce his compensation

by $100,000 for three years is meaningless in light of the history showing that he found ways to

get money to himself or his family even if it wasn't called "compensation" or "salary."  Chen's

suspect history in the Debtor's management can only lead to the conclusion that he will follow the

same playbook after confirmation and continue to use the Debtor's funds as his own personal

funds.  Such a result must be guarded against to protect creditor's interests and recoveries.

34.     Based on the totality of circumstances surrounding the Plan and the Debtor's

history, the Plan is not reasonably likely to "achieve a result consistent with the objectives and

purposes of the Code" nor does the Plan "provide for fundamental fairness in dealing with

---

*Order Approving Application To Employ Shumaker, Loop & Kendrick, LLP As Special Litigation Counsel For Debtor And Debtor-In-Possession As Of The Petition Date* (Docket No. 116) at ¶ 4; *Amended* Ex Parte *Order Approving Application To Employ Platinum Intellectual Property, PC As Special Corporate Counsel For Debtor And Debtor-In-Possession As Of The Petition Date* (Docket No. 115) at ¶ 4 (together, Docket Nos. 115 and 116, the "Retention Orders").  Pursuant to the Plan's treatment of Class 2 – Allowed Professional Claims, only SLK and Platinum are being authorized by the Plan to draw down on the retainers.

creditors." Therefore, the Plan was not proposed in good faith by the Debtor and cannot satisfy

section 1129(a)(3) of the Bankruptcy Code.

### c. Section 1129(a)(7) – The Plan Does Not Satisfy The "Best Interest Of Creditors" Test.

35.     Section 1129(a)(7), commonly referred to as the "best interest of creditors" test,

requires a plan to provide that a creditor who has not accepted the plan will receive at least as much

under the plan as that creditor would receive in a chapter 7 liquidation.  The best interests of

creditors test focuses on individual dissenting creditors, rather than on classes of claims or

interests. *See Bank of America Nat'l Trust & Savings Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S.

434, 441 n.13 (1999). Hayward's claim is impaired and, if the current proposed Plan is solicited,

Hayward will vote to reject it.  Thus, the Plan must provide that Hayward will receive as much as

it would in a chapter 7 liquidation, including from assets of the Debtor's alter egos.

36.     The Hypothetical Liquidation Analysis attached to the Disclosure Statement is

severely flawed—the result of which being that the Debtor cannot satisfy the best interests test

because it cannot demonstrate that Hayward and other non-insider unsecured creditors would fare

better under the Plan than they would in a chapter 7 liquidation.  The Hypothetical Liquidation

Analysis fails to account for the fact that approximately $18.2 million of the Debtor's total non-

insider liquidated liabilities are unsecured creditor liabilities that can likely be satisfied from the

assets of the alter ego Non-Debtor Defendants.  Additionally, the Hypothetical Liquidation

Analysis:

> a.   Values nearly every one of the Debtor's assets at 0%, but every liability at
>      100%—this is not a reasonable assumption. In typical liquidation analyses,
>      accounts receivable are usually valued at a minimum of 50%.

b. Provides for no recovery from, or contribution by, the alter ego Non-Debtor Defendants—despite the Debtor's attempt in other Plan provisions to use the District Court's alter ego finding to its benefit. When it comes time to recognize the Non-Debtor Defendants' alter ego liabilities to the Debtor's estate, the Debtor conveniently ignores that asset.

c. Fails to list specific claims, including chapter 5 claims, against insiders, including Lu and Chen, as further set forth in the 9019 Objection.

d. Artificially inflates the liabilities in a chapter 7 liquidation case by over $150,000 for administrative claims for multiple Debtor law firms and Chen—whereas a chapter 7 trustee would likely not retain any of those firms or Chen to provide chapter 7 post-petition services.

37. Additionally, the Debtor further fails to satisfy the best interests test because the Plan purports to take away Hayward's right to enforce its Judgment against the Non-Debtor Defendants due to the joint and several nature of the Judgement, as well as their direct liability to Hayward  Similarly, the Plan is not in the best interests of other general unsecured creditors because these "alter ego" Non-Debtor Defendants are not making **any** contribution to the Debtor's estate in return for the benefits they are receiving through the proposed Plan.

38. Because the Debtor does not, and cannot, satisfy the best interests test, the Plan is unconfirmable on its face.

**d.  Section 1129(a)(11) – The Plan Is Not Feasible.**

39. Pursuant to section 1129(a)(11) of the Bankruptcy Code, the Debtor must establish that confirmation of its Plan is not likely to be followed by the need for further liquidation or reorganization. "The question of feasibility is a question of fact in which the debtor bears the burden to show feasibility of the plan by a preponderance of the evidence." *In re Wiggins Farms, Inc*., 2012 WL 6059208, at *2 (Bankr. E.D.N.C. Dec. 6, 2012) (citing *In re Inv. Co. Of Sw., Inc.*, 341 B.R. 298, 310 (B.A.P. 10th Cir. 2006)). "To be confirmed, a plan must 'provide adequate

19

means for the plan's execution,' . . . which necessarily requires some means by which the debtor

may repay its debts." *In re Roland*, 77 B.R. 265, 267 (Bankr. D. Mont. 1987) (quoting 11 U.S.C.

§ 1123(a)(5)) (citing *In re Matter of Winshall Settlor's Trust,* 758 F.2d 1136, 1137 (6th Cir. 1985));

*see also In re Trans Max Techs., Inc.*, 349 B.R. 80, 92 (Bankr. D. Nev. 2006) (to satisfy the

feasibility requirement, "[t]he debtor must offer more than speculation about the source of funding

for the plan.") (citation omitted).

40.    In support of its position that the Plan is feasible, the Debtor attaches projections

for its Net Income for the next three years. *See* Disclosure Statement, Exh. C. These projections,

however, are clearly unreasonable.  The NBCF Warranties estimated in the Debtor's projections

are contrary to the actual warranty numbers incurred in just the first few months of the Debtor's

bankruptcy case. Additionally, the projections do not account for the sizeable avoidance actions

and other claims held by the Debtor's estate, nor do they account for any recovery based on the

District Court alter ego findings.  Furthermore, even if the Debtor's projections are correct, the

projected net income as the sole source of recovery for Hayward's proposed Class 4 Allowed

Judgment Claim is unreasonable compared to the value of the releases (through the Plan's

injunction language) being given to Debtor insiders and non-Debtor affiliates under the Plan

(discussed below).[14]

41.    In addition, the Plan does not obligate NBCF to continue selling the Debtor

products for any period of time after confirmation, and it does not prohibit NBCF from

---

[14] Hayward does not concede that any claims asserted by it in the District Court Action, including any of its rights and recoveries obtained through the Judgment, constitute property of the Debtor's bankruptcy estate, and thus Hayward cannot be enjoined from pursuing collection against the Non-Debtor Defendants.  And, even alter ego claims can be direct claims belonging to a creditor and not the debtor's estate.  *See Borg v. Warren*, 545 F.Supp.3d 291, 317-18 (E.D. Va. 2021). Hayward preserves all rights with respect thereto.

manipulating (increasing) the cost of goods for the duration of the Plan distributions.  Without

such protections, the chances of a positive Net Income, and thus creditor recoveries, are bleak.

42.     The Debtor's projections are also inaccurate because they fail to address the fact

that Hayward may have a large administrative claim, under *Reading Co. v. Brown*, 391 U.S. 471

(1968) and its progeny, for post-petition infringement.  Hayward's timely filed proof of claim

includes unliquidated claims based on pre- and ongoing post-petition patent infringement by the

Debtor and its affiliates.  However, the Debtor's Plan and projections do not address or provide

for the funding of such potential administrative claim.  Without establishing a funded reserve, the

Debtor cannot emerge from bankruptcy and the Plan is not feasible.

**e.  Sections 1129(a)(10), 1129(b)(1) and 1122 – The Plan Manipulates Claim
Classifications To Manufacture An Impaired Accepting Class.**

43.     Pursuant to section 1129(a)(10), to confirm a plan with impaired classes "at least

one class of claims that is impaired under the plan [must accept] the plan, determined without

including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  Only if an

impaired, non-insider class accepts the plan can a plan with a dissenting class be crammed down

under section 1129(b).  *See In re Bryson Properties, XVIII*, 961 F.2d 496, 501 (4th Cir. 1992)

("Before a plan can be crammed down, at least one noninsider impaired class of claims must vote

to accept it.").

44.     When classifying claims and interests pursuant to a chapter 11 plan, section 1122

of the Bankruptcy Code provides "a plan may place a claim or an interest in a particular class only

if such claim or interest is substantially similar to the other claims or interests of such class."  11

U.S.C. § 1122.

> Although the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case, this discretion is not unlimited. There must be some limit on the debtor's power to classify creditors. . . . The potential for abuse would be significant otherwise. . . . **If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed**.

*Bryson Properties*, 961 F.2d at 502 (quoting *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990)) (emphasis added). In *Bryson Properties*, the Fourth Circuit held that a debtor impermissibly classified unsecured claims into their own classes (asserting the classification scheme was appropriate because there were separate classes for nonrecourse and recourse loans). The Fourth Circuit found that "[e]ven if we adopt a flexible approach to § 1122, however, the classification scheme at issue is impermissible. . . . **In this case, [the debtor] has failed to offer any reason for separate classification of the unsecured claims which will withstand scrutiny. The classification is clearly for the purpose of manipulating voting and it may not stand**." *Id.* at 502 (emphasis added). In determining whether "a division of similar claims into two or more classes is proper and allowable"—or, in contrast, "the treatment is for the purpose of 'gerrymandering' an impaired accepting class or if the resulting treatment of the objecting class is not 'fair and equitable' . . . or 'unfairly discriminates' against one of the two equal priority classes"—courts may consider four factors:

> (1) a reasonable basis for the proposed discrimination is presented;
> (2) the plan can be confirmed and consummated without the discrimination;
> (3) the plan discrimination is proposed in good faith; and
> (4) the discriminatory treatment results in a material prejudicial result to the class discriminated against.

22

*In re Platinum Corral, LLC*, 2022 WL 127431, *8 (Bankr. E.D.N.C. Jan. 13, 2022) (citation omitted).

45.     Just as in *Bryson Properties*, this Plan is clearly gerrymandered to achieve an impaired consenting class, a class consisting of less than 5% of the non-insider claims pool. Furthermore, none of the four factors set forth in *Platinum Corral* support the Plan's classification of unsecured creditors.    All unsecured creditors in Classes 2, 3, 4 and 5 should be classified together, and there is no reasonable basis for their separate classification.[15]   By separately classifying the Allowed Professional Claims, Allowed NBCF Claim and Allowed Unsecured Claims from Hayward's Allowed Judgment Claim, the Debtor is attempting to manufacture an impaired consenting class, which does not exist without this discriminatory classification.  If all of these unsecured claims were classified together, as they should be, the Debtor cannot achieve confirmation absent Hayward's assent.  This misclassification of unsecured claims is especially egregious because (i) Hayward's Class 4 Allowed Judgment Claim and Class 5 Unsecured Claims are receiving the same treatment; (ii) the Class 3 Allowed NBCF Claim is receiving beneficial treatment with a higher return under the Plan due to the inappropriate offsetting calculation in NBCF's Claim; and (iii) the Allowed Professional Claims are receiving preferential treatment by being authorized to drawn down pre-petition retainers paid to them by the Debtor in violation of the TRO.  *See* Retention Orders, ¶ 4.  Without a valid reason for separate classification of these unsecured claims, the classification cannot be countenanced, and the Plan is patently unconfirmable on this basis alone.

---

[15] NBCF is not entitled to a distribution as it is an insider and alter ego of the Debtor.

**f.  Section 1129(b)(1) – The Plan Discriminates Unfairly Against Hayward.**

46.     If a Plan is rejected by an impaired class of creditors, in order for the plan proponent

to cramdown a plan on the rejecting impaired class, section 1129(b)(1) of the Bankruptcy Code

requires that the plan not discriminate unfairly and be fair and equitable to the rejecting impaired

class.  *See* 11 U.S.C. § 1129(b)(1).

47.     The term "discriminate unfairly" is not defined in the Bankruptcy Code.  "[T]he

pertinent inquiry is not whether the plan discriminates but whether the proposed discrimination is

'unfair.'"  *Hargreaves v. Nuverra Envtl. Sols., Inc. (In re Nuverra Envtl. Sols., Inc.*), 590 B.R. 75,

89 (D. Del. 2018) (quoting *In re Tribune Co.*, 472 B.R. 223, 242 (Bankr. D. Del. 2012) (quoting *In

re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006))).

48.     "Courts typically examine the facts and circumstances of the particular case to

determine whether unfair discrimination exists.  Various tests have emerged in the caselaw, with

the hallmarks being 'whether there is a reasonable basis for the discrimination, and whether the

debtor can confirm and consummate a plan without the proposed discrimination.'"  *Nuverra*, 590

B.R. at 89-90 (quoting *Armstrong*, 348 B.R. at 121).  Furthermore, "the analysis for determining

whether the discriminatory treatment is unfair should be viewed by its effect on the dissenting

class."  *Id.* at 90 (internal quotations omitted).  This is also "consistent with the legislative history

of § 1129(b)(1), which makes clear that '[t]he criterion of unfair discrimination is not derived from

the fair and equitable rule or from the best interest of creditors test. Rather it preserves just

treatment of a dissenting class from the class's own perspective.'"  *Id.* at 90 (quoting H.R. Rep.

No. 595, 1st Sess. 417 (1977)).

49.     Here, the Plan violates section 1129(b)(1) of the Bankruptcy Code because it unfairly discriminates against Hayward due to the Plan's clear bias in its treatment of Hayward compared to the Debtor's insiders and affiliates, often as a result of terms that violate clear provisions of the Bankruptcy Code. The Plan's proposed treatment of Hayward's Allowed Judgment Claim is the Hayward's Pro Rata Share (based on either the Appellate Award or Judgment amount) of the Reorganized Debtor's Net Income upon each Distribution Date *in pari passu* with Class 5 in annual installments for the years ending in 2025, 2026, and 2027.  *See* Plan, Sec. 3.4  Such a proposed recovery is flawed for several reasons.  First, there is no basis for Hayward only receiving three years of Net Income.  This is particularly true where that Net Income is projected to be less than $2 million and, thus, Hayward would receive at most only 10% of its Judgment.  Second, if Hayward's Class 4 Claim is not going to be paid in full, then Class 5 (Allowed Unsecured Claims) and Class 6 (Equity Interests) should receive no distributions— otherwise, the plan is in violation of the Bankruptcy Code's absolute priority rule as discussed below.

50.     Additionally, the Plan does not provide any consideration to Hayward as a result of the Judgment's alter ego finding (which finding the Debtor either uses in its favor or ignores depending on which argument is more advantageous to the Debtor and its insiders in any situation)—the value of the alter ego Non-Debtor Defendants is not proposed to be distributed through the Plan despite the proposed re-vesting of assets in the Reorganized Debtor[16] and the apparent release, through the Plan's discharge and injunction, of Hayward's rights against the Non-

---

[16] *See* Plan, Section 9.4 (re-vesting Debtor assets and estate property into the Reorganized Debtor, including "all alter ego causes of action as well as Judgment collection against the Non-Debtor Defendants pursuant to the Judgment's alter ego findings[]").

Debtor Defendants (discussed further below).  Such proposed treatment in the Plan flies in the face

of the Non-Debtor Defendants also being directly liable to Hayward for the Judgment, separate

and apart from the alter ego finding.  At every turn, the Plan has been designed to discriminate

unfairly in its treatment of Hayward due to the Debtor's animosity towards Hayward as a result of

the District Court Action and resulting Judgment.

### g.  <u>Section 1129(b)(1) and (2) – The Plan Is Not Fair And Equitable.</u>

51.    In addition to a cramdown plan not discriminating unfairly, such plan must also be

fair and equitable to the rejecting impaired class.  *See* 11 U.S.C. § 1129(b)(1); *see also In re EFH*

*Grove Tower Assocs*., 105 B.R. 310, 313 (Bankr. E.D.N.C. 1989) (For a plan to be fair and

equitable, the "plan must literally be fair and equitable.").  Section 1129(b)(2)(B) provides that,

for a plan to be fair and equitable with respect to a class of unsecured claims:

> (i) the plan provides that each holder of a claim of such class receive
> or retain on account of such claim property of a value, as of the
> effective date of the plan, equal to the allowed amount of such claim;
> or
>
> (ii) the holder of any claim or interest that is junior to the claims of
> such class will not receive or retain under the plan on account of
> such junior claim or interest any property, . . . .

11 U.S.C. § 1129(b)(2)(B).  The Bankruptcy Code's fair and equitable standard is also referred to

as the absolute priority rule, which provides that senior creditors must be paid in full before junior

creditors or equity owners can receive or retain any property.  *See also Bryson Properties*, 961

F.2d at 503 ("The absolute priority rule provides that a dissenting class of unsecured creditors must

be provided for in full before any junior class can receive or retain any property [under a

reorganization] plan.") (internal quotations omitted).

52.     Because Hayward cannot accept the Plan in the current Plan, under section 1129(b) the Debtor is required to prove that the Plan is fair and equitable to Hayward.  In order to satisfy the absolute priority rule and show that the Debtor's Plan is fair and equitable to Hayward, the Plan must either (i) pay Hayward's Allowed Judgment Claim in full; or (ii) if Hayward's Allowed Judgment Claim is not being paid in full (as is the case under the current Plan), not allow a holder of a junior claim or interest to receive or retain any property. As a result, the Plan clearly violates the absolute priority rule by allowing Chen to retain his equity interests in the Debtor.  *See Bryson Properties*, 961 F.2d at 503-05 (holding that the plan violated the absolute priority rule where a junior interest holder retained his interest in the debtor partnership but a senior unsecured creditor was not paid in full).

53.     Here, Debtor proposes to allow Chen to retain his equity interest in the Debtor despite Hayward and other unsecured creditors not being paid in full, supposedly based on the "new value" exception to the absolute priority rule.  The Supreme Court has held that "[a] debtor's prebankruptcy equity holders may not, over the objection of a senior class of impaired creditors, contribute new capital and receive ownership interests in the reorganized entity, when that opportunity is given exclusively to the old equity security holders under a plan adopted without consideration of alternatives."  *203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) (syllabus holding). While "[l]ower courts have struggled to define appropriate 'alternatives' in the context of the new value exception[,]" *In re Cleary Packaging, LLC*, 657 B.R. 780, 799 (Bankr. D. Md. 2023), "[a] market test would require an opportunity to offer competing plans or would be satisfied by a right to bid for the same interest sought by old equity[.]" *In re Platinum Corral, LLC,* 2022 WL 127431, *12 (Bankr. E.D.N.C. Jan. 13, 2022) (internal quotations and citation omitted).  Such a market test

27

(either through proposals of competing chapter 11 plans or by allowing others to bid for the right to receive equity in a reorganized debtor) "could increase the price paid for new equity in the reorganized debtor, thereby providing a larger return to the class of general unsecured creditors." *Id*. at 2022 WL 127431, *13.

54.     Generally, for an equity holder to retain its equity in a reorganized debtor when more senior creditors are not being paid in full, the equity holder is required to provide sufficient new value to the debtor's estate for distribution through the plan. *See Bryson Properties*, 961 F.2d at 503-04 (questioning continuation of new value exception after codification of absolute priority rule in the Bankruptcy Code, but that, such exception, if exists, requires infusion of new capital). Courts rely on a five-factor test to evaluate new value contributions: new value must be "(i) new, (ii) substantial, (iii) in money or money's worth, (iv) necessary for a successful reorganization, and (v) reasonably equivalent to the value of the stock being retained or received." *Cleary Packaging,* 657 B.R. at 800 (citing *Bonner Mall P'Ship v. U.S. Bancorp Mort. Co. (In re Bonner Mall P'ship)*, 2 F.3d 899, 908 (9th Cir. 1993), *cert. granted sub nom. U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 510 U.S. 1039, 114 S. Ct. 681, 126 L. Ed. 2d 648 (1994), *motion to vacate denied and case dismissed*, 513 U.S. 18, 115 S. Ct. 386, 130 L. Ed. 2d 233 (1994)); *id*. at 800, n. 49 (collecting cases applying this five-factor test, including *Platinum Corral, LLC*, 2022 WL 127431, at *12 (Bankr. E.D.N.C. Jan. 13, 2022)).  Significant emphasis is placed "on the proposed new value actually being 'new' and in the nature of a fresh, outside capital infusion that will help pay creditors or otherwise aid the reorganization." *Cleary Packaging*, 657 B.R. at 802.

55.     While the Debtor asserts that Chen is providing new value in order to retain (and enlarge) his equity, such value is merely illusory and clearly falls short of the five-factors. *See also*

28

*id.* at 800-04 (finding that plan where equity holder retained its equity interest over unsecured creditor that was not paid in full violated section 1129(b)(2)'s fair and equitable requirement). The supposed new value provided by Chen includes a waiver of the Chen Claim, a two-thirds reduction in salary until all Plan payments have been made and an agreement not to receive any distributions on account of his equity interest during the Plan payment period. *See* Plan, Art. III. Chen's "new value" is not new, substantial, necessary for a successful organization or reasonably equivalent to the value of the stock being retained.

56.     Altogether, the "new value" provided by Chen totals a mere $512,500 (Chen Claim in the amount of $212,500, reduced salary for three years of $300,000 in the aggregate, and waiver of illusory equity distributions during the Plan payment period). "Sweat equity," however, is not "new," "substantial," or "money or money's worth." *See Cleary Packaging, LLC*, 657 B.R. at 801-02 ("The first two forms of proposed new value (i.e., sweat equity and debt forgiveness) are not considered 'new,' 'substantial,' or 'money or money's worth' under the case law.") (citing *Northwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) (holding that a promise of future labor warrants no exception to the absolute priority rule)). Therefore, Chen's three-year reduced salary cannot be included in Chen's alleged new value—bringing the new value to a waiver of a $212,500 unsecured claim and waiver of potential equity distributions for three years. Chen is not actually contributing **any** money to the estate and the waiver of these small amounts is certainly not substantial considering the amount of unsecured claims asserted against the Debtor. Furthermore, Chen's alleged new value contribution is not factored into the Debtor's three-year projections and, even if it was, the contribution is minimal. The Debtor has not included any disclosures on the value of Chen's stock so it is impossible to evaluate the reasonable equivalent

29

of Chen's equity interests. Given that Chen's equity distributions are only limited for the first

three years after the Effective Date, it appears more likely than not that his retained equity interests

will be worth substantially more than his "new value" contribution. While the Debtor bears the

burden on the value of Chen's new equity in the Reorganized Debtor, the Debtor has not market

tested the value. Without such a market test, the value of the equity is impossible to determine.

### h. The Plan Proposes To Grant Impermissible Third-Party Releases Disguised Through Expansive Discharge And Injunction Language.

57.    The Debtor, through the Plan, attempts to sneak in expansive language to achieve

a *de-facto* non-consensual third-party release, which the Supreme Court prohibited in *Harrington*

*v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 219 L. Ed. 2d 721 (2024). In *Purdue*, the Supreme Court

held that a bankruptcy court may not extend to non-debtors the benefits of a Chapter 11 discharge

and injunction, which is reserved in the Bankruptcy Code for actual debtors. *See generally id*.

The Supreme Court's decision in *Purdue* changed the landscape of third-party releases and

injunctions, and its holding restraints the Debtor's attempt to have the Plan's discharge and

injunction extended to the Non-Debtor Defendants, Chen and Lu. In fact, after *Purdue*, a debtor

cannot purport to release direct causes of action held by a creditor against a third-party, unless

such creditor affirmatively consents to the release.

58.    Specifically, the Plan proposes the following injunction provision:

> Injunction. Confirmation of this Plan shall have the effect of, among
> other things, permanently enjoining all Persons who have held, hold,
> or may hold or have asserted, assert, or may assert Claims against or
> Equity Interests in the Debtor or the Reorganized Debtor, or their
> assets, with respect to any such Claim or Equity Interest from and
> after the Effective Date, from taking any of the following actions
> (other than actions to enforce any rights or obligations under the
> Plan): **(a) commencing, conducting, or continuing in any**
> **manner, directly or indirectly, any suit, action, or other**

30

**proceeding of any kind** (including without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) **against or affecting the Estate, the Debtor, the Reorganized Debtor, or any of their then existing or subsequently acquired property or assets, including but not limited to Estate Causes of action, such as alter ego claims and Judgment collection against the Non-Debtor Defendants on the basis of the Judgment's alter ego findings; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Estate, the Debtor, the Reorganized Debtor, or any of their then existing or subsequently acquired property or assets;** (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Estate, the Debtor, the Reorganized Debtor, or any of their then existing or subsequently acquired property or assets; (d) asserting any right of setoff or recoupment, directly or indirectly, against any obligation due or assets of the Estate, the Debtor, the Reorganized Debtor, or any of their then existing or subsequently acquired property or assets, except as contemplated or allowed by the Plan; (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (f) prosecuting or otherwise asserting any Claim or Equity Interest, including any Cause of Action, released pursuant to the Plan.

Plan, Sec. 9.5 (emphasis added). The Disclosure Statement makes clear that this Plan injunction is intended to effectively give a release to Non-Debtor Defendants, Chen and Lu:

On the Effective Date, the Debtor and the Estate will be discharged from all Claims and liens that existed before confirmation of the Plan, except for liens, payments, and distributions expressly provided for in the Plan. The discharge will be fully effective against all Creditors regardless of whether they have voted to accept or reject the Plan, and regardless of whether the Plan is confirmed by consent or through "cram-down" under the provisions of Section 1129(b) of the Bankruptcy Code. **Except as otherwise provided in the Plan, the confirmation of the Plan vests all of the property of the Estate in the Reorganized Debtor, including but not limited to all alter ego causes of action as well as Judgment collection against the Non-Debtor Defendants pursuant to the Judgment's alter ego findings and damages.**

31

> **Along with the discharge, confirmation of the Plan shall permanently enjoin all Persons** who have held, hold, or may hold or have asserted, assert, or may assert Claims against or Equity Interests in the Debtor or the Reorganized Debtor, or their assets, with respect to any such Claim or Equity Interest from and after the Effective Date, **from taking any certain actions (other than actions to enforce any rights or obligations under the Plan). Such actions include, but are not limited to, collections by Hayward or any other Holder of the Allowed Judgment Claim against the Non-Debtor Defendants based on the alter ego finding of the Judgment along with all other Estate Causes of action based on theories that third parties are alter egos of the Debtor.**

Disclosure Statement, Article VI ("Effect of Confirmation – Discharge") (emphasis added).

59.     The disguised non-consensual third-party release of the Non-Debtor Defendants, Chen and Lu through the Plan's expansive discharge and injunction provisions are clearly impermissible under *Purdue*.

60.     The Disclosure Statement makes clear what the Debtor is attempting to accomplish with the inclusion of this specific discharge and injunction language by stating that Hayward is enjoined from collecting against the Non-Debtor Defendants "based on the alter ego finding of the Judgment along with all other Estate Causes of action based on theories that third parties are alter egos the Debtor."  Disclosure Statement, Article VI ("Effect of Confirmation – Discharge"). But the Non-Debtor Defendants are liable to Howard both as alter egos as well as directly.  The Debtor cannot hinder Hayward's collection rights against the alter egos under the guise that alter ego claims belong to the estate.

61.     Furthermore, even though the discharge provision is limited to the Debtor, because the discharge operates with the re-vesting of all assets into the Reorganized Debtor, including "all alter ego causes of action as well as Judgment collection against the Non-Debtor Defendants

pursuant to the Judgment's alter ego findings and damages.[,]" the discharge also effectively acts

as a third-party release of the Non-Debtor Defendants.  *See* Disclosure Statement, Article VI

("Effect of Confirmation – Discharge"); Plan, Sec. 9.1, 9.4.  In addition to running afoul of the

Supreme Court's *Purdue* decision, this expansive discharge also violates section 524(e) of the

Bankruptcy Code, which expressly prohibits the discharge of a non-debtor, providing that

"discharge of a debt of the debtor does not affect the liability of any other entity on, or the property

of any other entity for, such debt."  11 U.S.C. § 524(e).[17]  While the Fourth Circuit has cautioned

that relieving a non-debtor's liability in derogation of § 524(e) may be done only "cautiously and

infrequently[,]" *Behrmann v. Nat'l Heritage Found., Inc.*, 663 F.3d 704, 712 (4th Cir. 2011), courts

in the Fourth Circuit consider six factors to identify those "infrequent" situations in which such

relief is permissible.  The six factors are:

> (1) There is an identity of interests between the debtor and the third
> party…; (2) The non-debtor has contributed substantial assets to the
> reorganization; (3) The injunction is essential to reorganization…;
> (4) The impacted class, or classes, has overwhelmingly voted to
> accept the plan; (5) The plan provides a mechanism to pay for all, or
> substantially all, of the class or classes affected by the injunction;
> and (6) The plan provides an opportunity for those claimants who
> choose not to settle to recover in full.

*Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 347 (4th Cir. 2014).  Here, the

Debtor could only attempt to argue that the first factor is present and, critically, the Fourth Circuit's

factors related to a section 524(e) discharge of a non-debtor may also have no weight after the

Supreme Court's *Purdue* decision.

---

[17] There is one exception to Section 524(e)'s prohibition on discharges of non-debtor, but that exception as laid out in Section 524(a)(3) is inapplicable.

62.    The Plan also exculpates each "Exculpated Party"—which includes Debtor "affiliates, subsidiaries, and shareholders, and each of their respective current and former members, managers, professionals, attorneys and financial advisors, agents, directors and officers, and other persons and entities"—from "Exculpated Claims." *See* Plan, Article 1 (Sections. 44, 45), Section 9.3. Exculpations that cover parties other than the Debtor and estate fiduciaries are not permitted. *See*, *e.g.*, *In re Wash. Mut., Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) ("The exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers."). Clearly, neither Lu, Chen, or the Non-Debtor Defendants can receive the benefit of exculpation.

### i.    The Plan Contains Numerous Other Objectionable Provisions.

63.    The Plan contains a slew of other objectionable provisions. First, the Administrative Claims Bar Date should extend through the Effective Date of the Plan and not only cover administrative claims incurred through the Confirmation Date. *See* Plan, Art. 1, Sec. 2. Any claims that accrue against the Debtor between the Confirmation Date and Plan Effective Date are administrative claims and, as such, should be included in the Administrative Claims Bar Date. Additionally, the Administrative Claims Bar Date does not apply to trade obligations, which may be paid in the ordinary course. *See* Disclosure Statement, Art. IV. In light of the relationships between the Debtor and NBCF, this carve-out for administrative trade obligations is suspect. Trade creditors should have to file an administrative priority claim motion so that any claims are transparent and cannot simply be paid without Court approval.

34

64.     Similarly, the Administrative Claims Bar Date does not apply to fees and expenses of Professionals incurred after the Confirmation Date.  *See* Plan, Art. 1, Sec. 2.  In light of the historical troubling practices of the Debtor paying fees for both the Debtor and Non-Debtor Defendants, and the Defendants paying none, this cannot be permitted.  This is particularly the case where such fees would reduce the Debtor's Net Income available to Hayward and, thus, could reduce Hayward's distribution to zero if the Debtor and its management chose to spend all of the Debtor's limited Net Income on alleged legal fees.

65.     Second, Section 6.2 of the Plan limits claim objections, such that they can only be brought by the Debtor (pre-Effective Date) or the Reorganized Debtor (post-Effective Date).  This provision is unacceptable because section 502 of the Bankruptcy Code authorizes parties in interest, including creditors, to object to claims.  *See* 11 U.S.C. § 502(a) ("A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, . . . , objects."); *see also In re Team Sys. Int'l, LLC*, 2024 Bankr. LEXIS 2573, *3-4 (Bankr. D. Del. Oct. 21, 2024) (discussing non-debtor's right to object to claims).  In addition to violating the Bankruptcy Code, this provision is unacceptable because the Debtor (and thus Reorganized Debtor) is conflicted.  It is critical in this case to preserve a creditor's (or other party in interest's) ability to object to other asserted claims.

66.     Third, there must be an independent plan administrator appointed to avoid post-confirmation impropriety, including regarding matters impacting upon Net Income and evaluation (and pursuit) of estate claims and causes of action.[18]  The Debtor has historically shown that it

---

[18] *See, e.g., Adams v. S. Produce Distribs.*, 657 B.R. 420, 429 (E.D.N.C. 2022) (committee involved post-confirmation).

cannot be left to its own devices, as evidenced by this Court finding enough evidence to require the appointment of the Trustee. Therefore, it is imperative that the best interests of the Debtor's estate and creditors be represented post-petition by an independent plan administrator overseeing, among other things, claim reconciliations, distributions, business operations impacting Net Income, and prosecution of causes of action.

67.     Fourth, Section 7.7 of the Plan allows the Reorganized Debtor to "setoff against any Claim (and the Distributions to be made pursuant to this Plan with respect to such Claim), Causes of Action of any nature whatsoever that the Reorganized Debtor or its Estate may have against the Holder of such Claim." Any setoff, particularly involving insiders, must remain subject to Court approval. The Plan should also withhold any distributions against any party whose claim is challenged or who is a defendant.

68.     Finally, the Plan does not speak to what happens if Net Income is zero. If the Reorganized Debtor has no net income over the next three years, such that there is no distribution to any of the Debtor's unsecured creditors, the Debtor should not be allowed to exclusively benefit from the terms of its one-sided Plan, retaining absolutely all of the value of the Debtor's estate for the Debtor and its insiders and affiliates.

## II.     The Disclosure Statement Should Not be Approved Because It Lacks Adequate Information As Required By Section 1125 of the Bankruptcy Code.

69.     The Disclosure Statement is so lacking in substance and replete with incomprehensible provisions that it fails to provide adequate information as required by section 1125(b) of the Bankruptcy Code. To comply with section 1125(b), a disclosure statement must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy] Code alternatives so that [creditors] can

intelligently accept or reject the Plan.'" *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991)

(quoting *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988)); *see also*

*In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990) ("Generally, a disclosure

statement must contain all pertinent information bearing on the success or failure of the proposals

in the plan of reorganization."). At a minimum, "[a] disclosure statement should provide the

average unsecured creditor 'what it is going to get, when it is going to get it, and what

contingencies there are to getting its distribution.'" *In re RADCO Props. Inc.*, 402 B.R. at 683

(quoting *Ferretti*, 128 B.R. at 19). The Debtor's Disclosure Statement fails to do so and, therefore,

may not be approved.

    70.    The Disclosure Statement, as proposed, contains numerous omissions and

misstatements that must be corrected.  While Hayward reserves the right to supplement this

Objection should the Debtor revise or supplement the Disclosure Statement, the Disclosure

Statement's most critical inadequacies are:

    a)  The Disclosure Statement fails to accurately reflect Hayward's claim based on the Judgment and ongoing infringement.  Hayward filed a timely proof of claim for this Judgment amount of $17,248,507.90 plus unliquidated damages based on pre- and ongoing post-petition patent infringement by the Debtor and its affiliates, a material portion of which may constitute an administrative expense under *Reading Co. v. Brown*, 391 U.S. 471 (1968), and its progeny.

    b)  The Disclosure Statement fails to provide any valuation of each non-debtor alter ego affiliate, including NBCF, and fails to describe their assets.  Under the applicable "identity theory" of alter ego liability, a finding of alter ego automatically expands the debtor's estate to include the property of its alter egos. *See, e.g.*, *Deckelbaum v. Cooter, Mangold, Tompert & Chapman, PLLC*, 275 B.R. 737, 742 (D. Md. 2001); *Smith v. Richels (In re Richels)*, 163 B.R. 760, 763 (Bankr. E.D. Va. 1994); *Searcy v. Knight (In re Am. Int'l Refinery)*, 402 B.R. 728, 748 (Bankr. W.D. La. 2008); *In re Star Mountain Res., Inc.*, 2020 WL 6821721, at *5-6 (Bankr. D. Ariz. Sept. 30, 2020); *Holcomb v. Pilot Freight Carriers, Inc.*, 120 B.R. 35, 41-42 (M.D.N.C. 1990).  The Disclosure Statement does not address the

impact of the alter ego finding, weather on the Debtor's estate, creditor distributions, or otherwise.

c) The Disclosure Statement fails to sufficiently describe the proposed treatment to Class 3 Allowed NBCF Claim (which treatment Hayward objects to as violative of the Bankruptcy Code on a Plan level). Specifically, the Disclosure Statement does not explain why NBCF (an insider) is receiving favorable offsetting treatment of its claim and how the Debtor derived the amounts that are proposed to be offset.

d) The Disclosure Statement fails to describe the Pro Rata Share; therefore, it is impossible for Hayward (and Class 5 unsecured creditors) to evaluate the Plan's proposed treatment of their claims because it is unable to determine how much of Net Income would actually be distributed under the Plan.

e) The Disclosure Statement fails to adequate describe potential Debtor claims and causes of action, including Chapter 5 causes of actions, that may be preserved under the Plan. The Disclosure Statement further fails to provide any details or mechanism pursuant to which such claims and causes of action will be pursued, and when, and fails to designate an independent third-party to pursue of all claims against insiders or affiliates. Adequate and complete disclosure of these potential claims and causes of action is critical to ensure that potential targets cannot raise a defense that such actions were not adequately preserved through reference in the Plan and Disclosure Statement.

f) The Disclosure Statement fails to explain why separate and superior treatment of Chen's Equity Interests and his claims is appropriate. Nor does the Disclosure Statement set forth what steps the Debtor took to market test and properly value Chen's emergence equity.

g) The Disclosure Statement fails to explain why separate classification and treatment of the Allowed NBCF Claim is appropriate, and why an alter ego and joint tortfeasor is entitled to a bankruptcy claim.

h) The Disclosure Statement fails to explain why separate classification and treatment of Class 2 professional claims is appropriate. Similar to the Debtor's lack of information of the Plan's preferential treatment of the NBCF Claim, the Disclosure Statement provides no information as to why Professionals are receiving preferential treatment, when such claims are merely general unsecured claims.

i) The Disclosure Statement states that Chen has the right to offset the Chen Claim against any potential cause of action brought against him by the Debtor or post-Effective Date representative of the Debtor. Such offset, however, is contrary to the Bankruptcy Code and such an offset of a contingent claim value in bankruptcy dollars against a 100%-dollar claim is to the direct detriment of the estate and its

creditors—and solely benefits Chen.  The Disclosure Statement fails to describe the Debtor's justification for allowing this proposed offsetting against potential valuable estate causes of action.

j)   The Disclosure Statement fails to provide any basis for the allowance and payment of Chen's alleged priority claim, particularly where no employment agreement has been provided or showing of services rendered.

k)   The Disclosure Statement fails to address any potential breach of fiduciary duty claims against Chen and Lu for their conduct as officers of the Debtor, including using the Debtor and its assets as their personal bank account.  Nor does the Plan address the alter ego claims that the Debtor's estate holds against Chen and Lu— which, if successfully prosecuted, could result in Chen's and Lu's direct liability for all claims asserted against the Debtor.  These potential breach of fiduciary duty and alter ego claims against Chen and Lu do not exist in a vacuum.  In fact, the record in this case and the District Court Action support such claims on the grounds that (i) the Lu Bank Statements demonstrate that Chen and Lu are alter egos of the Debtor, such that they are liable on all claims against the Debtor, including the Hayward Allowed Judgment Claim; (ii) Chen and Lu were officers of the Debtor and owed it fiduciary duties, which they breached [with their self-serving actions.]; and (iii) the Lu Bank Statements prove that Lu received fraudulent transfer from the Debtor. Again, all preserved estate claims must be referenced clearly in the Disclosure Statement to avoid potential defendants later attempting to argue that such claims were not adequately preserved.

l)   The Hypothetical Liquidation Analysis is flawed for multiple reasons described herein and does not provide creditors an accurate view of the Debtor's financials.  As discussed above in this Objection's argument that the Debtor fails the best interests of the creditors test under section 1129(a)(7) of the Bankruptcy Code, the Hypothetical Liquidation Analysis's issues include that it (i) values nearly every one of the Debtor's assets at 0% but every liability at 100% without explanation; (ii)  Provides for no recovery from, or contribution by, the alter ego Non-Debtor Defendants without explanation; (iii) fails to list specific claims, including chapter 5 causes of actions, against Debtor insiders without explanation; and (iv) artificially inflates chapter 7 liabilities by over $150,000 without explanation.

m)  The Plan proposes to assume all non-rejected executory contracts, including alleged oral leases for two cars—a 2018 Tesla Model 3 and a 2018 Lexus RX 450H.  Nowhere in the Plan or Disclosure Statement are these oral car leases mentioned or discussed.  The Disclosure Statement provides **zero** information about the leases, including the obligated parties and payment amounts.  Nor are these car leases included in the Debtor's projections.  If these cars are leased by the Debtor for the personal use of Chen and Lu, the assumption of these leases by the Debtor cannot stand, and the Plan needs to account for Chen's and Lu's use of these cars for the

last six years. The fact that these cars are being included as assumed leases makes clear that Chen intends to continue running the business the same as before—for the benefit of Lu and himself and no one else.

71.    At bottom, this Plan is just another attempt by Chen to enrich himself wrongfully at Hayward's expense. This Court should be deeply skeptical of the Plan and Chen, its proponent, because the District Court, who had the opportunity to evaluate Chen in person, has already found him to be a wrongdoer who makes false statements to cover his wrongs:

> *I believe Mr. Chen has engaged in a course of conduct that's wrong. I think this jury is going to find that it's wrong. They may find all of them are wrong, all the things that he did were wrong. I think it's pretty clear. I saw him testify up here and -- so I think he engaged in wrong conduct ... I think there's evidence that the difference -- Hayward lost money, and Blueworks and Company got money.*

(Trial Tr., Vol 6, 223:24-224:13)[19]

> *And if he lied about -- if that's where he's hidden all his money and he's lied about it, he'll probably have to stay in China the rest of his life to keep from being indicted.*

(*Id*. at 229:1-4)

> *It appears that the -- it appears that some of the earmarks of truth-telling are not present in what – in the – in Mr. Chen's testimony. But that's just from the Court.*

(Trial Tr., Vol 4, 204:24-205:3)

> *it's pretty clear to the Court that we're getting a bit of a two-step here and that, you know, if there's any -- if we've cheated and done something wrong, it's because we didn't understand the language and on and on and on and on. And I don't know whether the jury's picking up on that but I'm getting irritated.*

(*Id*., at 202:12-18).

72.    Indeed, when Hayward challenged Chen's wrongdoing, instead of correcting his conduct, Chen *doubled down* by directing the Debtor and its co-defendants to rely on "***flagrant***

---

[19]  True and accurate copies of the Trial Transcript are attached hereto as **Exhibit B**.

_**misrepresentations of material fact**_" in litigating the matter before the District Court.  Order (Doc.

#522), _Hayward Indus., Inc. v. Blueworks Corp._, Case No. 3:20-cv-00710-MOC-SCR (W.D.N.C.

Aug. 23, 2024) (quoting the Honorable Judge Cogburn) (emphasis added) (bold, ital., and

underlining intentional).

73.    Simply put, Chen has used the Debtor wrongfully to injury Hayward, both before

and during the underlying litigation.  This Court should not allow him to use the Plan to perpetuate

his wrongful conduct.

## CONCLUSION

74.    Based on the foregoing, Hayward requests that the Court deny approval of the

Disclosure Statement with prejudice and grant such other and further relief as the Court deems just

and proper, including dismissing or converting the Debtor's case to chapter 7.

Dated:  October 30, 2024
Charlotte, North Carolina

**WOMBLE BOND DICKINSON (US) LLP**

By:  _/s/  B. Chad Ewing_____
    B. Chad Ewing
    Russ Ferguson
    301 S. College Street, Sute 3500
    Charlotte, NC 28202
    Telephone: (704) 331-4900
    Facsimile: (704) 331-4955
    Email: chad.ewing@wbd-us.com
        russ.ferguson@wbd-us.com

    -and-

    Wojciech F. Jung (Admitted _pro hac vice_)
    Edward L. Schnitzer (Admitted _pro hac vice_)
    David M. Banker (Admitted _pro hac vice_)
    950 Third Avenue, Suite 2400
    New York, NY 10022
    Telephone: (332) 258-8400
    Facsimile: (332) 258-8949

Email: wojciech.jung@wbd-us.com
edward.schnitzer@wbd-us.com
david.banker@wbd-us.com

-and-

**MCCARTER & ENGLISH, LLP**
Erik Paul Belt
James Donoian
Anne E. Shannon
Alexander L. Ried
Siobhán M. Tolan
265 Franklin Street
 Boston, MA 02110
Telephone: (617) 449-6500
Facsimile:  (617) 607 9200
Email: ebelt@mccarter.com
jdonoian@mccarter.com
ashannon@mccarter.com
aried@mccarter.com
stolan@mccarter.com

*Attorney for Hayward Industries, Inc.*