## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISON

IN RE:

BLUEWORKS CORPORATION,

    Debtor.[1]

Chapter 11

Case No. 24-30494

## NOTICE OF FILING OF DISTRICT COURT PLEADINGS

    PLEASE TAKE NOTICE that the debtor and debtor-in-possession in the above-captioned case has filed the attached in *Hayward Industries, Inc., v. Blueworks Corporation, Blueworks Innovation Corporation, Ningbo C.F. Electronic Tech Co. Ltd, Ningbo Yishang Import and Export Co., Ltd.*, District Court for the Western District of North Carolina, Civil Action No. 3:20-CV-710-MOC-SCR:

A. Blueworks Corporation's *Emergency* Motion for Clarification of Contempt Order [DE 588] Entered March 19, 2025 (the "Clarification Motion")

B. Blueworks Corporation's Memorandum of Law in Support of Its *Emergency* Motion for Clarification of Contempt Order [DE 588] Entered March 19, 2025 (the "Memorandum in Support of the Clarification Motion")

C. Blueworks Corporation's Motion for Expedited Briefing Schedule on *Emergency* Motion for Clarification of Contempt Order [DE 588] Entered March 19, 2025 (the "Expedited Briefing Motion")

D. Memorandum of Law in Support of Blueworks Corporation's Motion for Expedited Briefing Schedule on *Emergency* Motion for Clarification of Contempt Order [DE 588] Entered March 19, 2025 (the "Memorandum in Support of Expedited Briefing Motion")

*[Remainder of Page Intentionally Left Blank]*

---

[1] Debtor is the following entity (the last four digits of its taxpayer identification number follow in parentheses): Blueworks Corporation (3957). The Debtor's address is 8408 Channel Way, Waxhaw, North Carolina 28173.

Dated: April 23, 2025
     Charlotte, North Carolina

RAYBURN COOPER & DURHAM, P.A.

By: /s/ Matthew L. Tomsic

     Matthew L. Tomsic
     N.C. State Bar No. 52431
     Natalie E. Kutcher
     N.C. State Bar No. 54888
     Ashley B. Oldfield
     N.C. State Bar No. 56552
     Suite 1200, The Carillon
     227 West Trade Street
     Charlotte, NC 28202
     (704) 334-0891

*Counsel to the Debtor and Debtor in Possession*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this day the **NOTICE OF FILING OF DISTRICT COURT PLEADINGS** was served on those parties registered with the United States Bankruptcy Court, Western District of North Carolina CM/ECF filing system.

This the 23rd day of April, 2025.

RAYBURN COOPER & DURHAM, P.A.

By:    <u>/s/ Matthew L. Tomsic</u>
       Matthew L. Tomsic
       N.C. State Bar No. 52431
       Suite 1200, The Carillon
       227 West Trade Street
       Charlotte, NC 28202
       (704) 334-0891

       *Counsel to the Debtor*

**<u>Exhibit A</u>**

**Clarification Motion**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| HAYWARD INDUSTRIES, INC., <br><br> Plaintiff <br><br> v. <br><br> BLUEWORKS CORPORATION, BLUEWORKS INNOVATION CORPORATION, NINGBO C.F. ELECTRONIC TECH CO., LTD; NINGBO YISHANG IMPORT AND EXPORT CO., LTD. <br><br> Defendants. | Civil Action No. 3:20-CV-710 -MOC-SCR |

## BLUEWORKS CORPORATION'S *EMERGENCY* MOTION FOR CLARIFICATION OF CONTEMPT ORDER [DE 588] ENTERED MARCH 19, 2025

Blueworks Corporation (the "Debtor") hereby requests clarification as to the scope of the Contempt Order and its impact solely to the Debtor, specifically that the Contempt Order does not bar the Debtor from importing and selling its products in the United States. The Limited Powers Chapter 11 Trustee supports the relief requested in this Motion.

In support of this Motion, the Debtor states as follows:

1.      On March 19, 2025, this Court entered the Contempt Order, holding the Ningbo Parties in contempt and sanctioning them with a domestic import and sales ban until the Judgment [DE 448] is satisfied. The pleadings and arguments by Hayward Industries, Inc. ("Hayward"), as well as the commentary by this Court made clear that the Debtor was neither a party to the contempt proceeding nor a target for contempt and sanctions. Hayward confirmed as much in email discussions relating to the proposed contempt order, stating the Debtor "is not the subject of the contempt order."

2.    However, following the entry of the Contempt Order, Hayward flipped its position, serving the Contempt Order on Amazon.com Services, LLC ("Amazon"), and causing Amazon to de-list the Debtor's products, pausing the Debtor's operations as a going concern and forcing the Debtor into a liquidation based on Hayward's unilateral reading of the Contempt Order post-entry.

3.    Due to the extraordinary, case- and enterprise-ending impact to the Debtor's operations, the Debtor first sought emergency temporary relief before the Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court"), which denied the relief sought in a bench hearing held April 9, 2025, and by formal order entered April 15, 2025, prompting the Debtor to request clarification from this Court as to the reach and breadth of the Contempt Order. In addition to its denial, the Bankruptcy Court also expressed misgivings as to the Hayward's actions following entry of the Contempt Order, citing similar objections made by the Bankruptcy Administrator for the Bankruptcy Court for the Western District of North Carolina during the emergency hearing.

4.    Following the emergency hearing in Bankruptcy Court, the Debtor conferred with its professionals and the Limited Powers Chapter 11 Trustee, who supports the relief requested in this Motion, to determine any next steps that should be taken. As the parties conferred, they also awaited entry of the order commemorating the Bankruptcy Court's bench ruling as well as the transcription of the emergency hearing. The Debtor ultimately decided to seek clarification by this Court to determine whether the Debtor may continue to operate to address and pay the judgment as proposed in its current plan of reorganization, or whether this Court intended the result that Hayward has now caused—the forced shutdown of the Debtor's business and transition of its Chapter 11 Bankruptcy Case from a reorganization to a liquidation.

5.     The Debtor believes several reasons exist to rebut Hayward's argument that the Contempt Order imposes a sales and import ban against the Debtor, which are described more fully in the contemporaneously filed memorandum in support. As the Debtor argued to the Bankruptcy Court and as the Bankruptcy Court noted in its bench ruling, the Debtor did not receive its day in court.

6.     The Debtor now seeks its day in this Court and seeks its due process rights, which Hayward has disregarded and trampled in its efforts to end the Debtor's business through a collateral attack in contradiction of Hayward's own position before entry of the Contempt Order.

7.     For the reasons stated above and in the memorandum in support, filed contemporaneously herewith, the Debtor requests the Court clarify that the Contempt Order does not ban the Debtor from importing and selling products in the United States.

8.     The Debtor conferred with counsel for Hayward by email on April 21, 2025, and Hayward responded by email on April 23, 2025, stating that it opposed the relief sought.

This the 23rd day of April, 2025.


RAYBURN COOPER & DURHAM, P.A.

By:     */s/ Matthew L. Tomsic*
Matthew L. Tomsic
N.C. State Bar No. 52431
Natalie E. Kutcher
N.C. State Bar No. 54888
Ashley B. Oldfield
N.C. State Bar No. 56552
Suite 1200, The Carillon
227 West Trade Street
Charlotte, NC 28202
(704) 334-0891

*Counsel to the Debtor*

{00402158 v 1 }3

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this day the **BLUEWORKS CORPORATION'S**
*EMERGENCY* **MOTION FOR CLARIFICATION OF CONTEMPT ORDER [DE 588]**
**ENTERED MARCH 19, 2025** was electronically filed via the District Court's CM/ECF system,
which will send notification of such filing to all counsel of record.

This the 23rd day of April, 2025.

By:     */s/ Matthew L. Tomsic*
Matthew L. Tomsic

**<u>Exhibit B</u>**

**Memorandum in Support of the Clarification Motion**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| HAYWARD INDUSTRIES, INC., <br><br> Plaintiff <br><br> v. <br><br> BLUEWORKS CORPORATION, BLUEWORKS INNOVATION CORPORATION, NINGBO C.F. ELECTRONIC TECH CO., LTD; NINGBO YISHANG IMPORT AND EXPORT CO., LTD. <br><br><br> Defendants. | Civil Action No. 3:20-CV-710 -MOC-SCR |

<u>**BLUEWORKS CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS
*EMERGENCY* MOTION FOR CLARIFICATION OF CONTEMPT ORDER
[DE 588] ENTERED MARCH 19, 2025**</u>

Blueworks Corporation (the "Debtor"), debtor and debtor in possession in the above-captioned case, by and through undersigned counsel, pursuant to LCvR 7.1(d), hereby files the following Memorandum of Law in Support of its *Emergency* Motion for Clarification of Contempt Order [DE 588] Entered March 19, 2025. The Limited Powers Chapter 11 Trustee (the "Trustee") supports the relief sought by the Debtor.

<u>**PRELIMINARY STATEMENT**</u>

On March 3, 2025, the District Court for the Western District of North Carolina (the "District Court") held a show cause and contempt hearing (the "Show Cause Hearing"), resulting in the Ningbo Parties being held in contempt and sanctioned. Counsel for the Debtor, the Trustee, and the Bankruptcy Administrator for the Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Administrator") understood based on the pleadings filed by Hayward

Industries, Inc. ("Hayward"), and the arguments at the Show Cause Hearing that—as Hayward would later confirm in writing—the Debtor "is not the subject of the contempt order" though some collateral impact may affect the Debtor based on the sanctions levied by the District Court against the Ningbo Parties—namely, that Debtor may not be able to continue supplying product from the Ningbo Parties.

Following entry of the Contempt Order, Hayward flipped its position, serving the Contempt Order on Amazon.com Services, LLC ("Amazon"), and causing the de-listing of the Debtor's products. With the Contempt Order in hand and the Debtor's sales frozen, Hayward then took the position that the Contempt Order is "a *de facto* ban to the Debtor from selling products in the United States" during proceedings brought by the Debtor to enforce the automatic stay in the Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court"). *See* Hayward Industries, Inc.'s Response in Opposition to Debtor's Interim Motion to Enforce Automatic Stay [Docket No. 286][1] (the "Hayward Opposition"), p. 10. Hayward has gone so far as to suggest that the Contempt Order prevents the Debtor from selling *any* products, not just Ningbo products "from candy bars to cell phone accessories to pool products and anything else[.]" Hayward Opposition, p. 9.

Hayward's dueling positions are irreconcilable. Hayward neither sought clarification before the District Court as to the reach and breadth of the Contempt Order vis a vis the Debtor nor did Hayward seek confirmation by the Bankruptcy Court that the automatic stay did not apply to its use of the Contempt Order as a vehicle to destroy the Debtor's business as a going concern and to force the Debtor into liquidation.

---

[1] Citations identified with "Docket No." will refer to the docket of *In re Blueworks Corporation*, Bankruptcy Court for the Western District of North Carolina, Case No. 24-30494. Citations to the District Court docket (as that term is defined herein) shall be identified by "DE".

The Debtor believes that the District Court carefully considered the relief sought by Hayward, deliberately choosing the language used in the Contempt Order to reflect that the Debtor may be impacted by sanctions against the Ningbo Parties while maintaining the Debtor itself was not outright sanctioned along with the Ningbo Parties. In other words, the Contempt Order's language, especially when considered with Hayward's pleadings and arguments, support the notion that the Debtor is *not* the subject of the Contempt Order.

In light of Hayward's shifted position, the Debtor now seeks clarification of the Contempt Order by the District Court. In short, the Debtor respectfully requests that the Court clarify whether the Contempt Order is in fact a de facto import and sales ban—effectively a sanction—against the Debtor, which has the practical effect of terminating the Debtor's Chapter 11 Case.

As the Bankruptcy Court suggested in denying emergency temporary relief sought by the Debtor, the District Court is in the best position to undertake such an analysis and provide certainty to the parties as to whether the Debtor's bankruptcy case and business may continue, allowing it to address the Judgment [DE 448] through its efforts to confirm a plan of reorganization.

## **BACKGROUND**

### A.    **Bankruptcy Court Proceedings**

On June 11, 2024 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor is operating its business and managing its property as a debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code. No examiner or statutory committee has yet been appointed in this Chapter 11 Case. Michael Bowers has been appointed Limited Powers Chapter 11 Trustee. [Docket No. 98].

As described in the Affidavit of Michael Bowers in Support of First Day Relief (the "Bowers Affidavit") [Docket No. 5], the Debtor sells swimming pool equipment, including chlorinators, chlorinator cell replacements, saltwater system parts, pool lights, pool alarms, pool timers, and pool pumps, directly to swimming pool owners. Bowers Aff., ¶ 7. The Debtor sells its products exclusively through listings on Amazon.com, which then pays the Debtor for the sales several times throughout each month by depositing the revenues in the Debtor's bank account. Bowers Aff., ¶ 33.

On March 31, 2025, the Debtor filed its Second Amended Plan of Reorganization of Blueworks Corporation [Docket No. 277] (the "Plan"). The Plan seeks to balance the Debtor's ability to operate, while also addressing the Judgment and providing a payment stream to Hayward in light of the Judgment (pending decisions and outcomes related to the Debtor's appellate rights). The Plan provides that the Debtor will pay its Net Income to Hayward for five years, Plan, § 1.1.58, 3.3, and assigns to Hayward valuable causes of action under the Bankruptcy Code, appropriately brought by the Debtor and Trustee in the first instance, Plan, § 6.5. In other words, the Debtor and Trustee are foregoing their rights in such causes of action to allow Hayward to pursue them for Hayward's own benefit. The Plan also uses Bankruptcy Code provisions to block Ningbo C.F. Electronic Tech Co. Ltd.'s ("NBCF") prepetition claim such that its claim will not be paid pursuant to the Plan. Plan, § 6.7.

The Plan provides certain guardrails and oversight by the Trustee following confirmation, including reporting requirements by the Reorganized Debtor to the Trustee, Plan, § 8.7; inclusion of the Trustee as a signatory to its bank account, which must remain at United Bank in Gastonia, Plan, § 8.8; and certain pre-authorization requirements by the Trustee before the Debtor can take certain actions, Plan, § 8.9.

Finally, the Plan includes default provisions, providing that any default in the Plan after notice and failure to cure will allow claims holders to pursue their state law and bankruptcy law remedies. Plan, § 12.24.

**B.     District Court Proceedings and Contempt Proceedings**

Prior to the Petition Date, a judgment in the amount of $16,021,736.30 (the "Judgment") was entered against the Debtor and in favor of Hayward this case (the "District Court Lawsuit"). Bowers Aff., ¶¶ 11-15. On June 7, 2024, also prior to the Petition Date, Hayward filed a Motion to Show Cause against all Defendants. [DE 468]. Following the Petition Date, Hayward acknowledged that its Motion to Show Cause applied "solely against Defendant Ningbo C.F." "[b]ecause Defendant Blueworks Corporation has filed bankruptcy and the automatic stay applies to that entity." [DE 535-1]. In its Second Supplement to its Motion to Show Cause, Hayward further requested that Mr. Richard Chen be required to attend the hearing personally based on activities as between Defendant Ningbo C.F. and Mr. Chen. [DE 550-1]. Again, Hayward stated in its Second Supplement:

> Indeed, the show cause hearing and a contempt finding thereon, rely only upon evidence concerning Mr. Chen's relationship with Ningbo C.F., ***not Blueworks***.

*Id*. at p. 9, n.9 (emphasis added). Finally, on January 9, 2025, Hayward filed an Emergency Motion for the Court to Expedite the Scheduling of the Show-Cause/Contempt Hearing as against Mr. Chen and NBCF only. [DE 558]. The Cout granted Hayward's Motion for Order to Show Cause [DE 468] and its Motion to Expedite [DE 558] on January 26, 2025. [DE 568].

On March 3, 2025, a show cause hearing was held, and  following the show cause hearing, the District Court entered an Order dated March 19, 2025, barring the "Ningbo Parties" from importing or selling any product in the United States [DE 588] (the "Contempt Order"). A true and accurate copy of the Contempt Order is attached hereto as **<u>Exhibit 1</u>.**

The Contempt Order's ruling states that:

1. [. . .] [T]he Ningbo Parties— including all agents, employees, officers, directors, shareholders, affiliates, subsidiaries, assignees, and anyone acting for or through them—shall be barred from importing or selling any product in the United States, including, but not limited to, salt cells, salt water chlorination systems, pumps, heaters, any other equipment for swimming pools, and any components thereof, including the products shown in Appendix A—including, but not limited to, any and all Energy Star certified pumps and any and all pumps bearing Intertek Certification Control No. 4007830. The Ningbo Parties shall not use any shell companies, agents, subsidiaries, affiliates, successors in interest, assignees, corporate restructuring, rebranding, or third parties to evade this import and sales ban.

2. For the avoidance of any doubt, unless and until the Ningbo Parties pay the judgment, all Ningbo Parties shall be barred from inducing, facilitating, contributing to, or otherwise causing, another natural or juristic person(s) (entity) from importing or selling any of the aforementioned products in or into the United States. As a non-limiting example, the Ningbo Parties shall not use any means to evade the import ban, including, for example, by selling products to a middleman, distributor, import/export agent, or any other person(s) or entit(ies) outside of the United States who will then import or sell those products in or into the United States.

[Contempt Order, pp. 16-17].

The Contempt Order defines the Ningbo Parties as: (i) NBCF; (ii) Ningbo Yishang Import and Export Co., Ltd.; (iii) Blueworks Innovation Corporation; and (iv) Zefeng "Richard" Chen.

## C.    Bankruptcy Proceedings following entry of Contempt Order

On or about March 29, 2025, the Debtor was informed that its listings on Amazon.com, Inc. ("Amazon") had been removed. The Debtor contacted counsel for Amazon on March 29, 2025, to inquire about the de-listing and contacted counsel for Hayward on March 31, 2025, related to the same. Hayward responded later that same day, asserting that the Contempt Order barred the Debtor's sale of its own inventory.

In other words, and as will be more fully discussed below, Hayward took the position that the Contempt Order placed a sales ban on the Debtor despite the fact that the Debtor was not before the District Court and not identified in the defined term "Ningbo Parties". Also, Hayward itself asserted the Debtor "was not the subject of the contempt order".

Through communications with counsel for Amazon from March 29 through April 3, Debtor's counsel was informed that Amazon had been served a copy of the Contempt Order by Hayward and subsequently removed the Debtor's listings. Debtor's counsel has attempted to obtain information from Hayward's counsel, including communications between the parties relating to the Contempt Order but had not been successful. Copies of the email communications between the Debtor and Hayward are attached hereto as **Exhibit 2**.

The items listed by the Debtor on Amazon are products owned and stored by the Debtor, which are invaluable to the Debtor's estate and its ability to operate as a going concern and consequently reorganize to address the Judgment. Without the ability to sell its inventory, the Debtor's chances for a successful reorganization are extinguished. As such, unless and until the Debtor's listings are reinstated on Amazon, the Debtor has been thrust into liquidation mode without advance notice to any party to the Debtor's Chapter 11 Case and without any party seeking such relief before the Bankruptcy Court or the District Court.

In response, the Debtor first sought relief from the Bankruptcy Court for the Western District of North Carolina by filing the Debtor's Emergency Motion to Enforce the Automatic Stay [Docket No. 283], which sought temporary relief to have the Debtor's products re-listed on Amazon while the parties scheduled and litigated final relief. The Debtor believed the Bankruptcy Court was the appropriate forum for the relief requested because Hayward's actions forced the Debtor into liquidation, which effectively resolves the Debtor's Chapter 11 Case. Such an action

converting the case from a reorganization to a liquidation should have been brought by motion to the Bankruptcy Court in the first instance. Importantly, until such relief is granted by the Bankruptcy Court, the Debtor could continue selling[2] its inventory for the benefit of and payment of the Debtor's claims.

On April 7, 2025, the Bankruptcy Court entered its Order Shortening Notice [Docket No. 285], setting expedited briefing deadlines and scheduling an emergency hearing on April 9, 2025 (the "Emergency Hearing"). Hayward filed the Hayward Industries, Inc.'s Response in Opposition to Debtor's Interim Motion to Enforce the Automatic Stay [Docket No. 286] (the "Hayward Response").

At the Emergency Hearing, the Debtor and Trustee argued that the Contempt Order did not apply to the Debtor, while Hayward argued that the Contempt Order did apply.[3] Ultimately, the Bankruptcy Court denied the Debtor's request for interim relief in a bench ruling, which was later memorialized in its Order Denying Debtor's Emergency Interim Motion to Enforce the Automatic Stay [Docket No. 309] (the "Bankruptcy Court Order"), stating:

- The Bankruptcy Court's "inclination is to want to grant the motion" Emergency Hearing Tr., 77:25;

- "[I]t seems clear that the debtor did not, largely based on the pleadings that were filed related to that motion to show cause, believe or understand that it was the subject of the contempt hearing [in] front of Judge Cogburn, nor that the resulting order would instruct Amazon to cease doing business with it", Emergency Hearing Tr., 78:11-16; see also, ¶ 3 ("Upon review of the transcript from the March 3 hearing, the court agrees with the

---

[2] As argued by the Debtor in the Bankruptcy Court, the appropriate approach by Hayward to determine the applicability of the Contempt Order to the Debtor would have been for Hayward to file a motion to convert or dismiss in the Bankruptcy Court. Then Hayward, the Debtor and other parties could litigate, fully and fairly, the practical effect of the Contempt Order. Alternatively, faced with the Debtor's disagreement whether the Contempt Order applied, Hayward could have sought clarification before this Court as to the reach and breadth of the Contempt Order, especially considering Hayward's own statements in the drafting of the proposed order.

[3] The Bankruptcy Administrator expressed concern about Hayward's unilateral action. See Emergency Hearing Tr., 30:11-31:17.

Debtor's characterization of the proceedings. Notably, there was no discussion about the automatic stay or the police powers exception to the automatic stay nor any mention of the Debtor being barred from selling its product on Amazon's website.");

- "It's also suspect to me that in the email exchange about the proposed order stemming from that hearing, that Hayward affirmatively represented that the proposed order is for the Ningbo Parties. 'Blueworks is not the subject of the contempt order,' and I quote." Emergency Hearing Tr., 79:1-5; <u>see</u> <u>also</u> Bankruptcy Court Order, ¶ ;4 and

- "So putting all of that together, it seems fair to say to me, at least, that the debtor was probably sandbagged by Hayward in this instance. And like Ms. Abel, that doesn't sit well with this Court. And also, as she added, it doesn't appear to me that the debtor got its day in court for purposes of that limited proceeding related to the motion to show cause." Emergency Hearing Tr., 79:6-11.

A true and accurate copy of the Emergency Hearing Transcript is attached hereto as **Exhibit 3**, while a true and accurate copy of the Bankruptcy Court Order is attached hereto as **Exhibit 4**.

The Bankruptcy Court went on to rule that the relief sought by the Debtor is inappropriate, whether pursuant to a consent order lifting the automatic stay entered into in the Bankruptcy Court or the terms of the Contempt Order itself as well as its reference to automatic stay and the District Court's police powers, among other reasons. Emergency Hearing Tr., 79:12-23; Bankruptcy Court Order, ¶ 5.

On April 15, 2025, the Bankruptcy Court entered the Bankruptcy Court Order. In the Bankruptcy Court Order, the Bankruptcy Court also noted:

- "At its core, the Motion seeks to have this court interpret the Contempt Order; however, the District Court is best positioned to do that." Bankruptcy Court Order, ¶ 5;

- "In addition, it would be inappropriate for this court to direct Amazon–a third-party to this proceeding–to resume selling the Debtor's product contrary to the terms of the Contempt Order, as evidenced by the inclusion of the Debtor's product on the chart attached as Appendix A to the Contempt Order." Bankruptcy Court Order, ¶ 6; and

- "Finally, whether as an affiliate or as an entity being induced to import or sell the products at issue—as described in paragraphs 1 and 2 of the decretal portion of the

Contempt Order—it appears to the Court that the Contempt Order applies to the Debtor." Bankruptcy Court Order, ¶ 7.

The Bankruptcy Court Order concluded: "To the extent the Debtor files a motion seeking clarification of the Contempt Order, this court respectfully urges the District Court to consider such motion as soon as reasonably possible in light of the apparent impact the Contempt Order has on the Debtor's ability to continue doing business."

Following entry of the Bankruptcy Court Order and receipt of the Emergency Hearing Transcript, the Debtor and Trustee conferred, analyzing the appropriate steps, if any, to take in response to the Bankruptcy Court's bench ruling and Bankruptcy Court Order. Ultimately, the Debtor decided to file these pleadings before the District Court in order to receive the District Court's guidance as to the Contempt Order.

In their discussions and preparation of the Motion and Brief, the Debtor sought to balance the emergency footing on which it found itself with the time necessary to draft and brief the Motion given the potentially case- and enterprise-ending nature of any ruling on its motion, forcing the Debtor into liquidation, ending its operations as a going concern, and foreclosing the Debtor's ability to pay any amounts toward the Judgment as proposed by its Plan.

## **<u>ARGUMENT</u>**

The reach and breadth of the Contempt Order is clear—it does not bar the Debtor from selling its own products manufactured and imported by an entity not subject to the Contempt Order.[4] The District Court was intentional in the use of its language in the Contempt Order to make that reach and breadth clear.

---

[4] The Debtor understands the Contempt Order bars NBCF from selling and importing inventory, whether to the Debtor or any other party, and also understands the Contempt Order bars the Debtor from paying NBCF as the current Debtor-owned inventory is sold through Amazon. The Debtor

However, despite Hayward's assertion that the Debtor was not the subject of the Contempt Order, Hayward now presses an argument that the Contempt Order is "a *de facto* ban to the Debtor from selling products in the United States[.]" Hayward Response, p. 10. Hayward accomplished its preferred reading of the Contempt Order—without any notice to the Debtor, Trustee, or other parties—by serving the Contempt Order on Amazon, resulting in the de-listing of the Debtor's products. Therefore, the Debtor respectfully asks this District Court for clarification that the Contempt Order does not bar the Debtor from importing and selling its products.

In other words, was it the District Court's intention that the Contempt Order be a blanket sales and importation ban against the Debtor, ending the Debtor's operations as a going concern and forcing the Debtor into a liquidation, despite the Debtor having no due process or right to be heard on the matter? The Debtor believes that result was not the District Court's intention.

The Debtor's sale of the Debtor's products does not violate the Contempt Order as the property of the estate is not owned by the Ningbo Parties and is not being imported or sold by the Ningbo Parties. Instead, the conduct put at issue by Hayward is the sale of the Debtor's products by the Debtor. Importantly, no proceeds from the sale of the Debtor's property will flow to the Ningbo Parties due to the Contempt Order. This fact will be verifiable, too: All proceeds from the sale of the Debtor's inventory on Amazon are catalogued in the Debtor's monthly reports filed in the Bankruptcy Court, which would show any transfers from the Debtor to a Ningbo Party. Furthermore, any concern relating to the Contempt Order's application to Mr. Chen is ameliorated by the fact that the Debtor's financial operations are currently controlled by the Limited Powers Trustee, ***not*** Mr. Chen. So long as the Debtor does not import any further inventory from the

---

is in the midst of negotiating with a new supplier so that it may continue selling products given the Contempt Order's import and sales ban directed at NBCF.

Ningbo Parties, and the proceeds from Debtor's sale of its current inventory do not flow back to the Ningbo Parties, the Contempt Order does not bar the Debtor from selling its own products.

The Contempt Order specifically notes that the order "focuses on the Ningbo Parties"; "any impact on Blueworks Corporation is pursuant to this Court's exercise of its police powers to enforce its orders." [Contempt Order, fn. 1]; and "To the extent that this sales and import ban impacts Blueworks Corporation, which is currently in Chapter 11 bankruptcy, the ban does not violate the automatic stay of 11 U.S.C. § 362(a) because the ban is issued pursuant to this Court's police power to enforce its orders, including the TRO."[5] While the impact on the Debtor was considered, no direct enforcement against the Debtor was intended. And an explanation exists for such a carve-out—one could imagine an argument made by a debtor that the inability of a debtor to purchase products from its sole supplier violates the automatic stay. In other words, the footnote (and subsequent automatic stay reference in the Contempt Order) must be read in the context of the Contempt Order, not in isolation to support a ban of the Debtor's sale of its own products.

Also supporting the argument that the Contempt Order is not to be enforced against the Debtor prospectively is the fact that the Debtor was not before the District Court in the contempt proceedings. The Contempt Order only establishes jurisdiction over the Ningbo Parties and only references violations of the temporary restraining order by the Ningbo Parties.

While Hayward filed Hayward Industries, Inc.'s Motion to Show Cause [DE 468] against the Debtor and all its codefendants before the filing of the Chapter 11 Case, Hayward shifted its focus from the Debtor in later pleadings, ending its pursuit of the Debtor for contempt and

---

[5] The Debtor disputed the propriety of such an inclusion in the proposed order shared by Hayward and notified Hayward of the same given that the automatic stay was not litigated in the contempt proceedings, and the Debtor was not a party to the contempt proceedings. The Debtor did not press this issue following Hayward's confirmation that the Debtor was not the subject of the Contempt Order.

sanctions and even referencing that the automatic stay applied. *See* Hayward Industries, Inc.'s

Motion for Leave to File Supplement to Motion to Show Cause [DE 535] ("Because Defendant

Blueworks Corporation has filed bankruptcy and the automatic stay applies to that entity, this

Supplement is filed solely against Defendant Ningbo C.F., which has not filed for bankruptcy.");

Hayward Industries, Inc.'s Motion for Leave to File Second Supplement to Motion to Show Cause

[DE 550] ("Because there is a bankruptcy stay, and, because the wrongdoing in this Section B(1)

arises from Mr. Chen's relationship with *Blueworks*, the information in this Section B(1) is for

informational purposes only. Indeed, the show cause hearing and a contempt finding thereon, rely

only upon evidence concerning Mr. Chen's relationship with Ningbo C.F., not Blueworks.");

Hayward Industries, Inc.'s Emergency Motion for the Court to Expedite the Scheduling of the

Show-Cause/Contempt Hearing [DE 558] (seeking "the show-cause hearing as soon as the Court

can schedule one so that Mr. Chen and Ningbo CF can answer Hayward's allegations that they

have violated, and are continuing to violate, the TRO by diverting assets out of this country").

    In *Remington Rand Corp.-Delaware v. Bus. Sys.*, the Third Circuit reversed a finding of

civil contempt against an individual, J.A.M. Banning ("Banning"), because Banning did not

receive notice that he was subject to the court's contempt power. 830 F.2d 1256, 1258 (3d Cir.

1987). Banning had previously been appointed by a Dutch court to act as a trustee for a company

seeking the Dutch equivalent of a Chapter 11 reorganization.   *Id.* at 1257. A show cause order

was subsequently issued by the United States District Court, and following the show cause hearing,

which Banning did not attend, Banning was held to be in civil contempt of the show cause order.

*Id.*  The Third Circuit reversed this holding on the basis of lack of due process, finding that Banning

lacked proper notice that he was personally subject to contempt proceedings.  *Id.* at 1259. Though

discussion during the contempt hearing mentioned Banning being held in contempt, the Third

Circuit found "the discussion . . . could have provided Banning with some inkling that he might be held in contempt. But an inkling is not enough to subject one to potential incarceration or monetary penalties." *Id.* at 1258. The *Remington* Court further held that whether Banning was represented by counsel at the contempt hearing did not cure the due process issue: "There is a fundamental distinction between Banning's being represented because he had an indirect administrative interest in the contempt proceedings, and his being represented because he was named as an alleged contemnor." *Id.* See also, *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106 (2d Cir. 1987) (reversing a contempt order on similar grounds). Like *Remington*, the result here for the Debtor should be the same, especially considering the Debtor itself was not held in contempt and was not sanctioned.

By seeking the removal of the Debtor's Amazon listings, Hayward has prospectively and improperly restricted the Debtor's operations on the basis that a violation of the Contempt Order *could* occur. As stated above, the Debtor's proceedings in the Bankruptcy Court provide clear guardrails to ensure the Debtor's operations remain in conformity with the restrictions established by the Contempt Order and provide a forum, along with the District Court, to litigate any violations of the Contempt Order.

Finally, the Court need look no further than Hayward's own statements about whom the Contempt Order applies. In email correspondence related to Hayward's proposed order, Hayward itself confirmed "Blueworks is not the subject of the contempt order" and described the Debtor as a "third party". The cited correspondence is attached hereto as **Exhibit 5**. Hayward's own pleadings support this conclusion as argued herein.

In proposing the Contempt Order, Hayward took the position the Contempt Order did not affect the Debtor. But now, with the Contempt Order entered, Hayward changed positions, serving

the Contempt Order on Amazon, prompting Amazon to de-list the Debtor, effectively shutting down the Debtor's business, and now asserting the Contempt Order applies to the Debtor's sales of the Debtor's products.

The Debtor has incurred and will continue to incur substantial damages as a result of Amazon's removal of the Debtor's listings as the Debtor is unable to generate revenue through its only sales platform. Of additional concern, the Debtor's priority in search results on Amazon for its products may suffer along with its Amazon reviews and ratings. Furthermore, the Debtor's customers search for the Debtor's products on an as-needed basis, and if no listing exists for such a customer to purchase the product, the customer may find an alternative in the Amazon search results. In such a case, the Debtor may lose that sale for the entire pool season.

Most importantly, though, the Debtor faces no prospects of a successful reorganization should the Contempt Order be read to ban the Debtor's sales of its own products. Consequently, the Debtor respectfully asks the District Court whether such an outcome was intended and whose reading of the Contempt Order is accurate.

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtor respectfully requests that the District Court clarify its Contempt Order and rule that the Contempt Order does not bar the Debtor from selling its own products and from selling products received by an entity not subject to the Contempt Order.

[*Remainder of Page Intentionally Left Blank*]

This the 23rd day of April, 2025.

RAYBURN COOPER & DURHAM, P.A.

By:      */s/ Matthew L. Tomsic*
     Matthew L. Tomsic
     N.C. State Bar No. 52431
     Natalie E. Kutcher
     N.C. State Bar No. 54888
     Ashley B. Oldfield
     N.C. State Bar No. 56552
     Suite 1200, The Carillon
     227 West Trade Street
     Charlotte, NC 28202
     (704) 334-0891

     *Counsel to the Debtor*

## <u>ARTIFICIAL INTELLIGENCE (AI) CERTIFICATION</u>

I hereby certify the following:

1.       No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2.       Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

        This the 23rd day of April, 2025.

                                    */s/ Matthew L. Tomsic*
                                    Matthew L. Tomsic

## CERTIFICATE OF SERVICE

The undersigned certifies that on this day the **BLUEWORKS CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS *EMERGENCY* MOTION FOR CLARIFICATION OF CONTEMPT ORDER [DE 588] ENTERED MARCH 19, 2025** was electronically filed via the District Court's CM/ECF system, which will send notification of such filing to all counsel of record.

      This the 23rd day of April, 2025.


               By:     */s/ Matthew L. Tomsic*
                         Matthew L. Tomsic

## Exhibit 1

### Contempt Order

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:20-CV-710 -MOC-DSC**

| | |
|---|---|
| HAYWARD INDUSTRIES, INC., <br><br> Plaintiff, Counterclaim Defendant <br><br> v. <br><br> BLUEWORKS CORPORATION, BLUEWORKS INNOVATION CORPORATION, NINGBO C.F. ELECTRONIC TECH CO., LTD; NINGBO YISHANG IMPORT AND EXPORT CO., LTD. <br><br> Defendants, Counterclaim Plaintiffs. | ORDER |

**THIS MATTER** is before the Court on a Motion to Show Cause and related motion papers and evidence filed by Plaintiff Hayward Industries, Inc. (Doc. Nos. 468, 469, 476, 535-1, 550-1, 558-1–559-19, 559, and 559-1). The Court held a show cause hearing on March 3, 2025. For good cause shown, the Motion is **GRANTED**, and Defendants Ningbo C.F. Electronic Tech. Co. Ltd. ("Ningbo C.F."); Ningbo Yishang Import and Export Co., Ltd. ("Ningbo Yishang"); Blueworks Innovation Corporation; and Zefeng "Richard" Chen (collectively, the "Ningbo Parties") are held in civil contempt of this Court and are sanctioned in accordance with the terms of this Order.[1]

### I.     BACKGROUND

Plaintiff and Defendants are competitors in the manufacture and sale of equipment for

---

[1] Defendant Blueworks Corporation filed for Chapter 11 bankruptcy on June 11, 2024. While this order focuses on the Ningbo Parties, any impact on Blueworks Corporation is pursuant to this Court's exercise of its police powers to enforce its orders. See 11 U.S.C. § 362(b)(4).

swimming pools, such as saltwater chlorination systems, filters, pumps, and heaters. In

December 2020, Plaintiff sued Defendants for trademark infringement, false advertising, unfair

or deceptive trade practices, and related causes of action stemming from Defendants' advertising

and sale of so-called "salt cells," which are components of saltwater chlorination systems. A jury

trial was held from February 22 through March 1, 2024. After trial, a judgment of over $16

million was entered against Defendants. As of March 3, 2025, the judgment, including interest

and attorneys' fees, is $17,882,392.42. Plaintiff has spent the past year trying to collect on that

judgment, but the Ningbo Parties, especially Mr. Chen, are actively frustrating Plaintiff's

collection efforts by hiding and moving funds in violation of this Court's temporary restraining

order (TRO), first entered on April 11, 2024, and then continuously extended.

Plaintiff moved for the Ningbo Parties to show cause why they should not be held in

contempt. The Court held a show cause/contempt hearing on March 3, 2025, at which the

Ningbo Parties were represented by counsel but neither offered evidence in their defense nor

denied their contempt of this Court's orders. Defendants' principal, Richard Chen, did not appear

at the hearing, despite being ordered to do so and despite being subpoenaed to appear.

## II.   LEGAL STANDARDS

In contempt proceedings, the moving party must show, by clear and convincing evidence,

the following elements: (1) the existence of a valid decree or which the alleged contemnor had

actual or constructive notice; (2) the decree was in the movant's favor; (3) the alleged contemnor

by its conduct violated the terms of the decree and had knowledge (at least constructive

knowledge) of such violations; and (4) the movant suffered harm as a result. Meineke Car Care

Centers, LLC v. Asar Inc., LLC, No. 3:14-CV-129-RJC, 2016 WL 820952 (W.D.N.C. Mar. 2,

2016) (quoting Ashcraft v. Conoco, Inc., 218 F.3d 288, 301 (4th Cir. 2000)). Intent is largely

irrelevant; a court focuses only on whether the alleged contemnor's conduct complied with some "unequivocal command" set forth in detail in the order. Id. at *3.

Relevant to this case, a non-party, particularly an officer or director of a party, can be held in contempt of a court order, just the same as a party can. Life Techs. Corp. v. Govindaraj, 931 F.3d 259, 267 (4th Cir. 2019), as amended (Aug. 7, 2019) ("[A] court may treat as contempt of court the failure to obey a court order by an officer or director of a party"); Xfinity Mobile v. D Town Trading Inc., No. 3:20-MC-00083-RJC-DSC, 2022 WL 23166, at *2 (W.D.N.C. Jan. 3, 2022) (finding the individual officers and directors of defendant companies with knowledge of the relevant orders in civil contempt); Capital Source Fin., LLC v. Delco Oil, Inc., 520 F. Supp. 2d 684, 691 (D. Md. 2007) ("[C]ourts have held that a third party may be subject to personal jurisdiction for contempt for knowingly aiding and abetting the violation of a court order, even without other contacts with the forum state.").

If the movant makes a prima facie showing of these elements, the burden shifts to the alleged contemnor to justify his non-compliance. Meineke, 2016 WL 820952, at *3. The court must provide notice and the opportunity to be heard. Id. The movant may rest on the papers and then it is up to the alleged contemnor to show up and justify his violations or dispute that there even were violations. Id. at *2. A single violation is sufficient to support a contempt finding. Consumer Fin. Prot. Bureau v. Klopp, 957 F.3d 454, 461 (4th Cir. 2020).

The consequences for violating a court order fall within the district court's discretion, and a court has wide latitude in shaping a remedy for the contempt. Id. at 466. Sanctions may include, for example, incarceration, fines, or both until the contemnor purges the contempt. Meineke, 2016 WL 820952, at *3. Sanctions may be used to encourage compliance with a court's order and/or to compensate the movant for losses sustained. Id.

3

### III.   PROCEDURAL HISTORY

### A.   Verdict and Judgment for Hayward

After a week-long trial from February 22 to March 1, 2024, a jury returned a verdict for Plaintiff and against Defendants for false advertising in violation of the Lanham Act and unfair or deceptive trade practices in violation of the North Carolina Unfair or Deceptive Trade Practices Act ("UDTPA"). The jury awarded Plaintiff $4,900,000 in compensatory damages for false advertising under the Lanham Act and, alternatively, for violation of the NC UDTPA. The jury also awarded Plaintiff $750 in statutory damages for copyright infringement. See (Doc. No. 353). Under the UDTPA only, the award of $4,900,000 was automatically trebled, bringing the verdict amount to $14,700,750. On May 28, 2024, the Court entered judgment for Plaintiff against all Defendants in the amount of $16,027,736.30, which included both the verdict amount and mandatory pre-judgment interest at the North Carolina statutory rate. (Doc. No. 448).

In August 2024, the Court found that Hayward was the "prevailing party" and that the case was "exceptional" under the Lanham Act because Defendants litigated the case in an unreasonable manner, thus entitling Hayward to an award of attorneys' fees. (Doc. No. 522 at 8). The Court rested its finding that Defendants litigated the case unreasonably "chiefly on Defendants' reliance on flagrant misrepresentations of material fact," and on Defendants' delay tactics and "generally obstructionist approach during discovery." Id. As such, the Court awarded Hayward $1,195,000.28 in attorneys' fees. Id. at 13.

As of the date of the show-cause hearing, March 3, 2025, the judgment (including pre- and post-judgment interest and attorneys' fees) stood at $17,882,392.42. Post-judgment interest continues to accrue daily.

### B.   The TRO and Other Relevant Court Orders

4

On April 11, 2024, the Court granted Plaintiff's motion for a temporary restraining order ("TRO") barring, *inter alia*, "Defendants and their agents, employees, and representatives . . . from facilitating or allowing any withdrawal, transfer, or disposition of assets presently held in any bank accounts owned or controlled by Defendants." (Doc. No. 393 at 7). In the TRO, the Court warned that "Defendants' violation of any term of this Order could result in a finding of contempt." In response to Plaintiff's motions, the Court has extended the TRO in 14-day increments through the date of this order.

The Court also provided a means for judicial oversight by which Defendants could seek relief from the TRO so that Defendants could pay ordinary business expenses without violating the TRO. More specifically, the Court ordered as follows: "Defendants are instructed that the Court will consider requests for relief from the TRO on a case-by-case basis. Any such request shall identify the payee, amount to be paid, and reason why payment cannot be delayed until after the [hearing on the TRO]." (Doc. No. 404).

Defendants had notice of the TRO and related orders. Defendants had the opportunity to argue against the TRO at a hearing on April 23, 2024, and were represented by counsel at that hearing. Defendants and Mr. Chen and his wife (in their personal capacity) also filed a petition for writ of mandamus seeking to overturn the TRO, which the Court of Appeals for the Fourth Circuit denied. See In re Zefeng "Richard" Chen, Zhuoqing Lu, Ningbo C.F. Electronic Tech Co., Ltd., Ningbo Yishang Import and Export Co., Ltd., Blueworks Innovation Corp., and Blueworks Corp., No. 24-1319 (4th Cir. 2024). Defendants sought clarification of the TRO as well. (Doc. No. 394). The Court denied that motion but, as discussed above, provided a means for Defendants to seek relief from the TRO on a case-by-case basis. (Doc. No. 404).

The purpose of the TRO was to prevent Defendants from dissipating assets, which "could

5

prevent Plaintiff from collecting on the judgment in this matter." (Doc. No. 393 at 3); <u>see also</u>

(Doc. No. 419) ("Plaintiff's concern—that Defendants will leverage this latest withdrawal [of

counsel] to delay enforcement of the jury's verdict, potentially allowing Defendants to hide or

move assets—is well-taken"); (Doc. No. 449) ("The Court will therefore grant Plaintiff's motion

and dissolve the automatic Rule 62(a) stay due to the significant risk that Defendant's assets will

dissipate . . . . If Defendants truly desire a stay, they can mitigate dissipation risk by providing a

bond or other security . . . in an amount that would 'permit full satisfaction of the judgment

together with costs and interests,' or at least $16,021,736.30.'"). Defendants declined to provide

a bond.

It was clear from these and other statements the Court made during hearings that the

Court was concerned that Defendants and Mr. Chen would dissipate their assets and thus prevent

Plaintiff from collecting on its judgment. Indeed, the Court warned Defendants and Mr. Chen at

several hearings and status conferences that the Court wanted to ensure that Defendants pay their

judgment debt to Plaintiff. The Ningbo Parties have received fair warning repeatedly over the

past year. As just one example, at a status conference on January 14, 2025, the Court warned

Defendants and their principal, Mr. Chen, as to the possible consequences of their conduct:

> THE COURT: . . . I'm not going to let – the defendant is not going to dodge the
> Court with all these global games that he's [Mr. Chen's] playing, to the extent that
> this Court can do anything about it, to the extent that this Court can do anything
> about it.  And it may not have power to run everything down in other countries, <u>but
> his [Mr. Chen's] contempt will stop him from selling anything in this country at
> some point</u>.  He'll be barred or all the money that comes from that will go to
> somebody else, because the Court is not going to be fooled by moving money
> around internationally.

(Doc. No. 565-2 at 15:7–17).

> THE COURT:  . . . <u>But one thing the Court can do is make sure that Mr. Chen
> doesn't do any business in the United States if he doesn't pay bills</u>, and the Court

6

will end up having to do that if these things don't get settled. He's not going to be able to play games.

If he wants to be able to sell his product –the lawsuit and the way it was settled, he can still do business as long as he pays this judgment.  If he doesn't pay this judgment, get done with what he owes these folds, he's going to have a hard time doing business here.

(Id. at 20:9–23).

THE COURT: So Mr. Chen can get – pass the word to all of the Chen companies and whoever they're putting in charge of it that this Court is involved in making sure that the judgment is paid. It's not going to get in the way of Mr. Chen's legal business in this country if he will pay his debts.

(Id. at 33:12–16).

### C.    The Contempt Proceedings

On June 7, 2024, Plaintiff filed its first Motion to Show Cause (Doc. No. 468), alleging that Defendants operate a large factory in China with 200 employees and are continuing to make and sell various products. As such, Plaintiff alleged, Defendants must be paying their employees, suppliers, taxes, rent, and other ordinary business expenses from accounts that they own or control but without first seeking relief from the continuing TRO and were thus in contempt of the TRO. Plaintiff supplemented its original motion with additional evidence it had been gathering during post-judgment discovery in an attempt to collect on the judgment. See (Doc. Nos. 535-1, 550-1, and 558-1). In particular, Plaintiff alleged that it had attempted to garnish payments owed to Defendants by their U.S. customers (distributors and/or retailers of swimming pool equipment who bought and resold products manufactured by Defendants) but that those customers denied owing money to Defendants.

For example, as Plaintiff alleged, many of the U.S. customers (attempted garnishees) denied owing money to the "Ningbo C.F." entity *per se*, even though Hayward discovered that these U.S. companies were selling private label variable-speed pumps for swimming pools that

7

were manufactured by and purchased from Ningbo C.F.[2] Further correlation between Ningbo

C.F. and the private label variable-speed pumps sold by the attempted garnishees is shown by the

Intertek certification number found on each pump. Intertek is a standard-setting body. In touting

its Intertek certifications, Ningbo C.F. published online its Intertek Certification Authorization to

Mark document, which identifies Ningbo C.F.'s unique Intertek Control No. 4007830. Hayward

purchased and studied a large number of those Energy-Star certified pumps sold by the attempted

garnishees to discover that, not only does the Energy Star database identify them as Ningbo C.F.

pumps, but that the pumps themselves are marked with Ningbo C.F.'s unique Intertek

Certification No. 4007830. (Doc. No. 558-1 at 3-6 and n.3). These Ningbo C.F.-manufactured

pumps include those of attempted garnishees Pace Research (d/b/a CircuPool), Asia Connection

(d/b/a Blue Torrent), Stark Group (d/b/a Xtremepower), and EFBE (d/b/a Calimar and

PoolSupplyUnlimited).

Thus, Plaintiff alleges that the Ningbo Parties were directing their U.S. customers to pay

third parties who were, in reality, shell companies, agents, and/or alter egos of the Ningbo

Parties. The Ningbo Parties were then withdrawing funds from these third-party bank accounts

(particularly a bank account in Hong Kong held in the name of Fig Global Ltd., but which is

actually owned and controlled by Ningbo C.F. and Mr. Chen) and directing the money to other

accounts and companies in China, Singapore, and beyond. In short, Plaintiff argues that

Defendants are engaged in a long-running money laundering scheme that Ningbo C.F. and Mr.

---

[2] The Environmental Protection Agency's "Energy Star" partner database lists the manufacturer, brand name, model number, etc., of variable-speed pumps that have Energy Star certification. The database lists over 100 pumps of Ningbo C.F. that are Energy-Star certified (*see* https://www.energystar.gov/productfinder/product/certified-pool-pumps/results and sort by "Ningbo C.F."). The database correlates the manufacturer to the product sold, regardless of the brand name or label.

8

Chen have used to avoid the TRO and avoid paying their judgment debt to Plaintiff. On January 9, 2025, Plaintiff asked the Court to expedite the scheduling of a show cause/contempt hearing. (Doc. No. 558). On January 27, 2025, the Court ordered the Clerk to schedule a show cause/contempt hearing. (Doc. No. 568). The next day, January 28, the Clerk noticed the hearing for March 3, 2025.

Mr. Chen and the other Ningbo Parties have been well aware of these contempt proceedings. Indeed, they cited these proceedings in court filings in Hong Kong, where Plaintiff obtained an injunction freezing the Fig Global bank account. In the Hong Kong proceedings, Ningbo C.F. and Mr. Chen refused to disclose their assets to Plaintiff, in response to the Hong Kong court's order requiring such disclosure, on the grounds that the disclosures could incriminate them in the U.S. contempt proceedings. (Doc. No. 558-18, Ex. Q, Defendants' Skeleton Submissions, at ¶ 34).

Further, this Court has previously stated on the record that it would hold a show cause hearing and ordered that Defendants' principal, Mr. Chen, personally appear for this show cause/contempt hearing:

> MR. FERGUSON:  But we would ask that he be ordered to personally appear, your Honor.
>
> THE COURT:  And I'm going to order it.  I'm going to order that.  I'll order that, and we'll see how it goes.

See (Doc. No. 538 at 65:13–17).

The show cause/contempt hearing was held on March 3, 2025. Hayward made a prima facie case of contempt through its motion papers and at the hearing, thus shifting the burden to the Ningbo Parties to dispute the contempt allegations. But Mr. Chen did not appear at the hearing or offer any testimony. Nor did the Ningbo Parties present any witness in their defense.

9

The Ningbo Parties were, however, represented by counsel. Plaintiff presented evidence of the Ningbo Parties alleged violations and offered additional exhibits into the record, which were admitted without objection. The Court will refer to some of that evidence below.

## IV.   FINDINGS OF FACT

1.     Defendants and Mr. Chen had notice of all relevant court orders. The Ningbo Parties were represented by counsel at all hearings and at trial, and Mr. Chen attended many of those hearings and was Defendants' principal witness at trial, which Mr. Chen attended every day.

2.     The Court ordered Mr. Chen to attend the show cause/contempt hearing, but he failed to do so and offered no excuse for his absence.[3]

3.     The Ningbo Parties, including Mr. Chen, violated the TRO and other court orders, as discussed below.

4.     Plaintiff was harmed by the Ningbo Parties' conduct because, *inter alia*, it has been unable to collect on the judgment and has spent considerable sums in legal fees and costs attempting to do so.

### A.   The Ningbo Parties' Violations of the TRO

5.     The Ningbo Parties operate a large factory in China, employ 200 employees, and make and sell millions of dollars of products. Accordingly, the Ningbo Parties must be paying their employees, suppliers, rent, utilities, and other expenses from accounts that they own or control. But the Ningbo Parties have not come to this Court seeking relief from the TRO to pay these expenses.

6.     The Ningbo Parties, including Mr. Chen personally, have directed their

---

[3] Plaintiff had also subpoenaed Mr. Chen to appear at the March hearing. (Doc. No. 583).

10

customers, including U.S. customers, to pay for products manufactured by Ningbo C.F. by sending funds to entities and/or bank accounts held in the name of third parties but that in reality are owned or controlled by, or are alter egos of, Ningbo C.F. and Mr. Chen.

7.    In particular, Ningbo C.F. has directed its customers to send payments for its products to a bank account at The Hongkong & Shanghai Bank Corporation Limited (HSBC) in Hong Kong. That bank account is held in the name of Fig Global Ltd. See Exs. A (Doc. No. 559), B (Doc. No. 558-3), F (Doc. No. 558-7), N (Doc. No. 558-15).

8.    Fig Global Ltd. is Ningbo C.F.'s *alter ego* and/or a shell company under Ningbo C.F.'s control that Ningbo C.F. uses to hold or launder funds by having its customers pay for products by wiring funds to Fig Global's bank account in Hong Kong (the "Fig Account"). In effect, Ningbo C.F. and Mr. Chen own or control the Fig Account. This Court finds that Fig Global is an *alter ego* of both Ningbo C.F. and Mr. Chen. The following facts, among others, support these findings:

    a.  Fig Global is 100% owned and controlled by Mr. Chen, who is its sole director and shareholder. Ex. C (Doc. No. 558-4). Mr. Chen is, in turn, a 49% co-owner of Ningbo C.F. Mr. Chen is also a director of Ningbo C.F. See Ex. U, Ningbo C.F.'s post-judgment discovery responses. Previously, this Court has found that all of the Defendants are *alter egos* of each other. (Doc. No. 31 at 9–12, Doc. No. 569 at 3–4 and n.1).[4]

    b.  Ningbo C.F. holds itself out as an *alter ego* of Fig Global and vice versa. For example, Ningbo C.F. directs its customers to pay for products it manufactures by

---

[4] For similar reasons, this Court finds that all four Defendants are alter egos of Mr. Chen.

11

wiring funds to the Fig Account. <u>See</u> Exs. A (Doc. No. 559), B (Doc. No. 558-3), and F (Doc. No. 558-7); <u>see also</u> (Doc. No. 550-6 at 3).

c.  Ningbo C.F. tells its customers that Fig Global is Ningbo C.F.'s "Hongkong company name, for receiving goods payments." (Doc. No. 559) at 4–5; <u>see also</u> <u>id.</u> at 2 (Ningbo C.F. invoice specifying that payment be directed to the Fig Account and stating that "Fig Global Limited (please notice not Ningbo C.F., fig is our HongKong company name"); <u>id.</u> at 3 (Ningbo C.F. invoice specifying in the bank transfer information that the beneficiary is "Fig Global Limited NOT Ningbo C.F."); Ex. F, Doc. 558-7 at 58 (Ningbo C.F. invoice directing payment to "Fig Global Limited NOT Ningbo C.F."). Mr. Chen's signature or stamp appears on a number of these invoices. <u>See, e.g.,</u> (Doc. No. 558-7 at 2, 3).

d.  Documents produced by Ningbo C.F.'s U.S. customers in response to subpoenas show that the customers, at Ningbo C.F.'s direction, have, in fact, paid for goods by wiring funds to this Fig Account. <u>See, e.g.,</u> (Doc. No. 558-7 at 28–29, 34, 38).

e.  In addition, bank transactions records produced by HSBC show that, from April 11 through November 24, 2024, numerous deposits into the Fig Account were made by Ningbo C.F.'s U.S. customers. <u>See</u> (Doc. No. 559-1); (Doc. No. 558-5); (Doc. No. 558-13).[5] Ningbo C.F. has been directing its customers to wire payments to the Fig Account for at least the length of this litigation, as evidenced by invoices and emails dating back to 2020, when this litigation was filed.

---

[5] Plaintiff obtained court orders in Hong Kong (a) requiring HSBC to produce bank transaction records for the Fig Account and (b) freezing funds in that account and other assets owned by Fig Global. The bank records reflect transactions made from the date of the TRO (Apr. 11, 2024) through the date of the Hong Kong court's order (Nov. 24, 2024).

f.   Neither Ningbo C.F. nor Mr. Chen offered any evidence to the contrary before or

at the hearing and did not deny that Fig Global was their alter ego or shell

company used to receive payments for Ningbo C.F. products and that the funds in

the Fig Account belong to Ningbo C.F. To the contrary, the Ningbo Parties have

requested that the Court allow payment of their attorneys' fees from the Fig

Account.

9.      Before the Hong Kong court froze the Fig Account, the Ningbo Parties withdrew

funds from the Fig Account (which Ningbo C.F. and Mr. Chen own and/or control) without first

seeking relief from the TRO. Defendants caused transfers of funds from the Fig Account to other

accounts that they own or control in China, Singapore, and elsewhere, and to third parties in the

US and abroad. See (Exs. E and L).

10.     For example, the Ningbo Parties transferred US $5,560,434.80 from the Fig

Account to a company called Ningbo China Base Landhau Foreign Trade Co. ("Ningbo

Landhau"). (Doc. No. 558-13 at 3). Ningbo Landhau is also an alias, agent, or *alter ego* of

Ningbo C.F., or is otherwise controlled by or affiliated with Ningbo C.F. (Doc. No. 558-16).

11.     The Ningbo Parties were clearly moving money into and out of the Fig Account

that they control, including substantial funds received from Ningbo C.F.'s U.S. customers that

Hayward had attempted to garnish. For example, during the period from the date of the TRO

(April 11, 2024) through November 24, 2024, the following transfers into and out of the Fig

Account were made:

a.   Transfers out of the Fig Account to all recipients globally: $8,710,347.83.

b.   Transfers out of the Fig Account to Ningbo Landhau: $5,560,434.80.

c.   Transfers into the Fig Account from all sources: $6,539,611.22.

13

d.   Transfers into the Fig Account from USA sources: $5,494,503.00.

e.   Transfers into the Fig Account from USA customers that Hayward attempted to garnish: $4,866,101.83.

12.    Accordingly, for these and other reasons, this Court finds that Fig. Global Ltd. is an *alter ego* of Ningbo C.F., that the funds in the Fig Account are assets of Ningbo C.F., and that Mr. Chen is an *alter ego* of both Fig. Global Ltd. and Ningbo C.F., and that each are jointly and severally responsible for satisfying this Court's judgment against Ningbo C.F. and the other Defendants, such as Ningbo Yishang.

**B.    Other Violations of Court Orders**

13.    Mr. Chen failed to appear at the March 3rd show cause/contempt hearing, despite the Court's order that he do so.

14.    Previously, Hayward had served on the Ningbo Parties post-judgment discovery requesting, *inter alia*, information about their assets that could be used to satisfy the judgment. The Ningbo Parties, however, refused to answer these requests on the supposed ground that Chinese law prevented them from answering. Hayward moved to compel responses. (Doc. No. 505). This Court granted the motion to compel and ordered the Ningbo Parties to answer the discovery requests within 30 days. (Doc. No. 567). Defendant Ningbo C.F., but no other Defendant, served responses on February 26, 2025, in Chinese without English translations. (Ex. U.). Plaintiff's translations show that Ningbo C.F. was relying on the same defense (Chinese law) that this Court had rejected. By not answering the discovery, particularly requests seeking information on the Ningbo Parties' assets and accounts, the Ningbo Parties further frustrated Plaintiff's judgment collection efforts, which the TRO was designed to prevent.

14

15.     Defendants have used nine different law firms over the course of this case, serially hiring and firing them. This Court warned the Ningbo Parties that it would not look favorably upon further substitutions of counsel made in an effort to frustrate judgment collection. (Doc. No. 419). When one of those firms sought to withdraw, this Court granted it but ordered the Ningbo Parties to hire new counsel within 30 days. (Doc. No. 543). That order was entered on November 19, 2024. Nearly three months have passed since that order and the Ningbo Parties have still not retained new counsel.

## V.     CONCLUSIONS OF LAW

1.     This Court has previously found that it has jurisdiction over Ningbo C.F. and Ningbo Yishang. (Doc. No. 31).  Further, Mr. Chen, in addition to being an owner, director, and/or managing agent of Ningbo C.F., co-owns a family home with his wife in Waxhaw, North Carolina. Mr. Chen testified under oath at trial that he resides there with his family.

2.     The Ningbo Parties, including Mr. Chen, had notice of the TRO and related Court orders.

3.     The TRO and related Court orders are in favor of Plaintiff and were intended to ensure that Plaintiff could collect on the judgment.

4.     The TRO bars not just Defendants but also "their agents, employees, and representatives . . . from facilitating or allowing any withdrawal, transfer, or disposition of assets presently held in any bank accounts owned or controlled by Defendants." (Doc. No. 393). Mr. Chen is an agent, employee, or representative of Defendants. Indeed, as this Court previously found, Defendants are *alter egos* of each other and of Mr. Chen and his family.

5.     The Ningbo Parties, including Mr. Chen, violated the TRO and other Court orders as detailed above.

15

6. The Ningbo Parties, including Mr. Chen, have failed at every opportunity to offer any justification for their violations of the TRO and other Court orders.

7. The Ningbo Parties' violations have harmed Plaintiff by frustrating its attempts to collect on its judgment.

8. The Ningbo Parties, including Mr. Chen, are thus in contempt of this Court's orders.

**IT IS, THEREFORE, ORDERED** that:

1. Unless and until the Ningbo Parties pay the judgment (presently at $17,882,392.42 through the date of the contempt hearing, March 3, 2025), the Ningbo Parties—including all agents, employees, officers, directors, shareholders, affiliates, subsidiaries, assignees, and anyone acting for or through them—shall be barred from importing or selling any product in the United States, including, but not limited to, salt cells, salt water chlorination systems, pumps, heaters, any other equipment for swimming pools, and any components thereof, including the products shown in Appendix A—including, but not limited to, any and all Energy Star certified pumps and any and all pumps bearing Intertek Certification Control No. 4007830. The Ningbo Parties shall not use any shell companies, agents, subsidiaries, affiliates, successors in interest, assignees, corporate restructuring, rebranding, or third parties to evade this import and sales ban.

2. For the avoidance of any doubt, unless and until the Ningbo Parties pay the judgment, all Ningbo Parties shall be barred from inducing, facilitating, contributing to, or otherwise causing, another natural or juristic person(s) (entity) from importing or selling any of the aforementioned products in or into the United States. As a non-limiting example, the Ningbo Parties shall not use any means to evade the import ban, including, for example, by selling

16

products to a middleman, distributor, import/export agent, or any other person(s) or entit(ies) outside of the United States who will then import or sell those products in or into the United States.

3.      A copy of this order shall be sent to United States Customs and Border Patrol. (USCBP), which is respectfully requested and ordered to stop at the border and impound any such products.

4.      To the extent that this sales and import ban impacts Blueworks Corporation, which is currently in Chapter 11 bankruptcy, the ban does not violate the automatic stay of 11 U.S.C. § 362(a) because the ban is issued pursuant to this Court's policy power to enforce its orders, including the TRO. See 11 U.S.C. § 362(b)(4).

**IT IS FURTHER ORDERED THAT:**

5.      The Ningbo Parties shall pay to Hayward the attorneys' fees and costs that Plaintiff has incurred from April 11, 2024, through the date of this order in attempting to collect on the judgment. Plaintiff shall file an affidavit within ten (10) days of this order itemizing its fees and costs. Plaintiff shall not count any fees on which it previously relied when it presented its fees petition to the Court in the spring of 2024 and which the Court considered in awarding attorneys' fees to Hayward. See (Doc. No. 522).

**IT IS FURTHER ORDERED THAT:**

6.      The Ningbo Parties shall answer in full Hayward's post-judgment discovery requests, including identification of their assets, or risk further sanctions.[6]

---

[6] The Court notes, and reminds Defendants, that it has the authority to issue a bench warrant for Mr. Chen's arrest and incarceration as a remedy for civil contempt. It elects not to do so at this time.

Signed: March 19, 2025

Max O. Cogburn Jr.
United States District Judge

18

# APPENDIX A

| Manufacturer | Brand Name | Model/Serial No. | Description | Energy Star Unique ID |
|---|---|---|---|---|
| Ningbo CF | Floworks | AGP1515VS-NC | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2379418 |
| Ningbo CF | Flobot | FB2115VS-NC | In Ground (Self Priming) Pool Filter Pump 1.0 | 2379419 |
| Ningbo CF | Flobot | FW1615VS-NC | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2379420 |
| Ningbo CF | Flobot | IGP2115VS-NC | In Ground (Self Priming) Pool Filter Pump 1.0 | 2379421 |
| Ningbo CF | Floworks | SPP1515VS | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2379422 |
| Ningbo CF | Blueworks | BAPVS1515-NC | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381894 |
| Ningbo CF | Lemonpool | LAPVS1515-NC | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381895 |
| Ningbo CF | Chlorworks | CAPVS1515-NC | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381896 |
| Ningbo CF | Blueworks | BLPVS2115P-NC | In Ground (Self Priming) Pool Filter Pump 1.0 | 2381897 |
| Ningbo CF | Lemonpool | LEPVS2115P-NC | In Ground (Self Priming) Pool Filter Pump 1.0 | 2381898 |
| Ningbo CF | Chlorworks | CHPVS2115P-NC | In Ground (Self Priming) Pool Filter Pump 1.0 | 2381899 |
| Ningbo CF | Circupool | SmartFLO-CIR | In Ground (Self Priming) Pool Filter Pump 1.0 | 2381900 |
| Ningbo CF | Blueworks | BLPVS1615H-NC | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381901 |
| Ningbo CF | Lemonpool | LEPVS1615H-NC | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381902 |
| Ningbo CF | Chlorworks | CHPVS1615H-NC | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381903 |
| Ningbo CF | Blueworks | BIPVS2115H-NC | In Ground (Self Priming) Pool Filter Pump 1.0 | 2381904 |
| Ningbo CF | Lemonpool | LIPVS2115H-NC | In Ground (Self Priming) Pool Filter Pump 1.0 | 2381905 |
| Ningbo CF | Chlorworks | CIPVS2115H-NC | In Ground (Self Priming) Pool Filter Pump 1.0 | 2381906 |
| Ningbo CF | Blueworks | BSPVS1515 | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381907 |
| Ningbo CF | Lemonpool | LSPVS1515 | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381908 |
| Ningbo CF | Chlorworks | CSPVS1515 | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381909 |

| | | | | |
|---|---|---|---|---|
| Ningbo CF | Blueworks | BAPVS1515-NC | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381924 |
| Ningbo CF | Lemonpool | LAPVS1515-NC | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381925 |
| Ningbo CF | Chlorworks | CAPVS1515-NC | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381926 |
| Ningbo CF | Blueworks | BLPVS2115P-NC | In Ground (Self Priming) Pool Filter Pump 1.0 | 2381927 |
| Ningbo CF | Lemonpool | LEPVS2115P-NC | In Ground (Self Priming) Pool Filter Pump 1.0 | 2381928 |
| Ningbo CF | Chlorworks | CHPVS2115P-NC | In Ground (Self Priming) Pool Filter Pump 1.0 | 2381929 |
| Ningbo CF | Circupool | SmartFLO-CIR-SFD1.5 | In Ground (Self Priming) Pool Filter Pump 1.0 | 2381930 |
| Ningbo CF | Blueworks | BLPVS1615H-NC | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381931 |
| Ningbo CF | Lemonpool | LEPVS1615H-NC | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381932 |
| Ningbo CF | Chlorworks | CHPVS1615H-NC | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381933 |
| Ningbo CF | Blueworks | BIPVS2115H-NC | In Ground (Self Priming) Pool Filter Pump 1.0 | 2381934 |
| Ningbo CF | Lemonpool | LIPVS2115H-NC | In Ground (Self Priming) Pool Filter Pump 1.0 | 2381935 |
| Ningbo CF | Chlorworks | CIPVS2115H-NC | In Ground (Self Priming) Pool Filter Pump 1.0 | 2381936 |
| Ningbo CF | Blueworks | BSPVS1515 | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381937 |
| Ningbo CF | Lemonpool | LSPVS1515 | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381938 |
| Ningbo CF | Chlorworks | CSPVS1515 | Above Ground (Non Self Priming) Pool Filter Pump  1.0 HP | 2381939 |
| Ningbo CF | Flobot | FB2015VS | In Ground (Self Priming) Pool Filter Pump 1.7 | 2382569 |
| Ningbo CF | Flobot | FB2020VS | In Ground (Self Priming) Pool Filter Pump 2.0 | 2382570 |
| Ningbo CF | Circupool | SmartFLO - SF1.5P | In Ground (Self Priming) Pool Filter Pump 1.7 | 2382667 |
| Ningbo CF | Calimar | CMARVSP1.5 | In Ground (Self Priming) Pool Filter Pump 1.7 | 2382668 |
| Ningbo CF | PureLine | PL2518 | In Ground (Self Priming) Pool Filter Pump 1.7 | 2382669 |
| Ningbo CF | Blueworks | BLPVS2015P | In Ground (Self Priming) Pool Filter Pump 1.7 | 2382670 |
| Ningbo CF | Lemonpool | LEPVS2015P | In Ground (Self Priming) Pool Filter Pump 1.7 | 2382671 |
| Ningbo CF | Chlorworks | CHPVS2015P | In Ground (Self Priming) Pool Filter Pump 1.7 | 2382672 |

| | | | | |
|---|---|---|---|---|
| Ningbo CF | Blue Torrent | CFVAR152 | In Ground (Self Priming) Pool Filter Pump 1.7 | 2382673 |
| Ningbo CF | Blue Torrent | BTIGV150 | In Ground (Self Priming) Pool Filter Pump 1.7 | 2382675 |
| Ningbo CF | Circupool | SmartFLO-SF2.0P | In Ground (Self Priming) Pool Filter Pump 2.0 | 2382676 |
| Ningbo CF | Calimar | CMARVSP2.0 | In Ground (Self Priming) Pool Filter Pump 2.0 | 2382677 |
| Ningbo CF | PureLine | PL2516 | In Ground (Self Priming) Pool Filter Pump 2.0 | 2382678 |
| Ningbo CF | Blueworks | BLPVS2020P | In Ground (Self Priming) Pool Filter Pump 2.0 | 2382679 |
| Ningbo CF | Lemonpool | LEPVS2020P | In Ground (Self Priming) Pool Filter Pump 2.0 | 2382680 |
| Ningbo CF | Chlorworks | CHPVS2020P | In Ground (Self Priming) Pool Filter Pump 2.0 | 2382681 |
| Ningbo CF | Blue Torrent | CFVAR202 | In Ground (Self Priming) Pool Filter Pump 2.0 | 2382682 |
| Ningbo CF | Blue Torrent | Cyclone Series 2020 | In Ground (Self Priming) Pool Filter Pump 2.0 | 2382683 |
| Ningbo CF | Floworks | FW1515VS | In Ground (Self Priming) Pool Filter Pump 1.5 | 2382724 |
| Ningbo CF | Floworks | FW1515VS | In Ground (Self Priming) Pool Filter Pump 1.5 | 2382725 |
| Ningbo CF | Blueworks | BLPVS1515H | In Ground (Self Priming) Pool Filter Pump 1.5 | 2382870 |
| Ningbo CF | Chlorworks | CHPVS1515H | In Ground (Self Priming) Pool Filter Pump 1.5 | 2382871 |
| Ningbo CF | Lemonpool | LEPVS1515H | In Ground (Self Priming) Pool Filter Pump 1.5 | 2382872 |
| Ningbo CF | PureLine | PL2515 | In Ground (Self Priming) Pool Filter Pump 1.5 | 2382873 |
| Ningbo CF | Circupool | SmartFLO-SF1.5H | In Ground (Self Priming) Pool Filter Pump 1.5 | 2382874 |
| Ningbo CF | Blue Torrent | CFVAR1515 | In Ground (Self Priming) Pool Filter Pump 1.5 | 2382875 |
| Ningbo CF | Flobot | FB2010VS | Above Ground (Non Self Priming) Pool Filter Pump 1.5 HP | 2384751 |
| Ningbo CF | Chlorworks | CHPVS2010P | Above Ground (Non Self Priming) Pool Filter Pump 1.5 HP | 2384889 |
| Ningbo CF | Calimar | CMARVSP1.0 | Above Ground (Non Self Priming) Pool Filter Pump 1.5 HP | 2384890 |
| Ningbo CF | Lemonpool | LEPVS2010P | Above Ground (Non Self Priming) Pool Filter Pump 1.5 HP | 2384891 |
| Ningbo CF | PureLine | PL2517 | Above Ground (Non Self Priming) Pool Filter Pump 1.5 HP | 2384892 |
| Ningbo CF | Circupool | SmartFLO:SF1.0P | Above Ground (Non Self Priming) Pool Filter Pump 1.5 HP | 2384893 |
| Ningbo CF | Blue Torrent | CFVAR102 | Above Ground (Non Self Priming) Pool Filter Pump 1.5 HP | 2384894 |

| Ningbo CF | Star Water Systems | STPP15VS | In Ground (Self Priming) Pool Filter Pump 1.7 | 2400524 |
|---|---|---|---|---|
| Ningbo CF | Flobot | IGP2010VS | Above Ground (Non Self Priming) Pool Filter Pump 1.5 HP | 3388018 |
| Ningbo CF | Blueworks | BIPVS2010H | Above Ground (Non Self Priming) Pool Filter Pump 1.5 HP | 3388019 |
| Ningbo CF | Lemonpool | LIPVS2010H | Above Ground (Non Self Priming) Pool Filter Pump 1.5 HP | 3388020 |
| Ningbo CF | Chlorworks | CIPVS2010H | Above Ground (Non Self Priming) Pool Filter Pump 1.5 HP | 3388021 |
| Ningbo CF | Circupool | SmartFlo:USF1.0P | Above Ground (Non Self Priming) Pool Filter Pump 1.5 HP | 3388022 |
| Ningbo CF | Flobot | FBC2010VS | Above Ground (Non Self Priming) Pool Filter Pump 1.5 HP | 3388023 |
| Ningbo CF | Flobot | FBX2010VS | Above Ground (Non Self Priming) Pool Filter Pump 1.5 HP | 3388024 |
| Ningbo CF | Flobot | FB2015CVS | In Ground (Self Priming) Pool Filter Pump 1.7 | 3388025 |
| Ningbo CF | Blueworks | BLPVS2015CP | In Ground (Self Priming) Pool Filter Pump 1.7 | 3388026 |
| Ningbo CF | Chlorworks | CHPVS2015CP | In Ground (Self Priming) Pool Filter Pump 1.7 | 3388027 |
| Ningbo CF | Flobot | IGP2015VS | In Ground (Self Priming) Pool Filter Pump 1.7 | 3388028 |
| Ningbo CF | Blueworks | BIPVS2015H | In Ground (Self Priming) Pool Filter Pump 1.7 | 3388029 |
| Ningbo CF | Lemonpool | LIPVS2015H | In Ground (Self Priming) Pool Filter Pump 1.7 | 3388030 |
| Ningbo CF | Chlorworks | CIPVS2015H | In Ground (Self Priming) Pool Filter Pump 1.7 | 3388031 |
| Ningbo CF | Circupool | SmartFlo:USF1.7 | In Ground (Self Priming) Pool Filter Pump 1.7 | 3388032 |
| Ningbo CF | Flobot | FBC2015VS | In Ground (Self Priming) Pool Filter Pump 1.7 | 3388033 |
| Ningbo CF | Flobot | FBX2015VS | In Ground (Self Priming) Pool Filter Pump 1.7 | 3388034 |
| Ningbo CF | XtremepowerUS | 90166 | In Ground (Self Priming) Pool Filter Pump 1.7 | 3388035 |
| Ningbo CF | Flobot | FB2030VS | In Ground (Self Priming) Pool Filter Pump 3.0 | 3388036 |
| Ningbo CF | Flobot | IGP2020VS | In Ground (Self Priming) Pool Filter Pump 1.0 | 3388037 |
| Ningbo CF | Lemonpool | LIPVS2020H | In Ground (Self Priming) Pool Filter Pump 1.0 | 3388038 |
| Ningbo CF | Chlorworks | CIPVS2020H | In Ground (Self Priming) Pool Filter Pump 1.0 | 3388039 |
| Ningbo CF | Blueworks | BIPVS2020H | In Ground (Self Priming) Pool Filter Pump 1.0 | 3388040 |
| Ningbo CF | Circupool | SmartFlo USF2.0P | In Ground (Self Priming) Pool Filter Pump 2.0 | 3388041 |

| Ningbo CF | Flobot | FBC2020VS | In Ground (Self Priming) Pool Filter Pump 2.0 | 3388042 |
|---|---|---|---|---|
| Ningbo CF | Flobot | FBX2020VS | In Ground (Self Priming) Pool Filter Pump 1.0 | 3388043 |
| Ningbo CF | XtremepowerUS | 90167 | In Ground (Self Priming) Pool Filter Pump 2.0 | 3388044 |
| Ningbo CF | Blueworks | BLPVS2030P | In Ground (Self Priming) Pool Filter Pump 3.0 | 3388046 |
| Ningbo CF | Lemonpool | LEPVS2030P | In Ground (Self Priming) Pool Filter Pump 3.0 | 3388047 |
| Ningbo CF | Chlorworks | CHPVS2030P | In Ground (Self Priming) Pool Filter Pump 3.0 | 3388048 |
| Ningbo CF | Circupool | SmartFlo:SF3.0P | In Ground (Self Priming) Pool Filter Pump 3.0 | 3388049 |
| Ningbo CF | Calimar | CMARVSP3.0 | In Ground (Self Priming) Pool Filter Pump 3.0 | 3388050 |
| Ningbo CF | Flobot | IGP2030VS | In Ground (Self Priming) Pool Filter Pump 3.0 | 3388051 |
| Ningbo CF | Lemonpool | LIPVS2030H | In Ground (Self Priming) Pool Filter Pump 3.0 | 3388052 |
| Ningbo CF | Chlorworks | CIPVS2030H | In Ground (Self Priming) Pool Filter Pump 3.0 | 3388053 |
| Ningbo CF | Blueworks | BIPVS2030H | In Ground (Self Priming) Pool Filter Pump 3.0 | 3388054 |
| Ningbo CF | Circupool | SmartFlo:USF3.0P | In Ground (Self Priming) Pool Filter Pump 3.0 | 3388055 |
| Ningbo CF | Flobot | FBC2030VS | In Ground (Self Priming) Pool Filter Pump 3.0 | 3388056 |
| Ningbo CF | Flobot | FBX2030VS | In Ground (Self Priming) Pool Filter Pump 3.0 | 3388057 |
| Ningbo CF | XtremepowerUS | 90168 | In Ground (Self Priming) Pool Filter Pump 3.0 | 3388058 |

| Manufacturer | Brand Name | Model/Serial No. | Description | Energy Star Unique ID |
|---|---|---|---|---|
| Asia Connection LLC | Blue Torrent | BT AGV100 | Above Ground (Non-Self Priming) Pool Filter Pump 1.0 | 2379254 |
| Asia Connection LLC | Blue Torrent | ACPSP15VS | In Ground (Self-Priming) Pool Filter Pump 1.5 | 2382567 |
| Asia Connection LLC | Black and Decker | BDXBTVAR300 | In Ground (Self-Priming) Pool Filter Pump 3.0 | 2382568 |
| Asia Connection LLC | Blue Torrent | BTIGV300 | In Ground (Self-Priming) Pool Filter Pump 3.0 | 2382654 |
| Asia Connection LLC | Black and Decker | BDXBTAGVAR | Above Ground (Non-Self Priming) Pool Filter Pump 1.0 | 2382662 |
| Asia Connection LLC | Blue Torrent | AC750 | Above Ground (Non-Self Priming) Pool Filter Pump .5 | 2384776 |
| Asia Connection LLC | Blue Torrent | EZ500 | Above Ground (Non-Self Priming) Pool Filter Pump .5 | 2384777 |
| Asia Connection LLC | Blue Torrent | BTIGV150 | In Ground (Self-Priming) Pool Filter Pump 1.7 | 2470955 |
| Asia Connection LLC | Blue Torrent | BTIGV200 | In Ground (Self-Priming) Pool Filter Pump 2.0 | 2470956 |
| Asia Connection LLC | Blue Torrent | AC500 | Above Ground (Non-Self Priming) Pool Filter Pump .5 | 2674149 |
| Asia Connection LLC | Black and Decker | BDXBTVAR150 | In Ground (Self-Priming) Pool Filter Pump 1.7 | 3618373 |
| Asia Connection LLC | Black and Decker | BDXBTVAR200 | In Ground (Self-Priming) Pool Filter Pump 2.0 | 3618374 |

# SLIPSHEET

| ASIN | Model Number | Title | Subcategory |
|------|--------------|-------|-------------|
| B0BRR91J2Q | CHPVS2015P | CHLORWORKS Variable Speed Pool Pump Inground 1.5 HP- with Filter Basket for Inground Pools  Save Energy, Energy Star Certified 220-240V, 2 Years Warranty | Pool Pumps |
| B0BRPMSQ4N | SALT CELL | CHLORWORKS Salt Cell - Model No. CWH15A Compatible with Hayward Salt Cell Model No. T-Cell-15  1 Year Limited USA Warranty | Salt Cell |
| B0BYRRFRHP | CWPC40-1 | CHLORWORKS Salt Cell - Model No. CWPC  Fit for Pentair Intellichlor Moldel No. IC40, Salt Chlorine Generator Without Power Center, up to 40,000 Gallon Pool | Salt Cell |
| B0BRPTFFQ6 | CWH9A | CHLORWORKS Salt Cell - Model No. CWH9A Compatible with Hayward Salt Cell Model No. T-Cell-9  1 Year Limited USA Warranty | Salt Cell |
| B0BRR9B8ZG | CHPVS2010P | CHLORWORKS Variable Speed Pool Pump Inground 1HP- with Filter Basket for Inground Pools  Save Energy, Energy Star Certified 220-240V, 2 Years Warranty | Pool Pumps |
| B0BW8VC3X5 | salt system | CHLORWORKS Salt Chlorine Generator- Salt Water Pool Chlorinator System up to 40K Gallon Swimming Pool  Easy Operation, 1 Year Warranty | Chlorination System |
| B0BZ441GR9 | CWPC40-2 | Salt Cell - Model No. CWPC  Fit for Pentair Intellichlor Moldel No. IC40, Salt Chlorine Generator Without Power Center, up to 40,000 Gallon Pool | Salt Cell |
| B0DB5GS4ZP | CHPVS2020P | CHLORWORKS Variable Speed Pool Pump Inground 2HP- with Filter Basket for Inground Pools  Save Energy, Energy Star Certified 220-240V, 2 Years Warranty | Pool Pumps |
| B0BRR91XN9 | CHPVS2020P | CHLORWORKS Variable Speed Pool Pump Inground - with Filter Basket for Inground Pools  Save Energy, Energy Star Certified, 220-240V, 2HP, (CHPVS2020P) | Pool Pumps |
| B0BRR7VQJG | CHPVS2030P | CHLORWORKS Variable Speed Pool Pump Inground 3HP- with Filter Basket for Inground Pools  Save Energy, Energy Star Certified 220-240V, 2 Years Warranty | Pool Pumps |
| B0BW8VWLTS | salt system | CHLORWORKS Saltwater Pool System - up to 25 000 Gallons, Salt Generator for Inground Pools, 1 Year Warranty, Clear | Chlorination System |
| B0BRPVZ3TG | CWLH | ChlorWorks Salt Chlorine Generator - up to 25 000 gallons Inground Pool, Saltwater Pool System, 2-Year Limited Warranty, White | Chlorination System |

| | | | |
|---|---|---|---|
| B0BZ88C13K | salt system | CHLORWORKS Salt Chlorine Generator for Swimming Pool â€" up to 40 000 Gallon Inground Salt Pool, Salt Water Pool Chlorinator System, Easy Program, 110V/220V, 1.5" & 2"Connection | Chlorination System |
| B0D3LCGTHX | CWPC20-2 | CHLORWORKS Salt Cell - Model No. CWPC20-2  Fit for Pentair Intellichlor Moldel No. IC40, Salt Chlorine Generator Without Power Center, up to 40,000 Gallon Pool, 2-Year Limited Warranty | Salt Cell |
| B0C61KTB8K | CWH9A-1 | CHLORWORKS Salt Cell - Model No. CWH9A-1  Compatible with Hayward Salt Cell Model No. T-Cell-9, up to 25,000 Gallon Pool,1 Year Limited USA Warranty | Salt Cell |
| B0CRDH58HB | CWLH | CHLORWORKS Saltwater Pool System Chlorine Generator - up to 40 000 Gallons Salt Swimming Pool, Salt Chlorine Generator Compatible with 1.5" & 2" PVC Pipe | Chlorination System |
| B0BRPVSMW2 | CWLH | ChlorWorks Salt Chlorine Generator - up to 40K gallons Inground Pool  Saltwater Pool System, 2 Years Limited Warranty, White | Chlorination System |
| B0C61MYBFY | salt cell | CHLORWORKS Salt Cell-Model CWH15B  Compatible with Hayward Salt Cell Model T-CELL-15, up to 40,000 Gallon, Eco Friendly, 2-Year Limited USA Warranty | Salt Cell |
| B0CYH6N81C | CWZN | CHLORWORKS Zinc Anode for Saltwater Pool - 2" Inline Saltwater Pool Sacrificial Anode  Heavy Duty Zinc Anode for Pool Protect Metal Parts, No Leaks, Long Service | Pool & Spa Replacement Parts |
| B0D4V1B48V | CWHW bypass cell | ChlorWorks Bypass Dummy Cell Fits for Hayward T-Cell Salt System  Prolong Life of Salt Cell, Winter Protection Bypass Pipe | Pool & Spa Replacement Parts |
| B0BZYYNN6P | CWPL0214 | CHLORWORKS Sand Filter Pump for Above Ground Pool - Pool Sand Filter with Timer  Max Pump Flow Rate 3036 GPH, Up to 20,000 GAL Pools, 6-Way Valve Improved Circulation, Waterproof GFCI Plug | Pool Sand Filters |
| B0D3L7YTL5 | CWPC | Salt Cell - Model No. CWPC  Fit for Pentair Intellichlor Moldel No. IC60, Salt Chlorine Generator Without Power Center, up to 60,000 Gallon Pool | Salt Cell |
| B0BZYY4N2B | CWPL0216 | CHLORWORKS Sand Filter Pump for Above Ground Pool - Pool Sand Filter with Timer  Max Pump Flow Rate 3882 GPH, Up to 25,000 GAL Pools, 6-Way Valve Improved Circulation, Waterproof GFCI Plug | Pool Sand Filters |
| B0D7GTKBTB | CWPC | CHLORWORKS Salt Cell for Pool - Model No. CWPC  Fit for Pentair Intellichlor Moldel No. IC20, Salt Chlorine Generator Without Power Center, up to 20,000 Gallon Pool | Salt Cell |

| B0D2K9XD6F | CWPL0214-M | ChlorWorks 3036GPH Sand Filter Pump for Above Ground Pool Up to 20,000GAL Pools, Pool Sand Filter with Timer, 6-Way Valve, GFCI Plug, 110-120V, 2 Years Warranty | Pool Sand Filters |
| B0CRDCVWNH | CWLH | CHLORWORKS Salt Water Pool Chlorinator System - up to 25 000 Gallons Salt Swimming Pool, Salt Chlorine Generator Compatible with 1.5" & 2" PVC Pipe | Chlorination System |
| B0BZYTPGB2 | 2586GPH | CHLORWORKS 2586GPH Sand Filter Pump for Above Ground Pool with Timer  Up to 16900GAL Pools, 6-Way Valve, with GFCI Plug, 110-120V, 2 Years Warranty | Pool Sand Filters |
| B0D5CPC7WG | CWLH | CHLORWORKS Saltwater Pool System - up to 15 000 Gallons, Salt Generator for Inground Pools, 1 Year Warranty | Chlorination System |
| B0D5CQ46Y9 | CWLH20-2W | Salt Water Pool Chlorinator System - up to 15 000 Gallons Salt Swimming Pool, Salt Chlorine Generator Compatible with 1.5" & 2" PVC Pipe, 2 Years Warranty | Chlorination System |
| B0D2KDZVNM | CWPL0216-M | CHLORWORKS 3882GPH Sand Filter Pump for Above Ground Pool  Up to 25,000GAL Pools, Pool Sand Filter with Timer, 6-Way Valve, GFCI Plug, 110-120V, 2 Years Warranty | Pool Sand Filters |
| B0D492JVXD | CWPC POWER CENTER | CHLORWORKS CWPC Power Center Fit for Pentair IntelliChlor Pool and Spa Automatic Control System Models IC20  IC40, IC60 and CWPC Salt Cell | Pool & Spa Replacement Parts |
| B0BZ86R8PF | CWSC30-2 | Salt Chlorine Generator for Swimming Pool â€" up to 25 000 Gallon Inground Salt Pool, Salt Water Pool Chlorinator System, Easy Program, 110V/220V, 1.5" & 2"Connection | Chlorination System |
| B0D5CY2M2M | CWSC | Salt Chlorine Generator for Swimming Pool â€" up to 25 000 Gallon Inground Salt Pool, Salt Water Pool Chlorinator System, Easy Program, 110V/220V, 1.5" & 2"Connection | Chlorination System |
| B0BZTWKVVX | CW Flow Switch | CHLORWORKS Flow Switch with Tee Fit for Hayward Salt System  Protect System from Burning, Fix No Flow Issue | Pool & Spa Replacement Parts |
| B0D4V9984Y | CWSC | ChlorWorks Salt Chlorine Generator | Chlorination System |
| B0D5CQJ15S | CWLH | CHLORWORKS Salt Chlorine Generator- Salt Water Pool Chlorinator System up to 40K Gallon Swimming Pool  Easy Operation, 1 Year Warranty | Chlorination System |
| B0CQXGHNJL | CWPT cleaning stand | CHLORWORKS Pool Cleaning Stand-Acid Washing Kit Fit for Pentair Intellichlor Salt Cell and CWPC Salt Cell | Pool & Spa Replacement Parts |
| B0D2VLP1XL | Replacement unions | Replacement Unions | Pool & Spa Replacement Parts |
| B0DCVL4LZ1 | | CHLORWORKS Pool Flow Switch | Pool & Spa Replacement Parts |
| B086YSPLRQ | BLW1T15H | BLUE WORKS Salt Cell - Model Number BLW1T15H  Fit for Hayward Salt Cell Model Number T-CELL-15, Up to 40,000 Gallons Pool, 1 Year Warranty | Salt Cell |

| B07MZ1P4HH | BWA-T15-2W-A | BLUE WORKS Salt Cell - up to 40 000 Gallons Pool, Fit for Hayward Cell T 15, Salt Cell for Pool, 2 Years Warranty | Salt Cell |
|---|---|---|---|
| B07B6LYG7G | BLH30-BW | BLUE WORKS Saltwater Pool Chlorinator System- Up to 40 000 Gallons Pool, Salt Chlorine Generator for Inground Pool, 2 Years USA Warranty, Clear | Chlorination System |
| B085HB37VB | BLPVS1515H | BLUE WORKS Variable Speed Pool Pump Inground 1.5HP Inground Pool Pump 230V, 1-Year Warranty, BLPVS1515H | Pool Pumps |
| B086YJ97C8 | BLW1T9H | BLUE WORKS Salt Cell for Pool BLW1T9H  up to 25,000 Gallons Pool, 1-Year Warranty | Salt Cell |
| B06XT9T8TT | BLT9H-2W | BLUE WORKS Salt Cell BLT9H fit for Hayward Salt Cell T-Cell-9 2-Year Warranty (White) | Salt Cell |
| B07B6KZZVH | BLH40-BW | BLUE WORKS Saltwater Pool System BLH40 - Up to 40 000 Gallons Pool, 2 Years Warranty, White | Chlorination System |
| B07C3HV3ZS | BLH20-BW | BLUEWORKS Salt Water Pool Chlorinator System - Saltwater Pool System BLH20  up to 15,000 Gallons Swimming Pool, 2 Years Warranty for Salt Cell & Control Box | Chlorination System |
| B07B6JXXQ9 | BLH30-BW | BLUE WORKS Saltwater Pool Chlorinator System- Up to 25 000 Gallons Pool, Salt Chlorine Generator for Inground Pool, 2 Years Warranty, White | Chlorination System |
| B07B2S363X | BLT15H-2T | BLUE WORKS Salt Cell Model Number: BLT15H Fit for Hayward Salt Cell T-Cell-15  2-Year Warranty (Clear) | Salt Cell |
| B0B1Q646CN | | Salt Cell for Pool - up to 40 000 Gallons Pool, Compatible with Hayward Cell T 15 - Upgrade Cell Plates provided by American Company, 2 Year USA Warranty, BLUE WORKS, CBT15H | Salt Cell |
| B086YFD26V | BLW1T3H | BLUE WORKS Salt Cell BLW1T3H  up to 15,000 Gallons Pool, Salt Cell for Pool | Salt Cell |
| B07FQ9PBZS | BLSC30 | BLUE WORKS Salt Chlorine Generator - BLSC30 Salt Water Pool Chlorine System for Inground Pool  Up to 25,000 Gallons Pool Salt System, 2 Years Warranty, White Cell | Chlorination System |
| B09CKV7FCJ | BLT15H-1W | BLUE WORKS Salt Cell Model Number: BLT15H Compatible with Hayward Goldline AquaRite T-Cell-15  Cell Plates provided by American Company  1-Year USA Warranty (White) | Salt Cell |
| B08Q3D7X45 | BLH40-AY | BLUE WORKS Saltwater Pool System Salt Pool - up to 40 000 Gallons Pool, Salt Chlorine Generator for Inground Pool, 1 Year Warranty, Yellow | Chlorination System |
| B085HNT677 | BLPVS2020P | BLUE WORKS Variable Speed Pool Pump Inground  Inground Pool Pump 2HP, 230V, 1-Year Warranty, BLPVS2020P | Pool Pumps |

| | | | |
|---|---|---|---|
| B08928HM1N | BLPVS2030P | BLUE WORKS Variable Speed Pump 3HP Pool Pump Inground Energy Star Certified  220V-240V, 2-Year Limited USA Warranty, BLPVS2030P | Pool Pumps |
| B07L87YNSZ | BLT9H | BLUE WORKS Salt Cell BLT9H fit for Hayward Goldline AquaRite T-Cell-9  2-Year Warranty (Clear) | Salt Cell |
| B08QMYLK43 | BLSC21-AG AY | BLUE WORKS Saltwater Pool Chlorine Generator System BLSC Chlorinator for 20K Above Ground Pool & Flow Switch  Cell Plates provided by American Company | Chlorination System |
| B07FLZ6LCN | BLT3H | BLUE WORKS Salt Cell BLT3H fit for Hayward Salt Cell T-Cell-3 2-Year Warranty (White) | Salt Cell |
| B07FQ3WPS3 | BLSC40-BW | BLUE WORKS Salt Chlorine Generator - BLSC40 Salt Water Pool Chlorine System for Inground Pool  Up to 40,000 Gallons Pool Salt System, 2 Years Warranty, White Cell | Chlorination System |
| B088NQPT38 | BLH30 | BLUE WORKS Saltwater Generator Chlorinator BLH30 for 25K Gallons Pool with Flow Switch and Salt Cell | Chlorination System |
| B07FMC6RL1 | BLT3H | BLUE WORKS Salt Cell BLT3H for Pool  up to 15,000 Gallons Salt Pool, 2-Year Warranty (Clear) | Salt Cell |
| B07FQ9986B | BLSC-30BT | BLUE WORKS Saltwater Pool System Up to 25K Gallon Inground Salt Pool  2 Years Warranty, Clear | Chlorination System |
| B08926115X | BLPVS2015P | BLUE WORKS 1.5HP Variable Speed Pool Pump  Inground Swimming Pool Pump, 230V, 1 Year Warranty, BLPVS2015P | Pool Pumps |
| B07B6KSKLX | BLH30-BT | BLUE WORKS Saltwater Generator Chlorinator BLH30 for 25K Gallon Pool  2-Year USA Warranty | Chlorination System |
| B08Q3GTGZP | BLH20 | BLUE WORKS Saltwater Chlorination System BLH20 for 15 000 Gallons In-Ground Salt Pools | Chlorination System |
| B095C27F1Z | BLPTC | BLUE WORKS Salt Cell - Model No.BLPTC 20P fit for Pentair Salt Cell Model No.Pentair Intellichlor IC20  Up to 20,000 Gallons Pool, Detachable Flow Switch and Control Box, 1 Year Warranty | Salt Cell |
| B07C3KW6KV | BLH20-BT | BLUE WORKS Salt Chlorine Generator  Pool Salt Water Chlorinator System Up to 15,000 Gallons, 2-Year USA Warranty, Clear Cell | Chlorination System |
| B08928BQ3P | blpvs2010p | BLUE WORKS Inground Pool Pump - Variable Speed Pool Pump 1 HP  230V, 1 Year Warranty, BLPVS2010P | Pool Pumps |
| B07FQ9TBVH | BLSC-20BT | BLUE WORKS Salt Water Pool Chlorine Generator up to 15 000 Gallons, Saltwater System BLSC Chlorinator, Clear Cell | Chlorination System |
| B07BWDG8R1 | BLRC35AP | Blue Works Pool Salt Cell - Model BLRC35AP fit for Autopilot Salt Cell Model RC-35/22  SC-36, PPC1, Up to 35,000 Gallon Pool | Salt Cell |

| B07FQ8NJLV | BLSC 20 | BLUE WORKS Salt Chlorine Generator System BLSC 20  Up to 15,000 Gallons Salt Water Pool, White Color | Chlorination System |
|---|---|---|---|
| B08QMJ82NK | BLSC10-AG AY | BLUE WORKS Saltwater System up to 10K Gallon Above Ground Pool  Pool Salt System, BLSC10 | Chlorination System |
| B07FQ94QHL | BLSC-40BT | Blue Works Salt Chlorine Generator  up to 40,000 Gallons Salt Pool, BLSC Salt Chlorinator, Clear Cell | Chlorination System |
| B09NKKD67W | | BLUE WORKS Zinc Anode - Pool Anode  Zinc Anode for Saltwater Pool, Sacrificial Anode to Protect Metal Parts, 3.2ft Coopper Wire | Pool & Spa Replacement Parts |
| B074J53PSB | | BLUE WORKS Salt Cell Cleaning Stand  Help Clean The Salt Cell | Pool & Spa Replacement Parts |
| B07QCN6MHX | | BLUE WORKS Salt Cell for Pool Up to 15 000 Gallon Pools with a Cleaning Stand Compatible with Hayward Aqua Rite T-Cell-3  Cell Plates Provided by American Company 2-Year Warranty | Salt Cell |
| B08QMW6NZK | | BLUE WORKS Salt Water Pool Chlorine Generator System BLSC Chlorinator| Cell Plates provided by American Company(40 000 Gallon, Yellow Cell) | Chlorination System |
| B08XQ8PP17 | | BLUE WORKS Solar Pool Ionizer - Pool Ionizer Solar Powered Long Lasting Cooper Anode up to 32,000 Gallons, 85% Less Chlorine | Pool & Spa Replacement Parts |
| B095BY5W13 | BLPTC 60P | Replacement Salt Cell for Pool BLPTC 60P - fit for Pentair Intellichlor IC60  Independent Flow Switch and Control Box, up to 60K gallons Salt Pool, 1 Year Warranty | Salt Cell |
| B0DDXW3747 | BLT15H-1T | BLUE WORKS Salt Cell - Model Number BLT15H-1T  Fit for Hayward Salt Cell Model Number T-CELL-15, Salt Cell for Pool up to 40,000 Gallons Pool, 1 Year Warranty | Salt Cell |
| B086YRZ933 | W1T15+CS | BLUE WORKS Salt Cell for Pool Model Number: BLW1T15H Compatible with Hayward Goldline Aquarite Salt Cell Model Number T-cell-15  Cell Plates provided by American Company with a Cleaning Stand | Salt Cell |
| B01MR8371I | | BLUE WORKS Flow Switch Compatible with Hayward Salt Systems  Flow Sensor with Tee,15-Foot Cable | Pool & Spa Replacement Parts |
| B09Y1P6SLM | BLRC52AP | BLUE WORKS Replacement Salt Cell Model BLRC52AP Compatible with Autopilot Salt Cell Model RC-52, SC-60, PPC4 Up to 52K Gallons Pool | Salt Cell |
| B07QGRN1R4 | BLT9H | BLUE WORKS BLT9H Salt Cell Up to 25K Gallon Pools with a Cleaning Stand Compatible with Hayward Aqua Rite T-CELL-9/Turbo Cell(White)  Cell Plates Provided by USA Manufacturer 2-Year Full Warranty | Salt Cell |

| B0DF1MXDYM | BLT9H-1T | BLUE WORKS Salt Cell - Model Number BLT9H-1T  Fit for Hayward Salt Cell Model Number T-Cell-9, Up to 25,000 Gallons Pool, 1 Year Warranty | Salt Cell |
|---|---|---|---|
| B09Y1NCH9L | BLRC42AP | BLUE WORKS Chlorine Generator Replacement Salt Cell for Pool BLRC42AP Compatible with Autopilot PPC3 Pool Digital Chlorine Generator RC (42 000 Gallon) | Chlorination System |
| B09NDCBRSK | BLPT 60P | BLUE WORKS Salt Chlorine Generator BLPT60  Compatible with Pentair Intellichlor Ic60, up to 60,000 Gallon Pool, 2 Year Limited Warranty | Chlorination System |
| B0868JZG52 | FS-TEE | BLUE WORKS Flow Switch fit for Hayward Salt System Upgrade Design, Built in Circle Gasket and Tape, 15 Feet Cable, Without Tee Housing | Pool & Spa Replacement Parts |
| B07BWGQQ86 | BLRC42AP | BLUE WORKS Chlorine Generator Replacement Salt Cell for Pool BLRC42AP Fit for Autopilot PPC3 Pool Digital Chlorine Generator RC (42 000 Gallon) | Salt Cell |
| B08QMMGMV9 | BLSC 30 | BLUE WORKS Salt Water Pool Chlorine Generator System BLSC Chlorinator | Cell Plates provided by American Company(25 000 Gallon, Yellow Cell) | Chlorination System |
| B086YCGJNB | BLW1T3H | BLUE WORKS Salt Cell Model BLW1T3H with a Cleaning Stand Compatible with Hayward Goldline Aquarite Salt Cell Model Number T-Cell-3 for Salt Pool| Cell Plates provided by American Company | Salt Cell |
| B0BJ6BFRNY | BLT15H-GW | BLUE WORKS Salt Cell - up to 40 000 Gallons Pool, 4 Years Limited Warranty, Salt Cell Model BLT15H-GW | Salt Cell |
| B085HPJMQ4 | | BLUE WORKS Salt Chlorination System Compatible with Hayward Goldline Aquarite System with 15 000 Gallons Cell for In-Ground Pools | Cell Plates provided by American Company | Chlorination System |
| B07PQBD4QB | BLSW10 | BLUE WORKS Salt Chlorine Generator Chlorinator BLSW10 with Flow Switch and Salt Cell for Above-Ground Pool (White) | Chlorination System |
| B07QGTWPS2 | BLT3H | BLUE WORKS BLT3H Salt Cell Up to 15K Gallon Pools with a Cleaning Stand Compatible with Hayward Aqua Rite T-CELL-3/Turbo Cell(Clear)  Cell Plates Provided by American Company 2-Year Full Warranty | Salt Cell |
| B07NWFHKWG | BLH40 | BLH40 Salt Chlorine Generator Salt System Chlorinator for 40 000 gallons Compatible with Hayward Aqua Rite | Chlorination System |
| B07ZYVRGF8 | | BLUE WORKS Dummy Bypass Cell Compatible with Pentair 520588 and Automation Control Systems | Salt Cell |

| | | | |
|---|---|---|---|
| B09NDCYYWY | BLPT 20P | BLUE WORKS Salt Chlorine Generator BLPT20  Compatible with Pentair Intellichlor Ic20, up to 20,000 Gallon Pool, 2 Year Limited Warranty | Chlorination System |
| B07PTZ69JS | BLSC30 | BLUE WORKS Salt Chlorine Generator Chlorinator BLSW20 with Flow Switch and Salt Cell for Above-Ground Pool (White) | Chlorination System |
| B08XYRV48F | PT Cleaning Stand | BLUE WORKS PT Cleaning Stand Acid Washing Kit Compatible with Pentair InterlliChlor Cell BLPTC Salt Cell | Pool & Spa Replacement Parts |
| B07PRG92Y3 | BLSW20 | BLUE WORKS Salt Chlorine Generator Chlorinator BLSW20 with Flow Switch and Salt Cell for Above-Ground Pool (Clear) | Chlorination System |
| B0D2MH8429 | BLH System Bundle | BLH System PCB Main Circuit Board & PCB Display Board Bundle | Pool & Spa Replacement Parts |
| B09NDD4T7W | BLPT 40P | BLUE WORKS Salt Chlorine Generator BLPT40  Compatible with Pentair Intellichlor Ic40, up to 40,000 Gallon Pool, 2 Year Limited Warranty | Chlorination System |
| B07BWC57C9 | BLRC52AP | BLUE WORKS BLRC52AP Compatible with Autopilot Pool Digital Chlorine Generator RC (52 000 Gallon) | Salt Cell |
| B0D1Y5W7XT | BW cleaning Stick | BLUE WORKS BW Cleaning Stick | Pool Cleaning Tools |
| B07V68BNHN | BLT3H | BLUE WORKS BLT3H Salt Chlorination Cell Up to 15 000 Gallon Swimming Pools with a Dummy Cell Compatible with Hayward Aqua Rite T-CELL-3/Turbo Cell | Cell Plates Provided by USA Manufacturer(White) | Salt Cell |
| B07QFPYZRQ | BLT9H | BLUE WORKS BLT9H Salt Cell Up to 25K Gallon Pools with a Cleaning Stand Compatible with Hayward Aqua Rite T-CELL-9/Turbo Cell(Clear)  Cell Plates Provided by American Company 2-Year Full Warranty | Salt Cell |
| B085L7KN7P | BLH40-1W | BLUE WORKS Saltwater Chlorination BLH40 System for 40 000 Gallons In-Ground Pools | Cell Plates provided by American Company(White) | Chlorination System |
| B0DRY12SFP | BLSC20BW | BLUE WORKS Salt Chlorine Generator System BLSC 20  Up to 15,000 Gallons Salt Water Pool, White Color | Chlorination System |
| B0D6VJ397P | BLSC20 Replacement salt cell | BLUE WORKS BLSC20 Replacement Salt Cell for Pool | Salt Cell |
| B07TPHDQ2R | BLT15H | BLUE WORKS BLT15H Salt Cell Up to 40K Gallon Pools with a Cleaning Stand Compatible with Hayward Aqua Rite T-CELL-15/Turbo Cell(Clear) | Cell Plates Provided by USA Manufacturer | 2-Year Warranty | Salt Cell |
| B0CYZ53RLN | BLFS | BLUE WORKS Water Flow Switch | Pool & Spa Replacement Parts |
| B0D6VGJPPX | BLH40-BW REPLACEMENT SALT CE | BLUE WORKS BLH40 Replacement Salt Cell for Pool | Salt Cell |
| B0D6VHDSXG | BLSC40 Replacement salt cell | BLUE WORKS BLSC40 Replacement Salt Cell for Pool | Salt Cell |

| B086YN5SBK | BLW1T9H | BLUE WORKS Salt Cell Model Number: BLW1T9H with a Cleaning Stand Compatible with Hayward Goldline Aquarite Salt Cell Model Number T-Cell-9 for Salt Pool Cell Plates provided by American Company | Salt Cell |
|---|---|---|---|
| B09YRNFQMH | BLSC-B | BLUE WORKS Salt Water Pool Chlorine Generator System BLSC-B Chlorinator Cell Plates provided by American Company | Chlorination System |
| B0B5ZHWRKJ | BLH3040 | BLUE WORKS Saltwater Generator Chlorinator BLH3040 Yellow | Chlorination System |
| B07TC1WQ35 | BLT15H | BLUE WORKS BLT15H Salt Cell Up to 40K Gallon Pools with a Cleaning Stand Compatible with Hayward Aqua Rite T-CELL-15/Turbo Cell(White) \| Cell Plates Provided by USA Manufacturer \| 2-Year Full Warranty | Salt Cell |
| B07PQBNTD4 | BLSW10 | BLUE WORKS Salt Chlorine Generator Chlorinator BLSW10 with Flow Switch and Salt Cell for Above-Ground Pool (Clear) | Chlorination System |
| B0CRDPRL59 | Dummy Bypass | BLUE WORKS Bypass Cell Compatible with Hayward T-Cell-3 T-Cell-5, T-Cell-9, T-CELL-15, Prolong The Life of Salt Cell, Dummy Cell for Salt Water Pool | Pool & Spa Replacement Parts |
| B0D6VKL66M | BLH20-BW REPLACEMENT SALT CE | BLUE WORKS BLH20 Replacement Salt Cell for Pool | Salt Cell |
| B0B2R9XQSY | | BLUE WORKS Flow Switch | Pool & Spa Replacement Parts |

<u>**Exhibit 2**</u>

**Email correspondence between the Debtor, Hayward**

## Matthew Tomsic

| | |
|---|---|
| **From:** | Ewing, Chad <Chad.Ewing@wbd-us.com> |
| **Sent:** | Friday, April 4, 2025 10:41 AM |
| **To:** | Matthew Tomsic; Belt, Erik Paul |
| **Cc:** | Ashley B. Oldfield; Natalie Kutcher; Michael Martinez |
| **Subject:** | RE: Blueworks Amazon listings |

Matt,

Needless to say, we disagree with your reading of the Contempt Order.

I going to get in touch with my client later today about next steps.  I'll be in touch with you afterwards.

Chad

**From:** Matthew Tomsic <mtomsic@rcdlaw.net>
**Sent:** Friday, April 4, 2025 10:08 AM
**To:** Ewing, Chad <Chad.Ewing@wbd-us.com>; Belt, Erik Paul <ebelt@McCarter.com>
**Cc:** Ashley B. Oldfield <aoldfield@rcdlaw.net>; Natalie Kutcher <NKutcher@rcdlaw.net>; Michael Martinez
<mmartinez@grierlaw.com>
**Subject:** RE: Blueworks Amazon listings

Chad, given the lack of response and dispute related to the Contempt Order, the Debtor intends to file today a
motion to enforce the stay and ask the Court to hear it on the Chapter 11 day next week.

If Hayward is willing to clarify with Amazon that the Contempt Order does not bar Blueworks' sale of Blueworks'
products, the Debtor may be able to forego such a formal action. Please let me know as soon as possible if that's
the case.

-Matt

**From:** Matthew Tomsic
**Sent:** Thursday, April 3, 2025 1:30 PM
**To:** 'Ewing, Chad' <Chad.Ewing@wbd-us.com>; 'Belt, Erik Paul' <ebelt@McCarter.com>
**Cc:** Ashley B. Oldfield <aoldfield@rcdlaw.net>; Natalie Kutcher <nkutcher@rcdlaw.net>; 'Michael Martinez'
<mmartinez@grierlaw.com>
**Subject:** RE: Blueworks Amazon listings

Chad, following up my request for Amazon correspondence below.

-Matt

**From:** Matthew Tomsic
**Sent:** Monday, March 31, 2025 8:29 PM
**To:** Ewing, Chad <Chad.Ewing@wbd-us.com>; Belt, Erik Paul <ebelt@McCarter.com>
**Cc:** Ashley B. Oldfield <aoldfield@rcdlaw.net>; Natalie Kutcher <nkutcher@rcdlaw.net>; Michael Martinez

<mmartinez@grierlaw.com>
**Subject:** RE: Blueworks Amazon listings

Chad, please send all communications from Hayward to Amazon and vice versa related to the Ningbo Contempt Order. If you'd prefer a formal request, please let me know.

Blueworks disputes Hayward's newly expansive reading of the Ningbo Contempt Order, especially considering Hayward's:

1. affirmative representation that: "The proposed order is for the Ningbo parties. . . . Blueworks is not the subject of the contempt order."
2. Hayward's objection to participation by Blueworks' litigation counsel related to the Ningbo Contempt Order because such counsel is "representing a third party (Blueworks) and  . . . don't represent the Ningbo parties[.]"

Best,
Matt

---

**From:** Ewing, Chad <Chad.Ewing@wbd-us.com>
**Sent:** Monday, March 31, 2025 4:45 PM
**To:** Matthew Tomsic <mtomsic@rcdlaw.net>; Belt, Erik Paul <ebelt@McCarter.com>
**Cc:** Ashley B. Oldfield <aoldfield@rcdlaw.net>; Natalie Kutcher <NKutcher@rcdlaw.net>; Michael Martinez <mmartinez@grierlaw.com>
**Subject:** RE: Blueworks Amazon listings

Matt,

Attached to this email, please find (i) a copy of Judge Cogburn's March 19, 2025, Order and (ii) a copy of Appendix A to that order.

In the Order, Judge Cogburn prohibited the Ningbo Parties, including all agents, employees, officers, directors, shareholders, affiliates, subsidiaries, assignees, and anyone acting for or through them, from importing or selling any product in the United States.  The Court specifically prohibited the Ningbo Parties from using shell companies, agents, subsidiaries, affiliates, successors in interest, assignees, corporate restructuring, rebranding or third parties to evade this import and sales ban.  In addition, the Court also made clear that the Ningbo Parties could not use third parties to import or sell their products in the United States, unless and until the judgment in the amount of $17+MM is satisfied.  The Court specifically contemplated that the Ningbo Parties would attempt to use the Debtor Blueworks Corporation to evade the sales and import ban and specifically provided that the application of the ban to Blueworks Corporation does not violate the automatic stay because the ban was issued pursuant to the Court's police power to enforce its orders:

4.      To the extent that this sales an

which is currently in Chapter 11 bankruptcy,

U.S.C. § 362(a) because the ban is issued pur

orders, including the TRO. <u>See</u> 11 U.S.C. § 3

Contempt Order at 17, ¶ 4.  See also n.1 on p. 1. ("While this order focuses on the Ningbo Parties, any impact on Blueworks Corporation is pursuant to this Court's exercise of its police power to enforce its orders.  See 11 U.S.C. § 362(b)(4).")  Obviously, we do not represent Amazon nor does Hayward ultimately decide what products can be sold on Amazon; however, I think that we can all assume with a high degree of certainty that Amazon removed the Blueworks' sales listings from its website because those products are all Ningbo products and Judge Cogburn's order prohibits the sales of those products in the United States. I also observe that Appendix A cites, among other things, a number of Amazon ASINs for Blueworks-branded product.

Chad

**Chad Ewing**
Partner
Womble Bond Dickinson (US) LLP

**d:** 704-331-4996                301 S. College Street, Suite 3500
**m:** 704-724-2679                Charlotte, NC 28202-6050
**e:** Chad.Ewing@wbd-us.com



**womblebonddickinson.com**

  

This email is sent for and on behalf of Womble Bond Dickinson (US) LLP. Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law. Please see www.womblebonddickinson.com/us/legal-notice for further details.

**From:** Matthew Tomsic <mtomsic@rcdlaw.net>
**Sent:** Monday, March 31, 2025 9:39 AM
**To:** Ewing, Chad <Chad.Ewing@wbd-us.com>; Belt, Erik Paul <ebelt@McCarter.com>
**Cc:** Ashley B. Oldfield <aoldfield@rcdlaw.net>; Natalie Kutcher <NKutcher@rcdlaw.net>; Michael Martinez
<mmartinez@grierlaw.com>
**Subject:** Blueworks Amazon listings


Chad and Erik,

I was notified over the weekend that Amazon pulled Blueworks' sales listings. We've contacted counsel for
Amazon for an explanation.

I also wanted to reach out to you both to see whether you could provide any context or background related to the
same. Please let me know as soon as possible. If Hayward has communicated with Amazon related to Blueworks
and/or its codefendants in the District Court Case, please provide those communications as well.


-Matt

-------------------------------------------

**Matthew L. Tomsic**
Telephone: 704.334.0891
Fax: 704.377.1897
mtomsic@rcdlaw.net
Download vCard

-------------------------------------------

**R|C|D**
**Rayburn Cooper & Durham, P.A.**
227 West Trade Street | Suite 1200
Charlotte, NC 28202

## Exhibit 3

### Emergency Hearing Transcript

1

```
 1                UNITED STATES BANKRUPTCY COURT
                WESTERN DISTRICT OF NORTH CAROLINA
 2                      CHARLOTTE DIVISION

 3  IN RE:                    :    Case No. 24-30494-LTB

 4  BLUEWORKS CORPORATION,    :    Chapter 11

 5      Debtor.               :    Charlotte, North Carolina
                                   Wednesday, April 9, 2025
 6                            :    11:35 a.m.

 7  : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

 8

 9                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE LAURA TURNER BEYER,
10                 UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For the Debtor:           Rayburn Cooper & Durham, P.A.
                              BY:  MATTHEW L. TOMSIC, ESQ.
13                                 NATALIE KUTCHER, ESQ.
                              227 West Trade Street, Suite 1200
14                            Charlotte, NC  28202

15  For Michael T. Bowers:    Grier Wright Martinez PA
                              BY:  MICHAEL L. MARTINEZ, ESQ.
16                            521 E. Morehead St., Suite 440
                              Charlotte, NC  28202
17

18
    Audio Operator:           COURT PERSONNEL
19

20
    Transcript prepared by:   JANICE RUSSELL TRANSCRIPTS
21                            1418 Red Fox Circle
                              Severance, CO  80550
22                            (757) 422-9089
                              trussell31@tdsmail.com
23

24
    Proceedings recorded by electronic sound recording; transcript
25  produced by transcription service.
```

```
1   APPEARANCES (continued):

2   For Hayward Industries,      Womble Bond Dickinson (US) LLP
    Inc.:                        BY:  B. CHAD EWING, ESQ.
3                                     PATRICK SPAUGH, ESQ.
                                 301 S. College Street, Suite 3500
4                                Charlotte, NC  28202

5                                STEVEN HALPERN, ESQ.
                                 415 Vantage Park Dr., Suite 400
6                                Charlotte, NC  28203

7   For Amazon.com Services, LLC: K&L Gates LLP
                                 BY:  EMILY K. STEELE, ESQ.
8                                301 Hillsborough St., Suite 1200
                                 Raleigh, NC  27603
9

10  ALSO PRESENT:                SHELLEY K. ABEL
                                 Bankruptcy Administrator
11                               401 W. Trade Street, Suite 2400
                                 Charlotte, NC  28202
12
                                 MICHAEL T. BOWERS, CRO
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                P R O C E E D I N G S

2          THE COURTROOM DEPUTY:  No. 7, Blueworks Corporation,

3    Case No. 24-30494, fifth continued hearing on application for

4    compensation to Shumaker, Loop & Kendrick, LLP; third continued

5    hearing on objection to Claim No. 6, Hayward Industries; third

6    continued hearing on objection to Claim No. 9, Hayward

7    Industries; third continued hearing on objection to Claim No.

8    7, Hayward Industries; third continued on objection to Claim

9    No. 10, Hayward Industries; third continued on object to Claim

10   No. 4, Hayward Industries; continued hearing on confirmation of

11   chapter 11 plan; and hearing on debtor's emergency interim

12   motion to enforce the automatic stay.

13         THE COURT:  All right.  Why don't we start by having

14   you all announce your appearances?  And we'll start over here

15   with you, Mr. Martinez.

16         MR. MARTINEZ:  Thank you, your honor.  Good morning.

17   Michael Martinez here on behalf of Michael Bowers, the limited

18   powers trustee, who's with me in the courtroom.

19         THE COURT:  Okay.

20         MR. TOMSIC:  Good morning, your Honor.  Matt Tomsic,

21   Rayburn Cooper & Durham, on behalf of the debtor.  With me is

22   Natalie Kutcher as well.

23         THE COURT:  Okay.

24         MR. EWING:  Chad Ewing, your Honor, Womble Bond

25   Dickinson, for Hayward Industries.  With me today is Steve

1    Halpern, our client representative, Patrick Spaugh of, also of

2    Womble Bond Dickinson.

3              THE COURT:  Okay, great.

4              MS. STEELE:  Good morning, your Honor.  Emily Steele

5    from K&L Gates LLP.  I'm here for Amazon.com Services, LLC.

6              THE COURT:  Okay.  And tell me your last name again.

7              MS. STEELE:  Steele.

8              THE COURT:  Okay.

9              MS. STEELE:  S-T-E-E-L-E.

10             THE COURT:  Okay, very good.  Thank you.

11             MS. ABEL:  And Shelley Abel, Bankruptcy Administrator.

12             THE COURT:  All right.

13             Mr. Tomsic, this is your motion.  So we'll hear from

14   you.

15             MR. TOMSIC:  Yes, your Honor.  Thank you.  And we want

16   to certainly thank the Court for its indulgence here.  It's on

17   short notice.

18             As the motion to shorten said, it's, you know, it's a

19   somewhat dramatically shortened notice, but the debtor finds

20   itself in very dramatic and drastic circumstance.  So as the,

21   as you noted, we're here on the motion for interim relief to

22   enforce the stay.  But, but really, your Honor, what we, what

23   we're truly here on is whether today this case should be

24   effectively converted from a reorganization proceeding to a

25   conversion proceeding with no notice to the debtor, the parties

1 in interest, the Court, or, you know, or a full and fair record

2 and briefing schedule.  So I think what makes sense, your

3 Honor, is that I'll just briefly describe some background, then

4 touch on the relief requested, and then move into the argument

5 from there.

6         So pertinent here, starting with the background, and

7 as the Court likely remembers, the debtor sells pool supplies,

8 pool equipment, some of which is its own system, some of which

9 is compatible with Hayward's products.  It's aftermarket

10 products compatible with certain Hayward products.  And that

11 inventory is uniformly sold through Amazon.  That inventory is,

12 as well, again, pertinent for today, manufactured by Ningbo CF,

13 one of the co-defendants in the district court case.  On March

14 3rd, your Honor, the district court upstairs held a show cause

15 hearing related to the debtor's co-defendants and Mr. Chen,

16 Richard Chen, the debtor's principal.  Hayward had filed

17 pleadings arguing those parties were in violation of certain of

18 it, of the district court's orders and requested a show cause

19 hearing and a contempt hearing.  Specifically, the issues that,

20 the orders at issue are the TRO that was entered, I think it

21 was about, roughly, a year ago, if not quite that long ago, as

22 well as a failure to respond to discovery.  There are other,

23 other allegations in, in the order itself as well.  But the

24 main thrust of the argument related to those, as I understand

25 it.

1         On March 19th, a contempt and sanctions order issued

2    against the, quote, Ningbo Parties, and it was a broad ban from

3    importing and selling goods while the judgment of, of the

4    district court remained unsatisfied.  The Ningbo Parties were

5    defined as Ningbo CF, which, again, your Honor, is the debtor's

6    sole supplier,  Ningbo Yusheng, Blueworks Innovation Corp., and

7    Mr. Chen individually.  Six days later, roughly, the debtor

8    learned that its Amazon listings had been pulled and then over

9    the next several days contacted counsel for Hayward and counsel

10   for Amazon to try to get an understanding of why that happened

11   and you know, what steps the debtor needed to take to address

12   it.

13        Importantly here, your Honor, since the end of March,

14   the debtor has been unable to sell its products on Amazon,

15   which has forced it into, essentially, a liquidation posture

16   and effectively, you know, stopped its business operations as a

17   going concern.  That said, it is still salvageable with, if the

18   Court grants the relief that we've requested, especially in the

19   interim.  And it's, it's incredibly important at this point in

20   time as well because the temperatures are warming, pool

21   season's beginning, and folks are, presumably, on the market,

22   you know, starting up their pools and seeing what they need to

23   replace, what, what they don't need to replace.  And every day

24   that passes are, are opportunities for sales that the debtor

25   loses by not having its products listed on Amazon.

1          With that background in mind, your Honor, I'll just

2     turn to the relief requested.  And I want to stress, you know,

3     throughout the hearing today that the debtor is seeking an

4     interim order allowing it on an emergency basis to continue

5     selling, effectively a direction to Amazon to relist the, the,

6     the products for sale, and otherwise fully kind of reinstate

7     the debtor's Amazon account while the parties push for, you

8     know, a, a opportunity to fully brief the issues at play at a

9     final hearing.  And again, your Honor, the interim relief was

10    really designed by the debtor to try to balance, you know,

11    fairness to, to the Court, fairness to the parties, but also

12    address the urgency with which the debtor needed to try to get,

13    have this Court weigh in to determine if it can at least sell

14    on the interim to maximize its going concern value and allow

15    whatever chance there is left of a reorganization to occur.

16          Turning to the argument, your Honor, as the Court

17    knows, Section 362 bars acts to exercise control over property

18    of the debtor's estate.  The purpose of the stay -- this is in,

19    in the papers -- the purpose of the stay is to shield the

20    debtor from financial pressure during the pendency of the

21    bankruptcy case.  And the, the specific act here that the

22    debtor is focused on and, and believes the Court and the

23    parties should be focused on is not the entry of the order

24    itself upstairs, but rather, the, the transmission and service

25    of that order onto Amazon with, presumably, the directive to

1   delist the debtor's products that the debtor is selling.  And

2   by taking those steps unilaterally, Hayward is, in effect,

3   exercising control over the property of the debtor's estate,

4   all of its inventory, in violation of the automatic stay.

5       And while the focus, you know, the briefing obviously

6   is the impact in trying to measure the contempt order, the

7   debtor, as we argued, has put the argument forward that that

8   contempt order does not bar the debtor from selling the

9   debtor's products housed in, in the Amazon warehouses

10  throughout the country.

11      Here are several reasons that's the case.  And your

12  Honor need no, need travel no farther than the order itself.

13  Admittedly, there's a pretty dramatic disagreement about how to

14  read the order, as you can see from the Monday response by

15  Hayward.  But the first two pages of that response kind of

16  shows the leap that Hayward wishes this Court to take.  And it

17  starts off by talking about the order barring and prohibiting

18  the Ningbo Parties from taking certain actions.  And then

19  Hayward kind of works up to it.  By the time you get to Page 10

20  of their, their response, we've turned the order into a *de*

21  *facto* bar against Blueworks selling Blueworks products.  That's

22  not, that's not the case here, your Honor, for several reasons

23  and I'll just tick through them briefly again.  Again, we

24  briefed them and because of the shortened notice, you know, we,

25  the debtor for, forgone, forwent the opportunity of a reply

1   just to try to make sure we get before the Court as quick as

2   possible, especially with this chapter 11 day scheduled already

3   for today.

4            So first, your Honor, how do we know the contempt

5   order does not, on its face, apply to the debtor?  The contempt

6   order noted, notes itself that it focuses on the Ningbo

7   Parties.  And then that, that defined term does not include the

8   debtor.  And as Hayward has mentioned in its response, and as

9   we flagged up front in our briefing as well, there is a

10  footnote referencing any impact on Blueworks Corporation

11  pursuant to the Court's exercise of its police powers to

12  enforce its orders.

13           Now that -- Hayward would have this Court read that

14  language expansively to basically say the stay has been lifted

15  for all purposes in this bankruptcy case and, and Hayward can

16  take this contempt order and do with it what it wants,

17  including shutting off Amazon, shutting off Amazon's listings

18  of the debtor's product.  And you know, Hayward quibbled with,

19  with my reference about it's not hard to imagine what, what

20  purpose that reference might include.  And setting aside the

21  John Lennon reference, which was curious coming from Hayward

22  because that song's about everyone living in peace, we can

23  tease out the footnote and the police and regulatory powers as

24  it would apply in that narrow setting of the order.

25           So, and again, your Honor, we're here, quickly, on

1    interim relief.  This could be something that would be fully

2    fleshed out in a full and fair briefing schedule as well.  But

3    taking Hayward at its word that that was a proper exercise of

4    the police and regulatory powers, at a 30,000-foot view the

5    stay, the police and regulatory exception to the stay applies

6    to the court enforcing its own orders.  And so here in the

7    district court, the district court was enforcing its own orders

8    against Ningbo CF, the co-defendants, and Mr. Chen.

9            Take that down to the next level and we have our

10   footnote that says any, quote -- and it's important the

11   language used "any impact to Blueworks" as pursuant to the

12   court's ability to enforce its orders as against the nondebtor

13   co-defendants and Mr. Chen.  And it is not -- there is an

14   impact, obviously, on the debtor.  And we noted this in our

15   motion.  If Ningbo is barred from importing and selling, then

16   the debtor's got to find a new supplier, full stop.  And so

17   that impact on Blueworks, if we kind of walk back up the

18   staircase, that impact on Blueworks is any impact which would

19   be pursuant, again, assuming that, assuming for the sake of

20   argument that reference is in there appropriately, that impact

21   is pursuant to the district court's police and regulatory

22   powers to enforce its own orders against Ningbo CF, the

23   codefendants, and Mr. Chen, not to, as Hayward would have you

24   read that language in the footnote and then deeper in the

25   sanctions order, not to apply to, expansively, to the debtor

1   itself as basically opening the floodgates to allow whatever to

2   happen to the debtor based on the contempt order.  It's a, I

3   know it is a tedious kind of step-by-step reading, but I wanted

4   to try to tease that out on the front end for, for the Court

5   and for the benefit of the parties.

6           And so that's kind of No. 1, addressing the, the

7   footnote and the language later in the order talking about the

8   exception.

9           Second, and again, Hayward quibbled with the language

10  that we use.  The debtor -- the reason -- another reason and

11  support that the contempt order on its face does not apply to

12  the debtor is because the debtor was not before the district

13  court.  And again, your Honor, what that means, and maybe I

14  should have put it, we should have put a finer point on it in

15  the briefing, but the debtor was not a party to the contempt

16  proceeding.  Hayward was not seeking to hold the debtor in

17  contempt and was not seeking to sanction the debtor.  And so

18  the debtor was not before the district court.  And I, I, I

19  struggled with how to address this, but I think I need to for

20  the record.

21          Hayward's a hundred percent correct.  I was at that

22  hearing.  I was sitting in the gallery, and I was sitting in

23  the gallery because the debtor was not a target of contempt or

24  a target of, of sanctions.  And while Hayward tries to posture,

25  you know, my physical presence there, I think what happens is

1    Hayward mistakes, you know, attendance of a hearing with an

2    appearance before the court at a hearing.  And what Hayward

3    would have this Court believe, there was some a-ha moment where

4    I should have leapt up out of my seat and stomped my feet and

5    pounded the table and objected to everything that was

6    happening.  But, but simply, your Honor, that, that moment

7    didn't, didn't exist.

8            So there is not a --

9            THE COURT:  But was there discussion at that hearing?

10   I mean, once it -- okay.  So you weren't the subject of the

11   contempt proceeding, technically.  But if at some point the

12   conversation moved towards affecting the debtor or specifically

13   addressing the debtor, I mean, was there any thought to

14   standing up and, you know, stating your position on behalf of

15   the debtor so that now it doesn't leave this Court in the

16   position of having to try to interpret the, you know, my

17   colleague's order up above, you know?  I mean, it, it begs that

18   question.

19           MR. TOMSIC:  Yes, your Honor.  And, and the, the

20   debtor's contention is there was no, there was no discussion or

21   outright, you know, targeting of Blueworks during that hearing.

22   I believe Mr. -- I don't want to, I don't want to push off your

23   Honor's question, but I believe Mr. Martinez was going to go,

24   was, that was going to be part of his discussion --

25           THE COURT:  Okay.  And that's fine.

1        MR. TOMSIC:  -- as well.

2        But in short, your Honor, no, that, that a-ha moment

3   didn't, didn't occur.  And so, you know, it's not as if the

4   debtor rested on his laurels upstairs and then expects this

5   Court to leap into action downstairs.

6        So your Honor, just give me one moment.  I lost track

7   of where I was.

8      (Pause)

9        MR. TOMSIC:  The other -- looking at the -  turning to

10  the order itself, the debtor, again further supporting that it

11  was not the target of the contempt order, was that because the,

12  the language of the contempt order does not establish

13  jurisdiction over the debtor, right?  There's not a mention of

14  Blueworks is properly before the court and there's not a

15  recitation of any orders by the court that the debtor had

16  violated.

17        So this -- the, the, the entire kind of universe of

18  information and language in the order stands for the reasonable

19  conclusion that the debtor was not a party to the contempt

20  proceeding; and therefore, the contempt order was not directed

21  to or targeting the debtor.  And your Honor, Hayward, Hayward

22  confirmed that itself in discussion about the proposed order by

23  confirming that the debtor was not the subject of the contempt

24  order.

25        And so to, to go between, you know, on the one hand,

1   the debtor is not the subject of the contempt order now, to an

2   argument that the contempt order is a *de facto* sales and import

3   ban as to the debtor, it just, it, it leaps too far in logic

4   for, for both of those to be true at the same time.

5           THE COURT:  And when you say -- it was by email,

6   right, that Hayward mentioned that --

7           MR. TOMSIC:  Yes, your Honor.

8           THE COURT:  -- the debtor was not the subject of the

9   contempt order?

10           MR. TOMSIC:  Yes, your Honor.

11           THE COURT:  And was that in the context of the debtor,

12   I mean, of Hayward circulating that order by you all for

13   comment?

14           MR. TOMSIC:  Yes, your Honor.

15           So what, what happened was Hayward circulated the

16   proposed order to Ms. Dunn, who is, nominally, counsel still

17   for Ningbo CF.  She had filed a motion of withdrawal, but that

18   motion's not been granted upstairs.  And she, she's also a, a,

19   the special corporate counsel for the debtor here.  That's just

20   to, hopefully, keep the parties straight.  Michelle Dunn copied

21   myself and other of the debtor's attorneys into the response.

22   The debtor's special litigation counsel from Shumaker, the IP

23   folks --

24           THE COURT:  Uh-huh (indicating an affirmative

25   response).

1          MR. TOMSIC:  -- responded and said, "You didn't copy

2     everyone initially.  We don't have enough time to review."  And

3     then it was to that email that the response came from Hayward

4     saying, "The debtor is not the subject" -- he used the company

5     term -- "Blueworks is not the subject of the contempt order.

6     We will object to any input Blueworks has," you know.  "You,

7     you have as not, have attending the hearing special counsel to

8     the order."  There was a reference to a note that I had sent

9     where I was looking at the bankruptcy language.

10          THE COURT:  Uh-huh (indicating an affirmative

11     response).

12          MR. TOMSIC:  And then ultimately, beyond that, I

13     think, I think all this happened over the course of a Thursday

14     and Friday.  And then Hayward, I'm sure, we'll straighten out

15     the timeline if, if I'm off base.  'Cause I wasn't copied on

16     all the emails.  I wasn't copied on the initial one.  I wasn't

17     copied when the proposed order was sent to the, to Chambers as

18     well.  And I did, I believe Hayward put in another one of the

19     emails, I did, because I said I would respond, I did respond to

20     Hayward's counsel with thoughts about that language, but the,

21     the proposed order had already, had already been submitted at

22     that point.

23          And again, it really put the debtor in a box because

24     on the one hand, the debtor wasn't being sought to be

25     sanctioned or held in contempt.  But then on the other hand,

1   there is this relief that was granted.  And, and you can

2   imagine what the argument would be is, what if I did stand up

3   and shout and jump up and down in district court?  Or what if I

4   did email Chambers directly and say, "Oh, the debtor has all

5   these comments?"  Well, then I've kind of --

6            THE COURT:  Yeah.

7            MR. TOMSIC:  It's a trap, in some sense.  Then I'm

8   kind of stuck because now it, I've, I've walked into an

9   argument where, "It's obvious that the debtor knew this would

10  apply to it.  Because look, Mr. Tomsic's responding to emails.

11  Mr. Tomsic's arguing it at the contempt proceeding, at the

12  sanctions hearing."

13           And so, you know, in short, your Honor, the -- and

14  I'm, I'm getting, wrapping up too, as well.  I've just got two

15  more points -- the purpose of the contempt order isn't to

16  punish the debtor.  It was meant to punish the non-debtor

17  defendants.  I think that's, that's clear by the language of

18  the contempt order.

19           And then to, to zoom out for a second, I just want to

20  touch on the harm.  The harm here -- if the debtor is allowed

21  to sell its products and say, say Hayward is correct, say when

22  Ms. Abel's motion to convert is heard that the order is read to

23  apply to the debtor and that in the interim, if the debtor is

24  allowed to at least sell its products, the harm to Hayward, to

25  the other parties, the debtor argues, is, is minimal because

1   that money is going to flow into a bank account under the

2   control of Mr. Bowers and, and be there, you know, and, as we

3   argue and work towards final relief.  The harm to, to Hayward

4   is that for a certain amount of time, I guess, the debtor was

5   able to sell its products, but the funds will flow in to pay

6   claims, in the meantime.  The harm to the debtor, your Honor,

7   is, if this Interim relief isn't granted, the case is

8   effectively converted to a liquidation.  That inventory sitting

9   will just go to waste and not be used in any sense to, to

10  benefit the bankruptcy estate or the claims and parties in

11  interest.  And I mean, it's truly an existential problem for

12  the debtor.

13       And then, you know, the debtor also is not saying

14  that, you know, "Forever and always, Hayward, you can't bring

15  this argument."  The appropriate way to bring the argument is

16  somewhat how Ms. Abel's teed it up.  On, you get your district

17  court order.  Okay.  Is it questionable that it could apply to

18  the bankruptcy case?  Maybe.  You file your motion for stay

19  relief, you file your motion to convert, you file your motion

20  to dismiss, notice it up in the ordinary course, and then we

21  have a debate about it before your Honor whether this case

22  should continue, this bankruptcy case should continue.

23       And the key distinction here is, if that appropriate

24  process is followed, the debtor can sell in the meantime.

25  Instead, we've stopped.  We started at the conclusion with

1   Hayward's preferred reading of the order.  Our sales have been

2   shut down, and now we're scrambling to try to make heads or

3   tails of what, what's to happen.

4           THE COURT:  Well, let me ask this question.  You talk

5   about the debtor being put in a box, and I appreciate that

6   statement.  Isn't the motion that you have filed putting this

7   Court in a box?  Because in essence, you are asking me to

8   interpret Judge Cogburn's order.  That is the thing about which

9   you all have disagreement.  And frankly, I'm a little loathe to

10  try to interpret Judge Cogburn's order when Judge Cogburn,

11  frankly, can be asked to interpret his own order.  Now I

12  appreciate that getting a hearing in front of him on shortened

13  notice might be a little more difficult than getting a hearing

14  in front of this Court on shortened notice.  But, but that's,

15  that's an uncomfortable spot for this Court to be in, to say

16  the least.  It would be less comfortable if it were, it would

17  be less uncomfortable if it were a district court judge in, you

18  know, Arizona or New York.  But I mean, he's right here.

19          MR. TOMSIC:  Yes, your Honor.  The, the conversation I

20  think I had with someone yesterday was it's not as if, right,

21  it's a district court judge in New York or Arizona or Hawaii

22  even, right?  Judge Cogburn is upstairs.  The -- and, and we

23  wrestled with how to respond and where to respond, to be

24  honest, your Honor.  The debtor brought this motion here

25  because while it is a, it's a challenging lift, on the one

1   hand, you know, we had somewhat of a review of an upstairs

2   order at the outside of the case with the TRO, the temporary

3   restraining order, and whether it and how it applied to the

4   debtor.  But more importantly, your Honor, the, while we are

5   here on a stay enforcement motion, what we're truly here on is

6   whether this case should be converted and the debtor strongly

7   felt that this Court and your Honor should have the first say

8   in the first instance on that type of relief.  Had Hayward not

9   frozen up the inventory, then, then maybe it is upstairs where

10  we go.  Because we can sell in the meantime.  But effectively,

11  what's happened is a forced conversion to liquidation.

12          And so the debtor truly believed that we can go

13  through the jurisdictional elements and requirements, but that

14  really should be for the bankruptcy court to opine on in the

15  first instance, fully understanding, you know, that, of what

16  we're asking this Court and your Honor to do and, and, and to

17  review.

18          Your Honor, with that, unless you've got further

19  questions, that was my kind of open argument.  I would reserve

20  some time for rebuttal and that otherwise ask, again stressing

21  interim.  And if, if we need to take, you know, further steps

22  in other places, I again want to stress this relief is just

23  interim, just to get us to a final hearing in front of the

24  appropriate court at the appropriate judge to allow us to keep

25  selling and avoid what's, essentially, a forced liquidation of

1    the business and a full stop of the business's ability to

2    operate as going concern.

3              THE COURT:  Okay.

4              MR. TOMSIC:  Thank you.

5              THE COURT:  Thank you.

6              Mr. Martinez.

7              MR. MARTINEZ:  Thank you, your Honor.  Michael

8    Martinez here on behalf of Michael Bowers, the limited powers

9    trustee.

10             Just as a preliminary point or perspective from Mr.

11   Bowers' position, Mr. Bowers is here to serve the Court.  I'm

12   here to serve him, serve, help, help him serve the Court.

13   We're just looking for some direction on what we should do.

14   And if it's, you know, we need to help the debtor go upstairs

15   and get clarity, we can do that.

16             Some points I'd just like to make primarily relating

17   to that hearing, you know.  There's, there's much discussion in

18   the response about Mr. Tomsic not sort of jumping up at a

19   certain moment and protecting the bankruptcy estate's interest.

20   I was also there.  Ms. Abel was also there.  I, I, I never

21   realized that this is what Hayward was asking for.  And, and it

22   may have been, it may be blatant from anybody else's reading of

23   the hearings and the papers before the district court.  I did

24   not understand that what they were doing was saying the

25   bankruptcy debtor, as opposed to all of Richard Chen's other

1   affiliates, was going to have a, a sales ban.  And in fact, I

2   went back and looked 'cause I, you know, thought maybe I just

3   misremembered, you know.   I did a word search of the hearing

4   transcript.  Most of the times that Judge Cogburn even says the

5   word "Blueworks" in the, it's in the context of discussing

6   Blueworks continuing to sell products.

7        THE COURT:  Uh-huh (indicating an affirmative

8   response).

9        MR. MARTINEZ:  And the point he was making is as long

10  as they're continuing to sell products, the money's got to flow

11  to Hayward.

12       There's also discussion about, you know, one of the

13  things at the trial was whether the products, you could

14  advertise them on Amazon to say they're compatible with or not.

15  And, and Judge Cogburn was unwilling to say, give a permanent

16  injunction to say that Blueworks couldn't say that their

17  products are compatible with Hayward's.

18       But again, the, the point was he was contemplating the

19  debtor continuing to sell Amazon products.  The, the, the one

20  quote that's probably the best one for our side in the

21  transcript, and I'm just going to start the quote:

22       "But if they're going to continue to sell these units,

23        these inferior units but possibly compatible units,

24        through Blueworks, then they're going to have to,

25        until the judgment is paid, they're probably going to

1          have to pay the money to these folks over here at

2          Hayward."

3              So it -- it was -- I -- we, we could argue over how

4      obvious it was, but I think you could at least say it was

5      ambiguous, from me sitting there, that he might have been

6      envisioning after that hearing Blueworks continuing to be able

7      to sell products.  And, and you know, the, the, the point, you

8      know, he said, he did say what they quote at the early part of

9      the hearing that, you know, he said, "Blueworks is going to

10     have to", whatever, "come here and defend."

11             THE COURT:  What's your understanding of what he meant

12     by that?

13             MR. MARTINEZ:  Okay.  So Ms. Dunn was talking about

14     Mr. Chen's gamesmanship in Chena, blah, blah, blah.  Judge

15     Cogburn cuts her off in the middle of sentence and says,

16     "They're going to have to come here and defend."

17             So they, they had a four or five-year trial where the

18     Chen parties were called Blueworks.

19             THE COURT:  Right.

20             MR. MARTINEZ:  So I understood it to mean he's talking

21     about Chen and all his phantom entities over in Chena.  I did

22     not understand he was using Blueworks to mean the bankruptcy

23     debtor.

24             THE COURT:  Right.

25             MR. MARTINEZ:  And that, that point actually hurts

1   them because all these other times in the hearing that I'm

2   referencing where Judge Cogburn is talking about the debtor

3   continuing to operate, why didn't Mr. Belt, why didn't he have

4   the same obligation that Mr. Tomsic have to say, "Wait, wait,

5   your Honor.  You know we're saying that the bankruptcy debtor

6   is not going to be doing any more business."  He never says

7   that.

8          To sort of transition to the police -- I'm jumping

9   around in my outline, but it's on the --

10          THE COURT:  No, no.

11          MR. MARTINEZ:  -- tip, tip of my head -- the police

12   power concept.  I mean, there, there was no mention of the

13   automat, there's no mention of the, the bankruptcy or the

14   automatic stay at all during the hearing.  I did not have time

15   to reread their briefs in the district court before this

16   hearing.  I don't recall there being any discussion about the

17   police power in their briefs.  It may be in there and they,

18   they can correct, but I don't remember that being anything

19   briefed before the court.

20          It's a nuanced question.  It's not that all civil

21   contempt proceedings are accepted under 362(b)(4).

22          THE COURT:  Sure.

23          MR. MARTINEZ:  Case-by-case determination.  One of the

24   tests that I like is, is the primary thrust of what the court's

25   trying to do vindicate its authority, or is it trying to get a

1   private party paid?  And I think, it's not a slam dunk, but I

2   think there's at least a decent argument that what Judge

3   Cogburn is doing here is trying to get a private party paid its

4   judgment.  And then there's a quote.  I think it's in their

5   response.  Let's see.  Yeah.  The response says, here's the

6   quote, talking about the contempt sanction.  Sorry.  That

7   wasn't the quote.  In the response when they're talking about

8   characterizing the contempt sanction, Hayward says, "Is

9   designed to encourage the Ningbo Parties to satisfy the

10  judgment that they owe to Hayward."

11       So I think there's at least a credible argument that

12  this is outside the police power based on their own

13  characterization of the contempt proceeding.

14       So I'm going to jump back around.

15       The, the other thing that is important to keep in mind

16  is the context by which I was walking into that hearing.

17       THE COURT:  Let me ask this real fast.  Was there

18  specific conversation in front of Judge Cogburn about the, that

19  exception to the automatic stay?

20       MR. MARTINEZ:  Not -- not -- I, I don't remember.  No,

21  no.  There was not.

22       THE COURT:  So how did that --

23       MR. MARTINEZ:  And I read the hearing again --

24       THE COURT:  -- footnote --

25       MR. MARTINEZ:  -- transcript again.

1          THE COURT:  -- get stuck in the order?

2          MR. MARTINEZ:  It was part of the proposed order.

3          THE COURT:  Okay.

4          MR. MARTINEZ:  And so --

5          THE COURT:  But he didn't direct that from the bench?

6  In other words --

7          MR. MARTINEZ:  Okay.  Okay.  Sorry.

8          THE COURT:  -- in his ruling --

9          MR. MARTINEZ:  I, I heard them whispering over there.

10         It's also, it's also later in the order.

11         THE COURT:  Okay.

12         MR. MARTINEZ:  There's a footnote.  It -- it -- from

13 my perspective, the first time I saw it was when the proposed

14 order was circulated to Ms. Dunn, who sent it to Mr. Tomsic,

15 who sent it to me.

16         THE COURT:  But I guess my specific question is did

17 Judge Cogburn, when he ruled, did he say, "To the extent," you

18 know, "this has any effect on the debtor, Blueworks," you know,

19 "it falls within the exception, the police powers exception to

20 the automatic stay"?

21         MR. MARTINEZ:  Not during the hearing, no.

22         THE COURT:  Okay.  That's my question.

23         MR. MARTINEZ:  I mean, it's in the order.

24         THE COURT:  Okay.

25         MR. MARTINEZ:  And I, and I imagine he reads the order

1    and, and has some understanding of the things that are in, in

2    the order.

3            So, so the context of which we're going in there, I, I

4    wasn't around when they, when Hayward first got the stay

5    relief, but, when Mr. Bowers retained me, I went back and

6    looked at it and I understood that they were going upstairs to

7    sort of finish, wrap up the rest of that proceeding.

8            And then in the context of preparing for this, I

9    reread their motion and what they say in their motion when

10   they're asking for relief from stay to continue the, the

11   district court action, they're, they're talking about the

12   factors and, and the factors that the, the estate won't be

13   harmed.  And they said, "The, the debtor's estate will be

14   protected because Hayward will seek the enforcement of the

15   judgment as to the debtor only through the bankruptcy court."

16   And you know, we're only get, we're only doing post-judgment

17   motions to complete the case.

18           Then in their, I do remember from their pleadings that

19   they do mention the automatic stay in Blueworks, but only in

20   the context of saying, "We're not coming to you, Judge Cogburn,

21   now to get injunctive relief or sanctions against the

22   bankruptcy debtor 'cause there's the automatic stay.  We're

23   only asking you to enter relief as to the non-debtor entities."

24   So --

25           THE COURT:  In the pleadings that they filed in the

1    contempt proceeding upstairs?

2            MR. MARTINEZ:  Correct.  Correct.  Correct.

3            That, that's the only mention that I remember seeing

4    about the automatic stay in those pleadings.  I don't remember

5    them saying that and then saying, "But there's this police

6    power exception.  We're going to ask you to bar the bankruptcy

7    debtor from being able to sell products.  And, and you're, you

8    can do that under this power."

9            And then, you know, you know, our, our flag did go up

10    when we got that consent order.  And Shumake, you know, you've

11    got this, you got the email and someone filed it, you know.

12    We, we made the comment that this could be interpreted this, it

13    could be interpreted the, the exact way that they are now

14    interpreting it.  And they said, "Well, you're not," you know,

15    "you're not a party.  This doesn't," I mean, I don't think they

16    said "this doesn't affect you," but that was the message I

17    received.  "You can't be heard on this because Blueworks isn't

18    here."

19            So it's, it's a lot of, of they're having their cake

20    and eat it, too, kind of thing.

21            And then, you know, this is for another day.  But no

22    matter how this shakes out, you know, there's a question of if

23    they're going to be doing this, what kind of notice they need

24    to give to this Court out of their duty of candor to this

25    Court.

1          So you know, maybe it was obvious, you know.  Maybe

2     Mr. Tomsic was lying in wait, as they characterize him as

3     doing, but it wasn't obvious to me.  I'll say that.  I, I did

4     not know that this is what they were trying to do.

5          So the options going forward, as I see them, you know,

6     I, I don't know if you necessarily have to say that, that Judge

7     Cogburn's order was, you know, sort of an appropriate exercise

8     through the police power of entering that order during this

9     bankruptcy proceeding.  I think the court, I think courts enter

10    orders, including injunctive relief, and then a bankruptcy

11    court stays them, either through the automatic stay or through

12    other injunctions, 105 or whatever.  And I think we, you could

13    punt that issue and say either go back upstairs and resolve it,

14    or we'll, we'll have the confirmation hearing and send it all

15    upstairs for appeal.  But in the meantime --

16              THE COURT:  To him, by the way.

17              MR. MARTINEZ:  To him.

18              MR. EWING:  Right.

19              MR. MARTINEZ:  And, and that's, you know, that was a

20    big part of why I was there at that hearing, was he had said at

21    the prior hearing, "We want Hayward to be paid."  So I think

22    the bankruptcy plan should, I think it essentially does now,

23    says if the debtor is going to continue to operate, the money

24    goes to Hayward.  So, but we could send it up and see if it

25    passes muster or not.

1          But I, yeah, I do think Judge Cogburn's going to be

2     the one to hear it.

3          But let, let us sell the product in the interim.  It's

4     coming in.  It's under the supervision of this Court and Mr.

5     Bowers.  What, what's the harm?  If, if, if there's harm to

6     Hayward, they can get the money at the end of the day through,

7     through a court order.  There's only, there's only harm on this

8     side if we're missing the pool season or the beginning of the

9     pool season, not being able to sell product.

10          Thank you, your Honor.

11          THE COURT:  Uh-huh (indicating an affirmative

12     response).

13          Ms. Abel, why don't I go ahead and hear from you and

14     then I'll hear from Mr. Ewing.

15          MS. ABEL:  Thank you, your Honor.

16          I would --

17          THE COURT:  And Ms. Steele, of course.  My apologies.

18     I'm used to these folks being in here.  You're sort of new to

19     the party, Ms. Steele.

20          MS. ABEL:  I would, your Honor, start by adopting,

21     sort of in its entirety, Mr. Martinez's description of the

22     hearing upstairs.  I, too, left that hearing understanding that

23     the non-debtor affiliates were, had been chastised and did not

24     appreciate until, you know, several days after the entry of the

25     order that Hayward interpreted the order as requiring the

1   debtor to completely cease operations.

2          And I will go ahead and take the opportunity now to

3   apologize to the Court that you're not hearing the motion to

4   convert or dismiss today.  But all of these things that, that

5   inform what did ultimately get filed yesterday came later than

6   I had anticipated and I just didn't anticipate that it was

7   going to impact the, the course of the case like, in the way it

8   has.

9          I'm, I'm not normally in the habit of weighing in on

10  stay, stay violation motions or stay relief motions.  I think

11  that is more of a two-party dispute.  But I'm troubled that --

12          THE COURT:  Yeah.

13          MS. ABEL:  -- this was a very aggressive, unilateral

14  decision when the availability of two different courts is, you

15  know, I know that Judge Cogburn can't be reached maybe as fast

16  as you have been willing to be, but I -- it dis -- I am

17  dismayed that when we are in active cases that parties went

18  ahead and did what they did in, in any circumstance.  I have

19  all, you know, people will ask me, "Do you think the stay

20  applies?"  I say, "If you have any questions, just come down

21  and ask."  Even if it, we feel real confident it doesn't, I

22  mean, nobody has a problem, nobody gets fussed at about "that's

23  an advisory opinion," or, "You're asking for a, a comfort order

24  where we don't really feel the need to give you one."  It's, I

25  think it's always been the Court's preference, "If you are in

1    doubt, let's talk about it."  Because the automatic stay means

2    something.

3         And I understand that Judge Cogburn may have entered

4    an order and may have even, in fact, intended what is now, you

5    know, what Hayward advances.  But that doesn't mean that it, it

6    could not have been a, a motion or, you know, sought

7    appropriate relief from either that court or this about the

8    next steps.  And there are, although there are very few

9    additional creditors, there are other creditors in the case.

10   And there's a bankruptcy estate, there's a trustee, there are

11   people invested in the outcome of the case.  And now we've got

12   sort of, the, the relief that would have been requested has

13   already been implemented, and we're fighting about whether that

14   was appropriate or not, instead of the other way around where a

15   party is expected to normally carry their burden.  And so now

16   the debtor is in the, in the unfortunate position of carrying

17   their burden about whether this is a stay violation.

18        So I, I filed my motion and I've teed up the argument

19   to say, hey, this order got entered.  This order, there are a

20   lot of ways in which this order is problematic for the debtor's

21   prospects without reaching the conclusion that all these

22   products have to be removed.  And that's all in the papers.

23   And I don't want to get ahead of myself by arguing the motion

24   today.  But there are problems with this case, even if they can

25   continue to operate.  But -- and, and that's all set forth in

1  the motions that I filed yesterday.

2           But to be in a position where the debtor, I mean, the

3  debtor is essentially being forced to shut down without sort of

4  the Court getting an opportunity to view on that, to weigh in

5  on that, and that troubles me.  And so I, I don't know what the

6  right outcome is.

7           And I cer, and I, I feel very bad for the position

8  that you are in.  There was some discussion about the

9  possibility of withdrawing the reference.  The debtor declined.

10 I, I think that, I mean, I don't know.  I, I hate for you to

11 have to guess what he means when we could go ask him.  And, and

12 that might, it might be appropriate for the reference to be

13 withdrawn.  But there is a certain problem in, in the delay.

14 Because right now, the products are not listed.  And so it, it

15 puts the cart before the horse in a lot of respects.

16          So I'm not very helpful, your Honor, but that's my two

17 cents.  I have filed a motion to convert or dismiss that

18 references the impact of this order, but I certainly don't

19 endorse unilateral actions by creditors to take their products

20 off the marketplace when they're -- my, always my

21 recommendation would be to ask for court, court guidance before

22 taking those kinds of steps, so.

23          Thank you, your Honor.

24          THE COURT:  Uh-huh (indicating an affirmative

25 response).

1          Mr. Ewing.

2          MR. EWING:  Yes, ma'am.  Thank you.

3          I will say that we were the party that suggested we

4     withdraw the reference and have Judge Cogburn decide this

5     issue.  We agreed to work with the debtor and do it on an

6     expedited basis, and they said no.  So that's why we're here.

7          Secondly, to clear up a few other things.  First of

8     all, you know, Hayward does not, you know, Hayward Industries

9     does not own Amazon.com, nor do we control what products

10    Amazon.com lists on its website, nor can Hayward dictate to one

11    of, if not the largest company on the face of the earth what

12    products they sell or don't sell.

13         THE COURT:  Well, and if you would, Mr. Ewing, while

14    we're talking about that, just clarify for the Court.  And I

15    did read the pleadings, but as you all have heard me say --

16         MR. EWING:  Sure.

17         THE COURT:  -- a couple times, I've been stuck in

18    court for the last two days.  This was filed on an emergency

19    basis.  So I'm not necessarily as familiar with all of the

20    exhibits.  I did try to go through those as well.

21         But just clarify for me exactly what happened after

22    that order was entered, what communication there was by Hayward

23    to Amazon with respect to that order and the effect of that

24    order.

25         MR. EWING:  Hayward sent a copy of the order to Amazon

1   and Hayward called Amazon and said, "We have sent this order to

2   you.  You need to figure out what you're going to do with it."

3   I, I do not fully understand the process, but Amazon has a

4   process -- essentially, they call it like Amazon court,

5   right -- to resolve disputes between folks who sell on Amazon

6   and folks who think, for whatever reason -- usually, it's like

7   trademark or patent infringement -- that these folks should not

8   be selling on Amazon.  We didn't go through that because Amazon

9   didn't do that, right?  Amazon's the one that decides whether

10  they're going to do that.

11          We sent the order to Amazon and said, "Hey, you decide

12  what you're going to do with this."  And we never heard back.

13  A few days later, we figure out that Amazon took them down.

14  And I'll go through in a minute why I think that is the right

15  thing, why the order says.  It straight up says they should be

16  taken down, but we'll go through that.

17          But that was the extent of the, of the Amazon

18  communication.

19          Also, just to clear up a few other things, at the

20  beginning.  There were some comments about, well, you know,

21  this permanent injunction hadn't been entered.  Well, it has

22  been entered.  It was entered a couple days ago.

23          THE COURT:  I saw that.

24          MR. EWING:  So, you know.

25          THE COURT:  Or it was extended, right?

1          MR. EWING:  No, it was entered.

2          THE COURT:  Okay.

3          MR. EWING:  There's two, there's a couple of different

4   things, right?  There's the TRO.  The TRO was granted April the

5   19th, I think, 19th or 11th, I can't remember.  And that TRO

6   prohibits, essentially, transfers of money, right, or transfers

7   of property.  And with a TRO, you can make it a permanent

8   injunction.

9          THE COURT:  Right.

10         MR. EWING:  But in the meantime, what you can do is

11  you can extend it every 14 days --

12         THE COURT:  Oh, all right.

13         MR. EWING:  -- as long as it can go, right?

14         THE COURT:  Yeah.

15         MR. EWING:  And so every 14 days from last April,

16  Judge Cogburn has extended that TRO.  He has told us that he is

17  going to grant our permanent -- it's going to be an injunction

18  that prohibits these transfers.  And I think there's -- I

19  assume he's working on that.  So that's that part.

20         There's also a permanent injunction, right?  Because

21  our, our victory was multipart, right?  No. 1, it was a

22  monetary judgment, but also it was an advertising, it was

23  injunctive relief, right?  So even if this debtor comes in and

24  let's say a miracle were to happen right now and $20 million

25  were to fall out of the sky and we would grab it and we're

1   satisfied with our monetary judgment, we've still got our

2   injunctive relief.  The debtor still can't lie about our

3   products on the marketplace.

4           THE COURT:  Okay.

5           MR. EWING:  And that's what that injunctive relief,

6   that's what the permanent injunction's about.

7           THE COURT:  So that relates to the debtor's ability to

8   market the property --

9           MR. EWING:  And not just the debtor.

10          THE COURT:  -- in a particular way.

11          MR. EWING:  Like all the, all the defendants.

12          THE COURT:  Right, okay.

13          MR. EWING:  But yes, correct.  Yeah.  And they also --

14   my client reminded me.  It also makes them have lots of

15   disclaimers, right?  Like --

16          THE COURT:  Okay.

17          MR. EWING:  -- you can't say -- one problem we got,

18   right, is folks in the past, they've lied about our products,

19   right?  So if you just sort of remain mum and let the lie be

20   out there, well, you know, that doesn't really, that doesn't

21   really cure the problem, right?  'Cause people still believe

22   the lie.  You have to disclaim the lie.

23          THE COURT:  Okay.

24          MR. EWING:  So I want to go back and talk about

25   everything that happened, and I'd kind of like to start from

1   the beginning.

2          May I approach?

3          THE COURT:  Yes, sir.

4      (Document handed to the Court and counsel)

5          MR. TOMSIC:  Thank you.

6          MR. EWING:  You're welcome.

7          THE COURT:  Thank you.

8          MR. EWING:  You're welcome.

9          So here is a copy of our motion to show cause that was

10  filed in the district court case.  And if you look, this was

11  filed on June the 7th, and this case, this bankruptcy case, was

12  filed on the 11th, right?  So first sentence, "Now comes

13  plaintiff, Hayward Industries, and filed this motion for an

14  order requiring defendants, Blueworks Corporation," and all the

15  rest of them, "to show cause why they should not be held in

16  civil contempt for violating the court's temporary restraining

17  order."  That was filed on the 6th of June.  And if you look

18  over at the consent stay relief motion, that was filed on July

19  the 3rd, and it grants stay relief on the second page.  It

20  modifies the stay to permit "the continuation of all documented

21  proceedings in the district court action, including any

22  relations, motions" -- "related motions, appeals, trials,

23  trials pursuant to remand, or trials pursuant to an existing

24  motion, provided, however, that...."  And the only thing that

25  really matters in this case is (a), right?  "Hayward may not

1  collect from the debtor on account of a judgment or otherwise

2  seek to enforce the judgment against the debtor without further

3  order of the court or the district court."  And I don't want to

4  short circuit the process 'cause I want to go through this,

5  right?  And go through them all, right?  But this document, the

6  motion to show cause, was pending in the district court when

7  this order, the stay relief order, was granted.

8          THE COURT:  Uh-huh (indicating an affirmative

9  response).

10          MR. EWING:  This document, the motion to show cause,

11  references Blueworks.  And it straight up says "without further

12  orders from this court or the district court."

13          So just like how Mr. Wright doesn't do 363 sales

14  'cause he loses on them and people may not like it, I don't

15  have to come down here.  I can go to the district court.  It's

16  right here.  And this is the order.  I mean, it's a consent

17  order.  They signed it, and the court entered it.  And I know

18  people may not like it.  I know it may not be the way it's

19  usually done, but I don't have to do it that way, and I

20  especially don't have to do it that way if somebody else

21  consents to it.

22          So now let's talk about the actual hearing.  And I

23  didn't bring the copy.  Here's the way this, just to be clear,

24  here's how this works, right?  This motion is filed, right?

25  And as people have pointed out, the district court, hey, you

1    can't go down there and calendar up your own hearing, right?

2            THE COURT:  Right.

3            MR. EWING:  They do it when they want to.  But if your

4    opponents are just crushing you, if they're taking your money,

5    you don't have to sit there and just say, "Well, gee.  I'm

6    going to lose," right?  You can file stuff to prod them along.

7    And we did that, right?  But if you look at Judge Cogburn's

8    order, the order that was entered, the way it works is the

9    judge grants the motion to show cause.  And I may not have put

10   that in there.  If I didn't, if there's any -- I don't think

11   there'll be any dispute about it.  And you can go pull it off

12   the district court docket if you want to, or I can send it

13   around, either one.

14           THE COURT:  I've got it right here.  You're talking

15   about the order Judge Cogburn entered?

16           MR. EWING:  Well, he entered two, your Honor.  Here's

17   the way it works.  The first one is there's an order that says,

18   "The order granting the motion to show cause is granted."

19           THE COURT:  Okay.

20           MR. EWING:  And it orders the United States, the Clerk

21   for the Western District of North Carolina to notice a hearing,

22   and the clerk in this case --

23           THE COURT:  Oh.

24           MR. EWING:  -- did that.

25           THE COURT:  Okay.

1          MR. EWING:  And here's why that's important.  Because

2     the clerk notices the hearing on the docket.  That order saying

3     motion granted, notice the hearing, that's on the district

4     court docket.  And Mr. Tomsic, he appeared in that case.  He

5     got that.  He got that paper.  And that's under Federal Rule of

6     Civil Procedure 5 -- and I used to know all the little

7     letters -- but under Rule 5, that is service.  That's a cert.

8     of service.  That's why we don't -- in district court, you

9     don't file a cert. of service anymore.  'Cause it's right

10    there.  So that order was served on him.  No response.

11         The notice setting out the hearing date was served on

12    him.  Again, no response.  As everybody has said, the other

13    lawyers were at the hearing.  I was not at the hearing 'cause

14    my client has spent a ton of money on this case, already.  And

15    we'd like to stop.  But I will say I do have the transfer.  And

16    here's what, here's how it went down.  I'd like to read what

17    Judge Cogburn said:

18              "Yeah, we're not going to play games.  Blueworks is

19              going to have a hard time in this Court if they don't

20              come in here and defend.  If they left the company, my

21              understanding is it looked like it was mama and son

22              and relatives and all that kind of stuff.  And we will

23              not be gamed by this.  We will not be gamed.  It is an

24              outrage what is going on" --

25              And then Mrs. Dunn agrees with him.  She says,

1   "Absolutely."

2            The Court:

3            -- "is an outrage.  You cannot do business if you're

4            not going to do all the business."

5            Next.  Mr. Belt is going on, right?  He's our lead

6   counsel.

7            THE COURT:  Uh-huh (indicating an affirmative

8   response).

9            MR. EWING:  He's telling Judge Cogburn about the many

10  attempts we've, or he's trying to tell him about the many

11  attempts we've made to settle this matter.  Judge Cogburn cuts

12  him off.  Judge Cogburn says:

13           "It is irrelevant to me.  Because what I want to do is

14           to make sure that people follow the judgments of this

15           Court.  And it's nice if you all can settle things,

16           that's fine.  But there is a judgment of this Court.

17           There is a -- this Court -- they are in contempt of

18           this Court's judgment.  They are in contempt of this

19           Court's authority.  They are in contempt of this

20           country's authority."

21           Next.  And this also is Judge Cogburn:

22           "Mr. Chen has no, nothing with this Court right now.

23           He has ignored this Court.  This Court believes that

24           he lied on the stand and he has continued to act in a

25           manner that makes the Court not trust him in any way.

```
1        And this is a very closely held company.  This is a

2        very closely held company.  So he's going to have to

3        pay this."

4     Next.  And this, again, is Judge Cogburn:

5        "Yeah.  We certainly, if the Court issues that, you

6        know, we're not putting somebody in, we're not putting

7        somebody in debtors' prison.  But what he's done is he

8        did, he's ignored the Court.  He's not shown up for

9        court.  He has acted as if this Court has no authority

10       and he's going to find out it does have authority.

11       The problem is that he has created this issue.  I'm

12       certainly not going to allow him to do business in

13       this country if he is going to ignore the laws of this

14       country."

15    And then Judge Cogburn directed Mr. Belt to enter the

16  draft, take a draft of the contempt order.  And I will say -- I

17  have it here.  We can go back and read it -- Judge Cogburn's

18  draft, Judge Cogburn's direction was specifically to direct Mr.

19  Belt to make the consent, make the contempt order say that the

20  three, the four Ningbo Parties have to pay the full judgment.

21  We did not ask for a payment of the full judgment.  We only

22  asked for five point whatever million dollars.  Judge Cogburn

23  wanted the full payment because Judge Cogburn is sick and tired

24  of Mr. Chen and his people, well, his other folks, his fellow

25  travelers, ignoring the orders of that court.  And Mr. Chen is
```

1   going to stop that sooner or later.  It's going to happen,

2   Judge Cogburn has decided.

3        So now I want to address the back and forth about the

4   order.

5        THE COURT:  Well, and be-- and you probably are about

6   to do this because I asked them the same question.  But did

7   Judge Cogburn specifically address, either in questioning or in

8   his ruling, the police powers exception to the automatic stay?

9        MR. EWING:  He did not.  I would take -- my response

10  to that is twofold.  No. 1, he didn't have to because there's

11  already an order that says, there's already an order that says

12  that the stay was lifted.  So he didn't have to.

13       Secondly, Judge Cogburn didn't tell --

14       THE COURT:  Why was that provision stuck in the order

15  then?

16       MR. EWING:  I like to be careful, your Honor.  I don't

17  like to be down here.  And Judge Cogburn can write up his

18  orders as he wants to.  We --

19       THE COURT:  But I mean, he didn't write up the order.

20  You all drafted the order and then you submitted it to him for

21  approval, right?  I mean, that --

22       MR. EWING:  He revised it.

23       THE COURT:  Sure.  Okay.

24       MR. EWING:  And, and, and your Honor, I would, you

25  know, I worked for a district court judge, and I don't think

1  any district court judge in this building or in this District

2  would take the stand or would, would tolerate anybody else

3  saying that he or she does not draft his or her own orders.

4         THE COURT:  Right.  I, I understand all that.

5         MR. EWING:  It, it wasn't a consent order, right?

6         THE COURT:  Right.

7         MR. EWING:  It wasn't just "I'm slapping my name on

8  it," right?  Nobody consented to this.

9         THE COURT:  Okay.

10        MR. EWING:  Right?  They didn't consent.

11        All right.  As far as the back and forth on the order,

12 Mr. Belt sent a copy of the order to Michelle Dunn.  Because

13 while the other lawyers were in the courtroom -- and look, I

14 don't ever like to throw lawyers under the bus, right?  But

15 literally, the man said, "Your client is going to have a hard

16 time if they don't defend this case."  And the lawyers were

17 sitting in the courtroom listening to him say that, and they

18 sat there.  Mr. Belt sent the order to Michelle Dunn because

19 she was the only lawyer that showed up for any of these parties

20 and because Judge Cogburn told him to send it to her.  I don't

21 know what Ms. Dunn did with it.  I assume she sent it to

22 somebody.  I know she sent it to -- well, let me say this.  I

23 know she sent it to Mr. Tomsic because Mr. Tomsic responded

24 that he would have comments to it.  And counsel from Shumaker

25 also emailed Mr. Belt.  And the deal is she emailed him on a

 1  | different email chain, right?

 2  |         So the comments from Mr. Tomsic that says "I'm going

 3  | to have comments," it doesn't show up on that email that got

 4  | filed with her email, right?  Her email says, "Hey, look" --

 5  | and here's the pattern, right?  Mr. Chen and Mr. Chen's, Mr.

 6  | Chen has had, I think, at least 12 different sets of lawyers --

 7  |         THE COURT:  Right.

 8  |         MR. EWING:  -- right?  Mr. Chen delays everything,

 9  | right?  That's just the way it is.  And the Shumaker email

10  | comes in and says, "Well, gee, we didn't have time to review

11  | it."  Now Judge Cogburn had already told us to get this in, I

12  | think like the next day or the day after.  So Mr. Belt emails

13  | her back and says some version of, "We're not going to wait for

14  | your comments 'cause you weren't at the hearing and you don't

15  | represent the Ning, Ningbo CF anymore."  Ningbo CF was the only

16  | party that actually showed up for this thing, right?  If Mrs.,

17  | you know, if Mrs. Dunn didn't represent the debtor and the

18  | debtor didn't -- the debtor had notice,  Its lawyers were

19  | there.  They just didn't step inside the well and represent it.

20  |         So Mr. Belt sends that email and that's on like a

21  | Friday.  That's a Friday at 4:00 -- actually, his initial email

22  | was, "Give us your comments."  That was Friday at 5:58.

23  |         And I'm sorry.  My client has corrected me.

24  |         Ms. Dunn was also there for Mr. Chen.  May not matter

25  | for here, but it's important when it goes up there.

1          THE COURT:  Hmm.

2          MR. EWING:  Mr. Dunn's -- Mr., Mr. Belt gets an email

3   at like 4:00, 5:00, you know, after 5:00 on a Friday and he's

4   wanting to get this, he's wanting to get this document to Judge

5   Cogburn because he's got to.  And he sends that.  But he says

6   in that email, same email we're talking about, the Shumaker

7   lawyer, he tells her, "But I have told Matt," Mr. Tomsic, "that

8   I will wait for his comments."  And the comments never came.

9          The comments came the next day, came on a Saturday.

10  And in that email, Mr. Tomsic, which we filed it, says, "I will

11  circulate my comments to Ms. Dunn."  And Mrs. Dunn the next,

12  you know, the next week before the order is entered, circulates

13  comments to Judge Cogburn.  Nowhere in that comment is anything

14  about the bankruptcy stay mentioned.  Nowhere, right?

15         So I mean, that's why -- I mean, again, I don't like

16  to throw lawyers under the bus -- that's why it's a sandbag,

17  right?  It is a pure sandbag.  Everybody got notice.  Everybody

18  was there, right?  That's how you know people got notice.  They

19  were there.  They hear the judge say, "Your client is going to

20  be in trouble if they don't come here and defend."  And nobody

21  gets up.  They have a com, they have a chance to submit some

22  comments about their key point and they never do it.

23         We offer to go, let the judge that made the order

24  interpret the order and that is declined, right?  I mean, let's

25  call it like it is.  They think they can win in this court and

1    they know they're going to lose in that one.  And anybody that

2    reads this transcript, it is painfully obvious that they're

3    going to lose in that one.

4         Now let's go through the actual order itself.  And

5    again, I would object to any characterization that Judge

6    Cogburn did not draft and sign his own order.  And --

7         THE COURT:  Well, those -- don't look at them when you

8    say that -- those were my questions, Mr. Ewing --

9         MR. EWING:  Okay.  Well --

10        THE COURT:  -- not theirs.

11        MR. EWING:  -- fair enough.

12        So we have the order, right?  And there are four

13   ways -- we went through them in our brief -- as to why this

14   order applies to the debtor.  And it's all pretty simple.

15   Here's the easiest one I want to spotlight first, is the

16   absolute easiest one.  And you'll see there's an order and then

17   there's an opinion, right?  And so if you look over at the very

18   bottom, the damage is done on Page 16, which is like a couple

19   pages from the end of the order.  There's two -- like Judge

20   Cogburn spins a lot of reasons out in this 16-page or 17, 18-

21   page order as to why this contempt citation order is proper.

22   But in Paragraph 1 in the "It is therefore ordered" part, he

23   references, he says:

24        "Unless and until the Ningbo Parties pay the

25        judgment," presently at this number, "the Ningbo

1           Parties" -- and there are four Ningbo Parties.  It's

2           Ningbo CF, Ningbo Yusheng, Blueworks Innovation Corp.,

3           and Richard Chen, right, the individual.  There's four

4           of them -- "the Ningbo Parties, including all agents,

5           employees, officers, directors, shareholders,

6           affiliates, subsidiaries, assignees, and anyone acting

7           for or through them shall be barred from importing or

8           selling any product in the United States, including,

9           but not limited to" -- and there's a long list of

10          stuff, right -- "including the products shown in

11          Appendix A."

12   And there's, including, but not limited to, a lot of other

13   stuff.

14          Let's stop right there and we'll go through the rest

15   in a minute.  But let's look at Appendix A.  And Appendix A is

16   critical, your Honor.  And there's actually two parts to

17   Appendix A, right?

18          THE COURT:  Fortunately, I have Appendix A right here

19   in front of me, Mr. Ewing.

20          MR. EWING:  There's what I would call the main part.

21          THE COURT:  Yep.

22          MR. EWING:  There's the second part, the slipsheet,

23   right?  And the slipsheet is what's going to do a lot of work

24   in this, in this particular matter.  Look down at Page 11.  It

25   start, what I'm going to talk about starts on Page 11.  And

1   there's a chart there, right?  This chart has four columns.

2   The column on the very, on the very left-hand side, you have

3   to, if you have to, you can flip back to Page 9.  It tells you

4   what the columns are.  That is what's known as an ASIN, A-S-I-

5   N.  And then there's a model number, a title and a subcategory.

6   An ASIN is a Amazon number.  It is a number assigned by

7   Amazon.com and Amazon.com assigns a number, assigns an ASIN to

8   every single thing on the website.  This -- let's just take

9   one, for example.  Let's take the one for -- at the bottom of

10  Page 11 there's an ASIN that starts B086YSPLRQ and it matches a

11  Blueworks salt cell.  There is only one product in the world

12  that matches that ASIN.  That's the Blueworks salt cell.  And

13  there is only one place in the world that ASIN and that product

14  is sold.  And that is on Amazon.com and that is how you know

15  for a fact beyond dispute that the order says the debtor cannot

16  sell their products.  Because this product is only sold by the

17  debtor.  And it is -- now I'll just tell you.  We think, we

18  think somebody on the debtor is lying, not necessarily these

19  guys.  In fact, I don't think it's them.  And somebody is

20  selling products not on Amazon.com, right?  So let's just put

21  that out there.

22          But the fact that the ASIN is here, that tells you

23  that this order says, "Debtor, you may not sell your -- it

24  applies to you -- you may not sell your products."  'Cause the

25  only thing in the world that matches this ASIN is this debtor's

1  product.  That's it.  Nothing else.  And the debtor is the only

2  entity that sells a product with this ASIN.  If I got -- let's

3  say I went, let's say I somehow got a hold of a Bluework salt

4  sale and sold it on Amazon.  I wouldn't have this ASIN because

5  I'm not Blueworks.  That's how you know.

6         Going forward, I mean, that's just one way.  That's,

7  there are more, right?.  The document says the Ningbo Parties

8  "shall not use any shell companies, agents, subsidiaries,

9  affiliates, successors in interest, assigns, corporate

10 restructuring, rebranding, or third parties to evade the import

11 and sales ban."  Let's stop with the word "affiliate."  The

12 testimony -- we think Richard Chen is a liar.  We've made that

13 clear.  Richard Chen is the owner of Blueworks, right, a

14 hundred percent.  He's got this person named Haki Sun

15 (phonetic), who nobody's ever seen or heard of.  Nobody even

16 knows where this person lives, who supposedly owns 70 percent

17 of Blueworks.  But by his own admission, Richard Chen in the

18 trial court, Richard Chen is the CEO and manager and makes all

19 the decisions, right?  Richard Chen's a liar.  He owns all of

20 it.  Set that part aside.

21        It is undisputed that Richard Chen owns 30 percent of

22 Blueworks.  He says so.  The debtor says so.  Blueworks, you

23 know, to be an affiliate under the Bankruptcy Code you got to

24 own 20 percent.  Richard owns 30.  Blueworks is Richard Chen's

25 affiliate.  Richard Chen is a Ningbo party.  Richard Chen is

1   barred from selling.  Blueworks is barred as his affiliate.

2          Paragraph, Footnote 4 of Paragraph 1, right, Footnote

3   4 to the order, Richard Chen is barred from selling products as

4   a Ningbo party.  Footnote 4 says Richard's alter ego is the

5   debtor, is Blueworks Corporation.  Richard can't sell.

6   Paragraph 1, Richard can't do it through his alter ego.

7          Keep on going.  Paragraph 1 further bars Chen and

8   Ningbo CF from using agents, affiliates, assignees, or third

9   parties.  Well, the debtor's a third party under their view,

10  too, right?  The debtor supposedly buys these products from

11  Ningbo CF, somebody imports them into the country, and then the

12  debtor sells them.  That's a third party.  Can't do that,

13  either.

14         And then here's the kicker, right?  Paragraph 2, "For

15  the avoidance of any doubt, unless and until the Ningbo Parties

16  pay the judgment, all Ningbo Parties, including Richard Chen,

17  shall be barred from inducing, facilitating, contributing to,

18  or otherwise causing other natural or juristic persons,"

19  meaning an entity, "from importing or selling any of the

20  aforementioned products into the United States."  Well, hey,

21  Richard Chen, right?  He is, you know, he is the, he's one of

22  the Ningbo Parties, he's the manager of the debtor, and he

23  can't cause the debtor to sale or import.  It's right here in

24  the document.

25         So that's at least four different ways that we know

1  that the order bars the debtor from selling.  And the idea that

2  Judge Cogburn could not have figured out that he would bar the

3  debtor, that's just got to be wrong.  I mean, he says right

4  here in two places in his order.  He references, he says,

5  "Defendant, Blueworks Corporation, filed for chapter 11

6  bankruptcy on June 11, 2024.  While the order focuses on the

7  Ningbo Parties" --

8            THE COURT:  Where are you?  Where are you looking?

9            MR. EWING:  That's in two places.  That's Footnote 1

10  on Page 1.  And that's also, if you look back over -- that's

11  the next-to-the-last page, Page 17 -- that's Paragraph 4.

12            So if Judge Cogburn did not intend for this order to

13  bar Blueworks from selling or importing, there would be no

14  reason to say, "Hey, Blueworks is in chapter 11 bankruptcy, but

15  this doesn't violate the stay because I'm using my police

16  powers."

17            THE COURT:  It's interesting to me, Mr. Ewing, that it

18  says "to the extent that this sales and import ban impacts,"

19  rather than saying, "To be clear, the intention of this order

20  is for it to impact."  I mean, it's --

21            MR. EWING:  Well --

22            THE COURT:  -- it's interesting to me that it

23  starts --

24            MR. EWING:  -- it --

25            THE COURT:  Don't interrupt me, Mr. Ewing.

```
 1                    MR. EWING:  I'm sorry.  I'm sorry.

 2                    THE COURT:  It's interesting to me that it starts with

 3   the language, "to the extent," which almost implies that if it

 4   inadvertently, you know.  It's interesting that, that's the

 5   language that Judge Cogburn chose to include in the order.

 6                    MR. EWING:  And let me address that.  'Cause here's

 7   why you say it that way, right?  Here's why you don't limit

 8   this order to Blueworks, right?  Or here -- and here's why you

 9   make it as broad as possible.  Because Richard Chen, if you'll

10   look back -- and we can, we don't have the evidence that we

11   presented at the trial at the hearing today, right?  And if we

12   need to get that and give it to this Court, we can -- but the

13   evidence will show that Richard Chen -- and we know it was

14   Richard Chen because he signed it himself -- Richard Chen

15   signed, Richard Chen told customers to not pay -- excuse me --

16   he took their invoice, right?  And he crossed out the payment

17   instructions and said some version of, "Pay this bank account,

18   pay Richard Chen," essentially pay FIG, which is owned, as we

19   now know, 100 percent by Richard Chen --

20                    THE COURT:  Uh-huh (indicating an affirmative

21   response).

22                    MR. EWING:  -- right?

23                    THE COURT:  Uh-huh (indicating an affirmative

24   response).

25                    MR. EWING:  So you write the order as broadly as
```

1  possible to cover the waterfront.  Because if you don't,

2  Richard Chen is going to find a way around it.  I mean, if he

3  will take his, his, I guess, his titular employer's invoices,

4  cross them out, and say, "Titular Employer," which he owns and

5  controls, by the way, and say, "Pay me.  Don't pay this other,

6  don't pay the bank, don't pay the employer," then he is going

7  to do anything to get this money, right?

8          And the whole point of this, you, you are correct in

9  the, in the, in the sense that the debtor does, like, the

10  thrust, the thrust of this order was to punish the Ning, well,

11  not, was to compel the Ningbo Parties --

12          THE COURT:  Uh-huh (indicating an affirmative

13  response).

14          MR. EWING:  -- to comply, right?  But you know, to

15  compel the Ningbo Parties, to compel Richard Chen to comply,

16  you also have to compel everybody to comply, including the

17  debtor.  And the court is not limited.  The court doesn't have

18  to say, Judge Cogburn didn't have to say, "Well, gee, you know,

19  Richard.  You know, I can say you got to do it, and I can do

20  whatever I want to to you, but I can't do anything to this

21  debtor."  That's not the way contempt works.

22          THE COURT:  Right.  And I think what I'm struggling

23  with, Mr. Ewing, is what these folks said.  And you're at a bit

24  of a disadvantage because you weren't at the hearing.  I know

25  that you've read the transcript, though.  And it's, it's

1    interesting to me because I can sit through a hearing and then

2    I read a transcript, and sometimes they don't necessarily come

3    off the same way.  But according to Mr. Martinez and Mr.

4    Tomsic, who were at that hearing, several times throughout the

5    course of the hearing Judge Cogburn also referenced sort of

6    contemplating that Blueworks was, the debtor, was going to

7    continue to operate.

8         So to me, in my mind, what I'm struggling with is

9    there seems to be this tension between the way that hearing

10   played out and then the provisions that are provided for in the

11   order --

12        MR. EWING:  I -- your Honor -

13        THE COURT:  -- which sometimes happens.

14        MR. EWING:  Well, and I guess what I would say is

15   this.  I guess, No. 1, it sometimes happens, and we go by what

16   the order says, rather than what people said in court, right?

17   It's what's on the paper that matters.

18        But secondly, I don't think there's any, I don't think

19   there's any ambiguity in it at all.  Because, because what

20   could happen, right, I mean, at some point I think he says --

21   and you know, we can, I have the transcript.  We can read it.

22   We can figure out what they're talking about.  But the bottom

23   line is it goes back to paying the difference between the

24   judgment and the injunction, right?

25        Let's assume that tomorrow this worked and Richard

1    Chen paid us, right, paid us $20 million, or however much it is

2    now, right?  Then yeah, they could keep operating, right?  No

3    doubt about it.  Case would be dismissed, debtor had gone its

4    merry way.  But the debtor would still be bound by the

5    injunctive order --

6            THE COURT:  Uh-huh (indicating an affirmative

7    response).

8            MR. EWING:  -- right?  Would have to.  And that's an

9    order that the debtor's got to abide by.  And I'll just tell

10   you.  I don't think, you know, they're never going to pay us,

11   right?  We all know that.  Never going to pay us.  But even if

12   they somehow did, they're never going, they're never going to

13   follow this injunction, right?  The whole reason we're here to

14   start with is because they lie and cheat in their business

15   dealings.  Again, not them, but the --

16           THE COURT:  Right.

17           MR. EWING:  -- debtor.  And Mr. Chen is not going to,

18   you know, suddenly, you know, get religion and follow the law.

19   It ain't going to happen.

20           And so, yes, we fully intend or fully acknowledge, and

21   I think Judge Cogburn may, right, that even if somehow or

22   another this debtor goes forward or Ningbo goes forward or

23   whatever, it ain't the end of the story, right?  There's an

24   injunction out there, and he's got to follow that, too.

25           So I mean, long story short, this order, and I get

1  people typically do it another way, but this order says I can

2  go to this court or the district court.  And I went there.  And

3  everybody got noticed.  Everybody was there.  The district

4  court judge sat up and said, "Blueworks is going to have a hard

5  time if they don't come here."  And Blueworks lawyers were

6  there, and they didn't come.  And an order got entered adverse

7  to Blueworks.  And that's just the way it goes.  I mean, that's

8  what happens.  I mean, we think the order is proper, but even

9  if it's not, that's what happens when you sit in the courtroom

10 for a motion you got a notice on and you don't speak up.  You

11 waive it.  And I hate to say it, but that'll be upheld at the

12 Fourth Circuit 99 times out of a hundred.  I have done it

13 before.  Everybody has.  That's just the way it goes.

14         And I'm sorry if it means this -- well, I'm not sorry

15 -- it may mean this case is over.  And if so, I think my client

16 would, we changed our mind.  We would prefer dismissal.  We'd

17 be good with it right now.  I'm not asking you to do that

18 'cause they get their day in court, right?  But that's the way

19 it is.

20         THE COURT:  All right.  Thank you.

21         Ms. Steele.

22         MS. STEELE:  Thank you, your Honor. I don't have a ton

23 to add.  I would just note that Amazon doesn't have a, a stake

24 one way or the other on the substance of the debtor's motion.

25 We don't take a position on that.

1           Amazon does believe that it's bound by the district

2    court's orders, and it interpreted those orders as requiring it

3    to remove the listings that were specified on that appendix to

4    the contempt order, which is what it did.  And so Amazon is

5    looking for direction, whether it's from your honor or if it's

6    from the district court.

7           We sympathize with the Court's comment a little while

8    ago that kind of in a box, in a hard place right now, and that

9    there is an order from upstairs directing one thing.  And at

10   this, at this time, Amazon feels like it has to comply with

11   that.  But again, is, is looking for direction.

12          And I would also clarify just that, to Mr. Ewing's

13   comment, the orders that were entered were sent directly to

14   Amazon, their counsel.  I, I did not see those or was not aware

15   of those until I was alerted by Mr. Tomsic.

16          MR. EWING:  That's right.  We sent them to somebody.

17   Like Amazon's got its own team of lawyers, right?  And --

18          THE COURT:  Sure.

19          MR. EWING:  -- my client --

20          THE COURT:  More than we can --

21          MR. EWING:  A zillion.

22          THE COURT:  -- imagine, I'm sure.

23          MR. EWING:  My client typically deals with them in

24   what I was, in what I called Amazon court.  And I think we sent

25   them to one of those lawyers that either presides, presides

1  over, decides, what, however, however you want to call it.

2          THE COURT:  So they have their own judges, too?

3          MR. EWING:  Yeah.  Yes, ma'am.  I think so.  That's

4  right.  And I think people actually have now started becoming

5  arbitrators, right?  So you can, if you're, if you're a lawyer

6  and you're knowledgeable on this field, you can become an

7  Amazon arbitrator.

8          THE COURT:  Hmm.  Well, there you go.  Future career

9  aspirations.

10          All right.  Thank you, Ms. Steele.  I appreciate that.

11          Mr. Tomsic.

12          MR. TOMSIC:  Yes, your Honor.  I, I know we're getting

13  close to the, kind of the normal lunch hour.  I just have three

14  points I'll run through quickly at the,  with the Court's

15  indulgence that I just want to touch on in, in response to Mr.

16  Ewing's arguments.

17          The first is the consent stay relief and then the

18  filing of the first motion to show cause back in June 7, 2024.

19  The debtor's position is that the consent -- we'll start with

20  the consent stay relief.  That, that, in and of itself, while,

21  yes, this was clearly docketed before the consent stay relief

22  order was entered.

23          THE COURT:  The motion for show cause?

24          MR. TOMSIC:  The motion for show cause --

25          THE COURT:  Yes.

1          MR. TOMSIC:  -- yes, your Honor.

2          This document doesn't kind of retroactively bless

3   what's happened.  because under Paragraph 2(a), the consent,

4   consent stay relief order says "Hayward may not collect from

5   the debtor on account of the judgment or" -- and this, I think,

6   is the key language --- "otherwise seek to enforce the judgment

7   against the debtor without further order from this court or the

8   district court."  Preventing the debtor from selling its

9   Inventory until a, the judgment is paid, I think, clearly is

10  enforcing a judgment against the debtor.

11         So the debtor argues, would argue that that, that

12  consent stay relief, we had not, you know, unknowingly

13  proactively lifted the stay for a contempt order against non-

14  debtor parties to be entered and then for that order to be used

15  to freeze the debtor's ability to sell on Amazon.

16         So that's kind of No. 1.

17         No. 2, while, yes -- and your Honor, I mean, I think,

18  I think these can fairly be described as two independent

19  arguments.

20         Turning now to the Hayward Industries, Incorporated

21  motion to show cause, again filed June 7, 2024 before the

22  consent stay relief order, before the bankruptcy case was filed

23  -- and I have, your Honor, with apologies, I have these

24  pleadings.  I don't have copies for everybody, but I'll note

25  the docket.  These, what I'm referencing will be on the

1   district court docket.  I'm happy to, you know, during the

2   break, run to the office, print copies and bring them back if,

3   if your Honor would so --

4           THE COURT:  I can look them up on the docket if I need

5   to.

6           MR. TOMSIC:  Okay.

7           So that docket is No. 468, filed June 7, 2024.  There

8   -- the next document that I am aware of in the district

9   court -- it's a huge docket.  So I'm sure Hayward will correct

10  me if I miss anything -- but on October 19, 2024, there is a

11  motion for leave to file supplement to motion to show cause

12  filed by Hayward.  And that docket number is 535.  If you'll

13  just bear with me, I'm going to flip to the tab.

14          So the motion to supplement seeks to add, add

15  information.  "In the six months since the TRO was entered in

16  this case, three things have become clear.  Ningbo CF outright

17  refuses to state that it is not continuously violating the

18  TRO."  I won't read the whole thing, but it's targeting Ningbo

19  CF, Ningbo CF, Mr. Chen, Mr. Chen, and making arguments related

20  to Ningbo CF and Mr. Chen.

21          The next document, the next pleading filed related to

22  this show cause motion is filed at 550 on the docket, the

23  district court docket, which is motion for leave to file second

24  supplement to motion to show cause by Hayward Industries.  That

25  document, on Page 9 in Footnote 9 notes:

1              "Because there is a bankruptcy stay and because the

2              wrongdoing in this Section (b)(1) arises from Mr.

3              Chen's relationship with Blueworks, the information in

4              this Section (b)(1) is for informational purposes

5              only.  Indeed, the show cause hearing and the contempt

6              finding thereon rely only upon evidence concerning Mr.

7              Chen's relationship with Ningbo CF, not Blueworks."

8          And the relief requested by this second supplemental

9    motion to show cause is targeting Mr. Chen.  And again, you

10   know, Hayward will correct me if I'm off base.  And your Honor

11   can look at these pleadings for themselves, for herself and the

12   Court for itself.

13         And then finally, your Honor, the last document is at

14   Docket No. 558, which is a motion to expedite scheduling of

15   show cause contempt hearing by Hayward industries, which is

16   January 9, 2025.  And in that motion -- bear with me.  I'm

17   working on my, working through my tabs.  That motion, at the

18   very first sentence:

19              "Comes now Plaintiff, Hayward Industries, Inc., and

20              files this motion urgently seeking the show cause

21              hearing as soon as the Court can schedule one so that

22              Mr. Chen and Ningbo CF can answer Hayward's

23              allegations that they have violated and are continuing

24              to violate the TRO by diverting assets out of this

25              country via shell companies and with the knowing

1           complicity of certain U. S. customers."

2           So I work through, you know, that kind of tedious

3    recitation of pleadings to say that --

4           THE COURT:  You didn't think you were the subject of

5    the contempt proceedings.

6           MR. TOMSIC:  Correct, your Honor.

7           And that -- that, then, flows into the, the second

8    point with that direct quote that "Blueworks is going to have a

9    hard time."  Blueworks is certainly going to have a hard time

10   if its sole supplier cannot import or sell any more product in

11   the United States.  That was my understanding of that moment.

12   Because what we're missing here is some context, the broader

13   context that the debtor was not the subject of the contempt

14   proceeding and that the, the term, you know, that, that

15   statement of, by the court meant that, yes, of course the

16   debtor would have a tough time if its sole supplier is shut off

17   from supplying the debtor.  It's not as if that came to us in

18   real time in the hearing as, "Oh, wait.  Now we're talking

19   about the debtor, and we have to say something to stop this."

20          The same is true of the context and email

21   correspondence, my comments back to Mr. Belt, which, yes, that

22   email, your Honor can look at it.  It says what it says.  It

23   says that I would pass my comments along to Ms., Ms. Dunn.  But

24   importantly, your Honor, those are comments from the debtor's

25   attorney related to a proposed order that Hayward's counsel the

1    day before, the night before, afternoon before, said isn't, the

2    debtor isn't the subject of.  And so in that sense, it's not as

3    if, it's not as if the, the, the debtor had an obligation to

4    speak up.  Because by their own admission, we weren't subject

5    to that order.

6            And I, your Honor, I guess as the attorney being

7    thrown under the bus, I just, I'm generally going to object

8    that we're sandbagging anyone here.  We're simply coming before

9    the Court that we feel like is the appropriate court in the

10   first instance to review what is effectively a conversion of

11   this case from a reorganization to a liquidation.

12           And then my last point, your Honor, is I just want to

13   stress that we are here on interim relief.  We are not seeking

14   to jam anyone up.  We are not seeking to "sandbag" anyone, to

15   use Hayward's term.  We're trying to have the faucet turned

16   back on so we could sell and salvage any value that may be

17   remaining in that inventory in Amazon warehouses while the

18   parties can hash out and fully litigate and argue this, this

19   relief that, that Hayward is seeking.

20           And you know, the, the last -- and I'll end with where

21   Hayward's counsel ended -- the last comment was that they

22   understand the debtor should get its day in court.  The debtor

23   did not get its day in court.  The, the listings were pulled

24   down unilaterally under Hayward's reading of the order.  And

25   now we are scrambling to try to unring that bell and unscramble

1    those eggs.  And those are strong metaphors that, you know,

2    but, but it is salvageable at this time.

3         But importantly, your Honor, the debtor did not get

4    its day in court by the action taken from, by Hayward to, to

5    freeze the, freeze and delist its products on Amazon.  And that

6    is simply what the debtor is asking, to give us our day in

7    court, allow us to sell in the meantime, as would be the proper

8    approach under a normal notice regime and a normal process in

9    this court.  And again, stressing, your Honor, that we're only

10   seeking interim relief.  We're not seeking this Court to opine

11   outright on Judge Cogburn's order, only simply seeking an order

12   to direct Amazon to relist us while we sort out the

13   particulars.

14        And thank you, your Honor.

15        THE COURT:  Uh-huh (indicating an affirmative

16   response).

17        MR. TOMSIC:  With that, I, I have nothing further.

18        THE COURT:  Okay.  Thank you.

19        Mr. Ewing?

20        Oh, Mr. Martinez.  I, my apologies.

21        MR. EWING:  I, I'll let him -- yeah.  Let -- yeah.

22        MR. MARTINEZ:  I, I, I could be quick.  I had four

23   points, and Mr. Tomsic made one.  I'll just hammer home one

24   more time.

25        The, the first show cause motion was filed before the

1    bankruptcy.  The bankruptcy's filed.  The subsequent briefs and

2    papers relating to that clarified "we are no longer seeking

3    relief as to Blueworks," which is why we didn't step into the

4    well at the hearing, even when he said Blueworks that one time.

5    My characterization is different than Mr. Tomsic's.  I, I

6    understood him to be talking about Mr. Chen, anyway, at, when

7    he made that comment at the beginning of the hearing.

8         The -- I was, I was glad the Court brought up that "to

9    the extent" language.  I, I meant to make that point.  There's

10   a similar point in the footnote.  He says "any impact on

11   Blueworks," right?

12        THE COURT:  Right.

13        MR. MARTINEZ:  If you're going to use, to Mr. Ewing's

14   argument, the most expansive word possible, you'd say "all."

15   You wouldn't say "any."  "Any" implies there's doubt, if there

16   is an impact at all.

17        In the exchange you had with Mr. Ewing that, why

18   didn't Judge Cogburn, why wasn't there some discussion about

19   the automatic stay.  As I understood, the response was he

20   didn't have to because stay relief was already granted.  This

21   Court already gave stay relief, okay?  We're asking you to turn

22   it back on for a temporary period.  If that's the argument, you

23   turned it off.  Turn it back on for, until we can do a, get a

24   final resolution of this case.

25        And then the argument that, when all the discussion at

1    the hearing from Judge Cogburn about Blueworks operating was

2    contemplating a post, a world where Richard Chen had already

3    paid the $20 million.

4              THE COURT:  Oh.

5              MR. MARTINEZ:  I already read the language again, but

6    the, the one that I like the best -- I'm going to paraphrase it

7    this time -- he says, "If they're going to continue selling

8    these units until the judgment is paid, they're going to have

9    to pay the money over to Hayward," point being he's envisioning

10   a universe where the debtor continues to operate so long as the

11   money's contributed to pay the debtor.  That's what I think the

12   bankruptcy plan now does and we want an opportunity to try to

13   get it confirmed.

14             THE COURT:  So long as the money is contributed to pay

15   Hayward?

16             MR. MARTINEZ:  Correct.

17             THE COURT:  Yeah.  Okay.

18             Mr. Ewing.

19             MR. EWING:  They can't get around the ASINs, your

20   Honor.  There's nothing that they can say.

21             THE COURT:  Can't get around what?  I'm sorry.

22             MR. EWING:  The ASINS.  It's the --

23             THE COURT:  Oh, okay.

24             MR. EWING:  I mean --

25             THE COURT:  Right.

1          MR. EWING:  -- the debtor is the only entity in the

2     world, like literally on the planet Earth, that sells this

3     product with this ASIN.  That's it.  Nobody else.  And Judge

4     Max Cogburn said, "You may not sell this product with this

5     ASIN," period.  No ifs, ands, any or alls, or anything else.

6     And there's nothing -- I don't agree with anything they said

7     about the interpretation of the order, right?

8          Well, let's assume that they're right and I'm wrong

9     and the order is somehow, and everything they've said is,

10    "Well," you know, "we don't really know," right?  Well, we know

11    because of the ASIN.  Ningbo CF does not sell a product on

12    Amazon with that ASIN and neither does anybody else.  Not Mr.

13    Chen, not Ningbo Yusheng, not Blueworks Innovation Corp., or

14    any other entity.  It's the debtor.  That's it.  And if Judge

15    Cogburn didn't intend for this debtor to stop selling that

16    product on Amazon, it wouldn't be on that appendix.  And

17    there's no argument, there's no argument against that.  The

18    only argument that you can make against that is to say Judge

19    Cogburn doesn't know what he's signing, doesn't know what he's

20    writing, and doesn't know what his orders mean.  That's it, one

21    of them three, or Judge Cogburn doesn't mean that product to be

22    sold.  That's it.

23         And about this interim relief.  This is an order by a

24    United States District Court.  Well, let's back up.  I'll do

25    that one last.

1              About this order, about the stay relief argument, you

2      know, I disagree.  The order does not say that the debtor has

3      to pay us money.  The order says the Ningbo Parties have to pay

4      us money.  If you own a company or you own a business and I am

5      a court and I'm trying to get you to do something, I can take

6      negative action against your wholly-owned business to make you

7      do it.  And that's all that means.

8              But again, let's just assume that they are right, that

9      Judge Cogburn is making them, making the debtor pay us.

10     "Hayward may not collect from the debtor on account of the

11     judgment or otherwise seek to enforce the judgment against the

12     debtor without further order from this court or the district

13     court."  Judge Cogburn is the district court.  The order is the

14     contempt order.  It is a publicly available order.  Anybody

15     with a computer -- actually, you don't even have that, right?

16     You can walk up to the desk and get it.  Anybody that wants a

17     copy of this order can get it, right?  That is the order that,

18     even if they're right, that says Judge Cogburn is making us pay

19     what he can and they agreed to it.  And you know, you can't

20     say, "Well," you know, "you guys agreed to this."

21             If we want to talk about a lack of due process, a lack

22     of due process is when two parties agree to a consent order and

23     a court signs it and it sits there for almost a year, nine

24     months, and one of those parties follows that order and the

25     other party says, comes along and says, "Well, gee, we either

1   didn't know what we were signing, weren't paying attention,"

2   or, "don't like it anymore.  Please, please make it go away."

3   That's not the way orders work.  Everybody -- this is a valid

4   order and everybody relied on it.  And there it is.

5           And finally -- but as to, as to anything that was

6   filed about this case, about our various filings -- and I

7   should have --

8           THE COURT:  In the --

9           MR. EWING:  -- done this when I was making my other

10  point -- but I'll tell you.

11          THE COURT:  In the district court related to the

12  motion to show cause?

13          MR. EWING:  Correct.  That's right

14          Here's why it makes sense to shut down the debtor, or

15  do whatever you want to call it to the debtor to make Mr. Chen

16  comply, right?  This is our October filing:

17              "Indeed, Ningbo continues to avail itself of the laws

18              of the United States to import its products to the

19              United States through a number of different channels.

20              This is evident for more than just Amazon sales.  As

21              shown in the bankruptcy reporting, Blueworks continues

22              to have warranty claims from customers for Ningbo

23              products.  In July, Blueworks transferred $59,191.59

24              to Ningbo CF for new product because of warranty

25              claims by customers.  Indeed, it has been reported

1                that Blueworks sales continue to rebound and it has

2                spent almost $100,000 of inventory from Ningbo CF

3                since filing the bankruptcy on June 11, 2024.  And

4                inventory purchases by -- clearly, Ningbo products are

5                being bought and sold.  At least, at the very least,

6                Ningbo is selling products to Blueworks," right?

7           So if you're Judge Cogburn and you want to shut down

8    the Ningbo money, money coming to Ningbo and money coming to

9    Mr. Chen, you shut down this entity.  And he could because stay

10   relief had been granted.

11          And again, I don't want to belabor the point, but the

12   two, the key thing with knowing that he intended to get the

13   debtor is the ASINs.  The debtor is the only entity that sells

14   this product, any products with these ASINs.  And if anybody

15   else does it, the debtor should be suing them because they're

16   stealing from them.  They're the only ones.  And he says, "You

17   may not do that."  By saying "you may not do that," he

18   necessarily says the only person doing it can't do it.

19          I'll answer any questions you have.

20          THE COURT:  I don't have any more.

21          Unless anybody else has anything to say.

22          Ms. Abel.

23          MS. ABEL:  I, I'm going to be very brief, your Honor.

24   I just want to address a couple things.

25          You know, Mr. Ewing's argument made reference to the

1  fact that Blueworks' lawyers were there and had notice and that

2  the court, you know, referenced the fact that they didn't come,

3  that Judge Cogburn referenced the fact that they didn't come.

4  I, I fully believe that if the court believed that counsel was

5  there and was not, was not appropriately abstaining from making

6  an appearance because they were not before the court on that

7  motion to show cause, he would have asked them to come forward.

8  That did not occur.

9       One correction to the record.  I did not get notice of

10 the hearing.  I went because I knew about it, but I didn't, I'm

11 not getting notice in the district court case.  So that's one

12 thing I wanted to correct.

13      I wanted to ask the Court, if you don't mind.  Do you

14 have access to the transcript?  I do not.  And I don't know --

15      THE COURT:  If --

16      MS. ABEL:  -- whether that's something available to

17 the Court, but it seems like you may wish to review it.

18      THE COURT:  If it is on the district court's docket --

19      MS. ABEL:  It's redacted still.  Because the

20 transcript still -- it's that, you know --

21      THE COURT:  Oh, right.

22      MS. ABEL:  -- period of time when it's been produced,

23 but not yet available to the public.

24      THE COURT:  Yeah.  So no, I don't.

25      MS. ABEL:  So --

```
 1              MR. EWING:  Your Honor, we have, we both have copies,

 2    and I think, I mean, I think we'll, we'll give you a copy.

 3              MS. ABEL:  And --

 4              THE COURT:  Okay.

 5              MR. TOMSIC:  I'm happy to leave them.

 6              And Ms. Abel, you can have it.

 7              MS. ABEL:  I would love that.

 8              MR. TOMSIC:  Yes.

 9              MS. ABEL:  And respectfully, I think the Court should

10    get an electronic copy because it may be easier to navigate.

11    I'm -- you might want both, but --

12              THE COURT:  I'm, I'm a hard-copy person.  If somebody

13    has an extra hard copy, I'll take it.

14              MS. ABEL:  It's probably all marked up and tabbed,

15    but --

16              THE COURT:  Well, yeah, unless it's got your notes all

17    over it.

18              MR. EWING:  I'll take the tabs off.  Yeah, you got --

19    okay.  That's good.

20              MS. ABEL:  You know, the tabs might help, actually,

21    your Honor.

22              MR. EWING:  Yeah, okay.  You're not going to, you're

23    not going to give --

24              MS. ABEL:  It is what it is, I guess.

25              MR. TOMSIC:  May I approach, your Honor?
```

1          THE COURT:  Yes, sir.

2          MS. ABEL:  So that is something I do think --

3      (Transcript handed to the Court)

4          THE COURT:  Thank you.  I won't share it --

5          MS. ABEL:  -- would be good for your court --

6          THE COURT:  -- with anybody, I promise.

7          MS. ABEL:  -- your Honor to have.

8          You know, I, I'm frustrated because I, I think that

9  this case is going to end up where Hayward wants.  I, I've

10 reached the conclusion that there's no hope, but I don't, I

11 just really feel strongly that that, that Judge Cogburn, yes,

12 he wrote the order he wrote and yes, he attached the exhibits

13 he attached.  And maybe that is, maybe that's entirely right.

14 And I'll be embarrassed if Judge Cogburn reads this transcript

15 and thinks I didn't know what he meant.  But I, I think that if

16 there was a, a ruling by that court to have this company cease

17 operations in this country, he knows how to write that, and

18 that's not what he wrote.  It was much more narrow, and I, it

19 may still demand the result that Hayward advances, but not on

20 the basis that they were the subject of a contempt, a motion to

21 show cause, they failed to appear, and now they're upset about

22 the result.  I'm completely offended by it, and I just, I, I

23 don't know.  I, I feel bad for my colleagues that that's what's

24 being intimated.

25          So that, they might win, but not because that's what

1   happened.

2           THE COURT:  Yeah.

3           MS. ABEL:  So that's all, your Honor.

4           THE COURT:  Okay.

5           Here's --

6           Yes, sir.

7           MR. EWING:  Your Honor, I'll just respond.  And I

8   don't mean to belabor this, but Judge Cogburn doesn't know

9   these lawyers, right?  I think they've appeared in front of him

10  a time or two.  Maybe, maybe, he knows, but I mean, I've been

11  in plenty of hearings where nobody showed up for a party.  And

12  sometimes the judge calls out the party, but he doesn't go

13  around the room and say, "Hey, are you for this guy?  Are you

14  for this guy?"  And who knows why people, I mean, put yourself

15  in his spot.  And you will see the transcript, right?

16          THE COURT:  Yeah.

17          MR. EWING:  You, you will --

18          THE COURT:  I, I can, I can relate to his spot.

19          MR. EWING:  Right.  You will see the, like there was

20  no defense to this, right?  None, right?  These guys were going

21  to get whacked, whoever showed up.  And he was pretty nice to

22  Mrs. Dunn, nicer than a lot of judges would have been, and

23  didn't take it out on her.

24          So I mean, you know, I don't know why he didn't ask

25  them, but I don't think that necessarily -- I don't, I mean, I

1    don't think you can say, well, you know, that necessarily means

2    he didn't know what he was doing.

3              THE COURT:  Right.

4              MR. EWING:  And let's just be clear.  To, you know, to

5    say, to say anything else, you got to either say the order

6    doesn't mean what it says or he didn't know what he's doing.

7    And I don't think that's the right thing to do.  That's all the

8    more reason we said, "Hey, let's just have it in front of him."

9    But they wouldn't.  So here we are.

10             THE COURT:  Okay.

11             So it's 1:20.  And I think, given the, the urgency of

12   this proceeding, what I would like to do is I can take a break

13   and y'all can sit here while I go read a little bit and stew a

14   little bit, or we can recess and y'all can come back at 2:30

15   and I can give you a ruling.  That will let y'all go eat lunch,

16   do whatever you want to do.

17             But I see a lot of people over here shaking their

18   heads.

19             Mr. Ewing, I don't see any reaction on this.

20             MR. EWING:  We, we, we don't care.  We'll do whatever

21   you want us to.

22             THE COURT:  Okay.

23             Ms. Abel, any --

24             MS. ABEL:  That's fine, your Honor.

25             THE COURT:  All right.

1          So we will recess and then we'll come back at 2:30 and

2   I'll give you a ruling.

3          Thank you.

4          MR. TOMSIC:  Thank you, your Honor.

5          MR. EWING:  Thank you, your Honor.

6          THE COURT:  Uh-huh (indicating an affirmative

7   response).

8      (Recess from 1:21 p.m., until 2:42 p.m.)

9                          AFTER RECESS

10     (Call to Order of the Court)

11         THE COURT:  All right.  We are back in the Blueworks

12   Corporation chapter 11 case.  I don't have the case right in

13   front of me, case number right in front of me.  It is chapter

14   11 --

15         MS. STEELE:  24- --

16         THE COURT:  -- Case No. 24-30494.

17         MS. STEELE:  I was going to help.

18         THE COURT:  And don't let me forget.  There are

19   several other matters on the calendar that I need to address

20   after this ruling, but --

21         So with respect to the matter that the Court heard

22   before we recessed, the emergency interim motion to enforce the

23   automatic stay, having considered the pleadings, having

24   considered the arguments of counsel, the Court is going to deny

25   the motion.  My inclination is to want to grant the motion

1    because I realize what the likely outcome will be if I, if I

2    don't.

3          And I will also observe just for the record, while

4    acknowledging and being frank about the fact that I didn't have

5    time to read the entire transcript during the break -- and I, I

6    said this on the record before -- it appears to me, based on

7    the comments that were made in this hearing, that there is an

8    inherent tension between what happened leading up to that

9    hearing on the motion for contempt and during the hearing in

10   front of Judge Cogburn and the resulting order.

11         And to be more specific, it seems clear that the

12   debtor did not, largely based on the pleadings that were filed

13   related to that motion to show cause, believe or understand

14   that it was the subject of the contempt hearing front of Judge

15   Cogburn, nor that the resulting order would instruct Amazon to

16   cease doing business with it based on the representations of

17   Mr. Tomsic, Martinez, and Ms. Abel, all of whom were present at

18   that hearing.  I, I take them at their word when they say that.

19   I think, clearly, had they understood that could be an outcome

20   of that hearing, they would have participated in the hearing.

21   And frankly, I believe that if Judge Cogburn was contemplating

22   that relief during the hearing and realized that the debtor's

23   attorneys were sitting in the gallery, as Ms. Abel said -- I

24   know I would have -- he likely would have called upon them to

25   participate in the hearing.

1           It's also suspect to me that in the email exchange

2      about the proposed order stemming from that hearing, that

3      Hayward affirmatively represented that the proposed order is

4      for the Ningbo Parties.   "Blueworks is not the subject of the

5      contempt order," and I quote.

6           So putting all of that together, it seems fair to say

7      to me, at least, that the debtor was probably sandbagged by

8      Hayward in this instance.   And like Ms. Abel, that doesn't sit

9      well with this Court.   And also, as she added, it doesn't

10     appear to me that the debtor got its day in court for purposes

11     of that limited proceeding related to the motion to show cause.

12          Nevertheless, here's where we are.   The debtor has

13     filed a motion to enforce the automatic stay and "to permit

14     Amazon to resume listing of the debtor's products on an interim

15     basis."   And that relief strikes the Court as inappropriate for

16     a few reasons, whether pursuant to the consent order that the

17     parties entered into and agreed to in this Court, or pursuant

18     to the terms, the explicit terms of the order entered by Judge

19     Cogburn, which found that to the extent the order had any

20     impact on Blueworks, it was pursuant to the court's exercise of

21     its police powers to enforce its orders.   It would not be

22     appropriate and is not appropriate for this Court to then turn

23     around and enter an order enforcing the automatic stay.

24     Moreover, to do so would require this Court to direct Amazon,

25     who is a third party to this proceeding, to resume selling the

1   debtor's product, which is directly contrary to the terms of

2   Judge Cogburn's order, as Mr. Ewing pointed out, as is

3   evidenced by the debtor's product being included on the chart

4   that's attached as a supplement to that order.

5        So I think that relief that's being sought would be a

6   stretch of this Court's authority, to say the least.

7        Finally, as Mr. Ewing pointed out, the introductory

8   paragraph of Judge Cogburn's order, paragraph of the order

9   seemed pretty clear that the order applies to the debtor,

10  whether as an affiliate or as an entity being induced to import

11  or sell the products at issue.  So there's just, there's some

12  ambiguity and inherent tensions, as I said, between how it all

13  played out and then the order that was, the, the order that was

14  entered by Judge Cogburn.

15       So for those reasons, the Court will deny the

16  emergency motion to enforce the automatic stay.  The Court

17  would urge the debtor to file a motion to clarify in front of

18  Judge Cogburn to seek his assistance and clarification about

19  the terms of his order.  It is his order.  It says what it

20  says, and in most any circumstance, that's the best place to

21  seek that kind of relief.

22       And Mr. Ewing, I would ask you to please draw that

23  order and to circulate the order.

24       And for what it's worth, I would ask that you include

25  a provision in that order that urges the district court to

1    consider any relief sought by the debtor as soon as possible,

2    given the consequences of the order on this chapter 11

3    proceeding and the debtor's ability to continue doing business.

4         So that is the Court's order with respect to the

5    motion, interim motion to enforce the automatic stay.

6         Mr. Tomsic, as you noted in your email that you

7    circulated, sent to the Court and circulated, I think you

8    included all of the other parties on that email.  Confirmation,

9    of course, had originally been noticed for hearing today, then

10   the plan was amended and the confirmation hearing pursuant,

11   really, to that amended plan was renoticed for May 7th.  And so

12   I would believe and understand, based on the email that you

13   circulated, that probably all of these matters then get

14   continued to May 7th.

15        But I'll hear from you on that point.

16        MR. TOMSIC:  I, I think that's correct.  The May 7th

17   scheduling is the disclosure statement.  Ms. Abel --

18        THE COURT:  Right.

19        MR. TOMSIC:  -- scheduled --

20        THE COURT:  Right.

21        MR. TOMSIC:  -- the, the disclosure statement for the

22   second amended plan.  Ms. Abel has scheduled the, or notice for

23   hearing the --

24        THE COURT:  Motion to convert?

25        MR. TOMSIC:  -- motion to -- yes, correct, your Honor,

1  motion to convert.

2        The Hayward objections -- Mr. Ewing can correct me if

3  I'm off base -- but I think move as a block --

4        MR. EWING:  That's right.

5        MR. TOMSIC:  -- with --

6        MR. EWING:  That's right.

7        MR. TOMSIC:  -- everything else.

8        THE COURT:  Okay.

9        MR. TOMSIC:  And the, the one thing -- I, I misplaced

10  my calendar -- but the Shumaker fee app, which was also on for

11  today, the objections related to that, we filed an amended fee

12  app after consultation with Ms. Abel to address her concerns on

13  Mon, Tuesday, yesterday, I believe it was --

14        THE COURT:  Uh-huh (indicating an affirmative

15  response).

16        MR. TOMSIC:  -- pursuant to the ordinary negative

17  notice period.  So the objection to dead, the objection

18  deadline for that would be two Tuesdays from now.  And then we

19  just set the closest hearing date for that, which is the last

20  hearing date in April.

21        THE COURT:  Okay.  April 23rd.

22        MR. TOMSIC:  Yes, your Honor.

23        THE COURT:  Okay.

24        MR. TOMSIC:  With the thought that if there is an

25  objection filed, we'll just treat that as a status conference.

1   'Cause I think, to be frank and candid, the objection

2   deadline's the day before the hearing, but --

3           THE COURT:  Uh-huh (indicating an affirmative

4   response).

5           MR. TOMSIC:  -- we wanted to get it noticed, at least,

6   since it was an opportunity for hearing.  If no objection comes

7   in, then it won't be an issue.  But if --

8           THE COURT:  Okay.

9           MR. TOMSIC:  -- an objection does come in, we'll just

10  do a status conference of that on that hearing date in April.

11          THE COURT:  The April 23rd, anticipating that it would

12  move over to May 7th.

13          MR. TOMSIC:  Yes, your Honor.

14          THE COURT:  Okay.  All right.

15          Mr. Ewing?

16          MR. EWING:  Agree with all that.

17          THE COURT:  Okay.

18          Ms. Abel, anything to add?

19          MS. ABEL:  Nothing to add, your Honor.

20          I, the only thing I had thrown out for consideration

21  -- and I'm probably monkeying up the waters -- but given all

22  that we know about this case prior to disclosure statement

23  hearing, I had thrown out whether it would make sense to

24  consolidate disclosure statement and confirmation, but that

25  truncates all this timeline.  But I mean, it's, is really at

1 | the point of fish or cut bait on this case, so.

2 | THE COURT:  Yeah.  The only thing I would add is, you

3 | know, what we had contemplated for today was that it would be,

4 | really, all day today, tomorrow, and possibly the next day.

5 | Well, I have a very large Bestwall hearing on Friday,

6 | May 9th.  So you all will have very little time on May 7th.  I

7 | mean, you'll get, you know, your normal time, and then that's

8 | that.  We're not going to have a long, drawn-out hearing on a

9 | disclosure statement.

10 | MR. TOMSIC:  I think -- your Honor, I think that's

11 | correct.  And I'm kind of riffing off the cuff here, but you

12 | know, it seems to make sense, depending on how things shake

13 | out, would be to try to schedule a special setting, in any

14 | event.

15 | THE COURT:  Okay.

16 | MR. TOMSIC:  And then at that point, maybe we could

17 | take up everything together.  Because they are all intertwined,

18 | to some extent.  So maybe the May 7th date's a good placeholder

19 | for everything, but we'll work on getting our ducks in a row to

20 | figure out what are the matters we want to have heard and can

21 | we get a block of time altogether --

22 | THE COURT:  Okay.

23 | MR. TOMSIC:  -- for those.

24 | THE COURT:  And I'll let y'all work out all of that.

25 | And, and that's fine.  I'm just, I will forecast that we can't

1 | go for a day-and-a-half on May 7th.  That's just --

2 | MR. TOMSIC:  Of course.

3 | THE COURT:  -- not going to happen.

4 | MR. TOMSIC:  Yes, your Honor.

5 | THE COURT:  So I think --

6 | And thank you for, you know, those thoughts, too, Ms.

7 | Abel.

8 | So I think where we are is, then the Court will

9 | continue everything that's on the calendar until May 7th,

10 | including the hearing on the application for compensation.

11 | Maybe since that one's no protest notice for April 23rd, I'll

12 | just continue that one to April 23rd with the understanding

13 | that, if there's no response, that one just comes off the

14 | calendar.

15 | MR. TOMSIC:  Yes, your Honor.

16 | MS. ABEL:  In fact, your Honor, I would suggest, if

17 | it, absent any objection, I think we could moot, treat that as

18 | moot.  Because an amended application has been filed and

19 | noticed.  And that, that way, the hearing could come off.

20 | Because we really don't need a hearing unless a further

21 | objection is filed.

22 | THE COURT:  Well, I think my colleague sitting over

23 | here would tell me that amended application rests on this first

24 | application.

25 | MS. ABEL:  Ah --

```
1              THE COURT:  So it's not moot.

2              MS. ABEL:  -- because it, the way it was prepared.

3              THE COURT:  Yeah.

4              MS. ABEL:  Okay.

5              THE COURT:  He has a --

6              MS. ABEL:  I apologize.

7              THE COURT:  He has a pen trick that he does.  But

8   yeah.  So I think we need -- I think we need  --

9              MS. ABEL:  And then the only other matter that may be

10  treated as moot would be continued hearing on confirmation of

11  the plan.

12             MR. EWING:  That's right.

13             MS. ABEL:  That has also been amended.  So maybe that

14  cannot be muted, either.

15             THE COURT:  Yeah.  I think we keep all that on.

16             MS. ABEL:  Okay.  I'm learning.

17             THE COURT:  Yeah.

18             MS. ABEL:  Okay.

19             THE COURT:  Yep.

20             MS. ABEL:  Thank you.

21             THE COURT:  Yeah.

22             So we'll continue the hearing on the application for

23  compensation to April 23rd, but everything else, we will

24  continue to May 7th.

25             And we'll look for the order, Mr. Ewing.
```

```
1              Thank you.

2              Thank you, Ms. Steele.

3              MR. EWING:  Yes, ma'am.

4              MS. ABEL:  Thank you, your Honor.

5              MR. TOMSICH:  Thank you, your Honor.

6              MR. MARTINEZ:  Thank you.

7         (Proceedings concluded at 2:53 p.m.)

8

9

10

11

12                         CERTIFICATE

13              I, court approved transcriber, certify that the

14    foregoing is a correct transcript from the official electronic

15    sound recording of the proceedings in the above-entitled

16    matter.

17

18    /s/ Janice Russell                    April 14, 2025

19    Janice Russell, Transcriber                    Date

20

21

22

23

24

25
```

## **Exhibit 4**

### **Bankruptcy Court Order**



FILED & JUDGMENT ENTERED
Christine F. Winchester

April 15 2025

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

*Laura T Beyer*
Laura T. Beyer
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| BLUEWORKS CORPORATION, | Case No. 24-30494 |
| Debtor. | |

## ORDER DENYING DEBTOR'S EMERGENCY INTERIM MOTION TO ENFORCE THE AUTOMATIC STAY

The Debtor's Emergency Interim Motion to Enforce the Automatic Stay (Doc. No. 283) (the "Motion") came on for hearing before this court on April 9, 2025 at 9:30 a.m. Matthew L. Tomsic and Natalie Kutcher of Rayburn Cooper Durham P.A. appeared for the Debtor; Michael L. Martinez of Grier Wright Martinez, PA appeared for the Limited Powers Chapter 11 Trustee, Michael T. Bowers; Shelley K. Abel, United States Bankruptcy Administrator for the Western District of North Carolina appeared for her office; B. Chad Ewing and Patrick G. Spaugh appeared for Hayward Industries, Inc. ("Hayward"); and Emily K. Steele of K&L Gates LLP appeared for Amazon.com Services, LLC.

After considering the Motion, Hayward Industries, Inc.'s Response in Opposition to Debtor's Interim Motion to Enforce Automatic Stay, the transcript of the March 3, 2025 show cause and sanctions hearing before the Honorable Max O. Cogburn in *Hayward Industries, Inc. v. BlueWorks Corporation*, case no. 20-cv-710 (the "District Court Lawsuit") in the United States

District Court for the Western District of North Carolina (the "District Court"), and the March 19,

2025 Order of contempt entered in the District Court (Doc. No. 588) (the "Contempt Order"), and

after hearing the arguments of counsel, the court determines that the Motion should be denied for

the following reasons:

1.     The March 3 District Court hearing related to violations of the District Court's

temporary restraining order by the Debtor's non-debtor codefendants Blueworks Innovation

Corporation, Ningbo C.F. Electronic Tech. Co., Ltd. ("NBCF"), and Ningbo Yishang Import and

Export Co., Ltd. (collectively, the "Non-Debtor Defendants"). Following the hearing, the District

Court entered the Contempt Order, which barred the "Ningbo Parties" from importing or selling

any product in the United States. The Contempt Order defines the Ningbo Parties as: (i) NBCF;

(ii) Ningbo Yishang Import and Export Co., Ltd.; (iii) Blueworks Innovation Corporation; and (iv)

Zefeng "Richard" Chen.

2.     On or about March 29, 2025, the Debtor learned that its listings on Amazon.com

("Amazon") had been removed. According to Hayward's counsel, Hayward served a copy of the

Contempt Order on Amazon, and Amazon subsequently removed the Debtor's listings. In its

Motion, the Debtor seeks the entry of an order directing Amazon to re-list the Debtor's products

on its website and to take any additional steps necessary to fully restore the Debtor's Amazon

account. Absent such relief and without the ability to sell its inventory, the Debtor argues that its

"chances for a successful reorganization are extinguished," its business has been shut down, and

it has effectively been forced into a liquidation.

3.     Much of the argument at the April 9 hearing on the Motion focused on the pleadings

filed by Hayward in the District Court in support of Hayward Industries Inc.'s Motion to Show

Cause (the "Motion to Show Cause"), as well as the discussion that occurred during the show cause

2

hearing in the District Court on March 3, 2025. According to the Debtor, Hayward directed its

pleadings in support of the Motion to Show Cause at the Non-Debtor Defendants and specifically

targeted Ningbo and Chen. Consequently, while counsel for the Debtor, counsel for the Limited

Powers Chapter 11 Trustee, and the Bankruptcy Administrator attended the March 3 hearing and

observed it from the gallery, none of them participated in the hearing because they were unaware

that it implicated the Debtor or that the hearing's outcome could lead to an order requiring Amazon

to stop listing the Debtor's product on its website. Upon a review of the transcript from the March

3 hearing, the court agrees with the Debtor's characterization of the proceedings. Notably, there

was no discussion about the automatic stay or the police powers exception to the automatic stay

nor any mention of the Debtor being barred from selling its product on Amazon's website.

      4.     Following the March 3 hearing, counsel for Hayward circulated a proposed order

stemming from the show cause hearing and, in a March 7, 2025 email to former counsel for the

Ningbo parties, affirmatively stated that "Blueworks is not the subject of the contempt order."

Counsel for the Debtor received a copy of that email and, at the hearing on the Motion, confirmed

that this statement aligned with his understanding of the March 3 show cause hearing. At the April

9 hearing on the Motion, however, Hayward took a very different position, opposing the Motion

on the basis that the specific terms of the Contempt Order prohibit the Debtor from selling its

products.

      5.     Nevertheless, the court concludes it would be inappropriate to grant the relief

requested by the Debtor in the Motion. Whether because of this court's July 3, 2024 Consent Order

Relating to Hayward Industries, Inc.'s Motion for Relief from the Automatic Stay (Doc. No. 73)

or the explicit terms of the Contempt Order, which found that to the extent the Contempt Order

had any impact on the Debtor, it was entered pursuant to the District Court's police powers to

3

enforce its orders, it would not be proper for this court to enter an order enforcing the automatic stay. At its core, the Motion seeks to have this court interpret the Contempt Order; however, the District Court is best positioned to do that.

6.    In addition, it would be inappropriate for this court to direct Amazon–a third-party to this proceeding–to resume selling the Debtor's product contrary to the terms of the Contempt Order, as evidenced by the inclusion of the Debtor's product on the chart attached as Appendix A to the Contempt Order. Moreover, Amazon retains discretion to determine what products it chooses to offer on its website.

7.    Finally, whether as an affiliate or as an entity being induced to import or sell the products at issue–as described in paragraphs 1 and 2 of the decretal portion of the Contempt Order– it appears to the court that the Contempt Order applies to the Debtor.

**THEREFORE,** it is **HEREBY ORDERED, ADJUDGED, AND DECREED** that the Debtor's Emergency Interim Motion to Enforce the Automatic Stay (Doc. No. 283) should be and hereby is **DENIED.**

To the extent the Debtor files a motion seeking clarification of the Contempt Order, this court respectfully urges the District Court to consider such motion as soon as reasonably possible in light of the apparent impact the Contempt Order has on the Debtor's ability to continue doing business.

**SO ORDERED**.

This Order has been signed electronically.                United States Bankruptcy Court
The Judge's signature and Court's seal
appear at the top of the Order.

**Exhibit 5**

**Hayward Email Correspondence Related to Proposed Contempt Order**

**Matthew Tomsic**

| | |
|---|---|
| **From:** | Belt, Erik Paul <ebelt@McCarter.com> |
| **Sent:** | Friday, March , 2025 5:10 PM |
| **To:** | Trimmer, Christina .; Michelle   unn |
| **Cc:** | Ferguson, Russ; Matthew Tomsic;  ong, Ale ;  paugh, Patrick |
| **Subject:** | RE:   ayward  . Blueworks et al |

Christy

The proposed order is for the Ningbo parties.  You don't represent the Ningbo Parties anymore.   You were not at the hearing on Monday.   Blueworks is not the subject of the contempt order. The Court told us to share the proposed order with Michelle, which we did.  Michelle, I assume, shared the proposed drafts with you.

We will share with the Court the drafts Michelle sent.  We can't prevent you from sending in your own edits.  But we would object because you don't represent Ningbo.  Nonetheless, as a courtesy, I said that we'd wait a short time for Matt's edit, which I assume is just to the footnote we added about Blueworks and thus should not take long.  Or, if you and Matt expect that the edits will take longer, you can include that in whatever you send to the court.  Again, we will object because you are representing a third party (Blueworks) and you or Alex or  both have stated in court that you don't represent the Ningbo parties and were allowed to withdraw from the representation.

Regards

Erik



**Erik Paul Belt | Partner**
McCarter & English, LLP
265 Franklin Street | Boston, MA 02110

ebelt@mccarter.com | www.mccarter.com | V-Card
T 617.449.6506   M 617.459.3112

Boston | East Brunswick | Hartford | Indianapolis | Miami | Newark | New York
Philadelphia | Stamford | Trenton | Washington, DC | Wilmington

**From:** Trimmer, Christina D. <ctrimmer@shumaker.com>
**Sent:** Friday, March 7, 2025 5:00 PM
**To:** Belt, Erik Paul <ebelt@McCarter.com>; 'Michelle Dunn' <michelle.dunn@platinum-ip.com>
**Cc:** Ferguson, Russ <Russ.Ferguson@wbd-us.com>; Matthew Tomsic <mtomsic@rcdlaw.net>; Long, Alex <along@shumaker.com>; Spaugh, Patrick <Patrick.Spaugh@wbd-us.com>
**Subject:** RE: Hayward v. Blueworks et al

**EXTERNAL EMAIL | STOP | VERIFY | REPORT**

**Christina Davidson Trimmer**
Attorney at Law

**SHUMAKER**

101 South Tryon Street, Suite 2200 | Charlotte, North Carolina 28280
Direct 704.945.2151 | Fax 704.332.1197
ctrimmer@shumaker.com | bio | LinkedIn

Confidentiality Statement: This electronic message contains information from the law firm of Shumaker, Loop & Kendrick, LLP, and may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this message is prohibited. If you have received this electronic message in error, please notify the sender immediately by reply e-mail or telephone 800.444.6659.

**From:** Belt, Erik Paul <ebelt@McCarter.com>
**Sent:** Friday, March 7, 2025 4:52 PM
**To:** 'Michelle Dunn' <michelle.dunn@platinum-ip.com>
**Cc:** Ferguson, Russ <Russ.Ferguson@wbd-us.com>; Matthew Tomsic <mtomsic@rcdlaw.net>; Long, Alex <along@shumaker.com>; Trimmer, Christina D. <ctrimmer@shumaker.com>; Spaugh, Patrick <Patrick.Spaugh@wbd-us.com>
**Subject:** RE: Hayward v. Blueworks et al

CAUTION: External Email

Michelle

## Exhibit C

**Expedited Briefing Motion**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

|  |  |
|---|---|
| HAYWARD INDUSTRIES, INC.,<br><br>Plaintiff<br><br>v.<br><br>BLUEWORKS CORPORATION, BLUEWORKS INNOVATION CORPORATION, NINGBO C.F. ELECTRONIC TECH CO., LTD; NINGBO YISHANG IMPORT AND EXPORT CO., LTD.<br><br>Defendants. | Civil Action No. 3:20-CV-710 -MOC-SCR |

## BLUEWORKS CORPORATION'S MOTION FOR EXPEDITED BRIEFING SCHEDULE ON *EMERGENCY* MOTION FOR CLARIFICATION OF CONTEMPT ORDER [DE 588] ENTERED MARCH 19, 2025

Blueworks Corporation (the "Debtor") hereby respectfully moves the Court for an expedited briefing in connection with the concurrently filed Emergency Joint Motion for Clarification of Contempt Order [DE 588] Entered March 19, 2025 (the "Motion to Clarify"). The Limited Powers Chapter 11 Trustee supports the relief requested by the Debtor.

In support of this motion, in addition to the Debtor's memorandum filed simultaneously herewith, the Debtor shows the Court as follows:

1.   The relief sought in the Motion to Clarify is essential to the Debtor's ongoing operations and ability to continue to prosecute its bankruptcy case in the Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court"), which recognized the same in its order denying emergency, temporary relief to the Debtor and prompting the Debtor to move before this Court.

2.   Specifically, the Bankruptcy Court stated: "To the extent the Debtor files a motion seeking clarification of the Contempt Order, this court respectfully urges the District Court to consider such motion as soon as reasonably possible in light of the apparent impact the Contempt Order has on the Debtor's ability to continue doing business." *Order Denying Debtor's Emergency Interim Motion to Enforce the Automatic Stay* [Docket No. 309].[1]

3.   As described further in the Motion to Clarify, following the entry of the Contempt Order dated March 19, 2025 (the "Contempt Order"), Hayward Industries, Inc. ("Hayward") contacted Amazon.com Services, LLC ("Amazon"), and delivered a copy of the Contempt Order thereto, causing Amazon to de-list the Debtor's products in late March.

4.   As the Debtor exclusively sells its products through Amazon, the Debtor's operations have ceased since March 29, 2025. In effect, the removal of the Debtor's listings extinguishes the Debtor's chances for a successful reorganization. Due to the drastic impact to the Debtor's operations and resulting impact on the Debtor's Chapter 11 Bankruptcy Case, the Debtor first went to the Bankruptcy Court for temporary relief, which was denied.

5.   In light of the present situation, the Debtor believes that an expedited briefing schedule is necessary to obtain the Court's guidance as soon as possible and prevent further irreparable harm to the Debtor and its reorganization efforts.

6.   The Debtor proposes the following briefing schedule to make this motion and the Motion to Clarify ripe for the Court's ruling as soon as practicable:

---

[1] This document may be found on the docket of *In re Blueworks Corporation*, Bankruptcy Court for the Western District of North Carolina, Case No. 24-30494.

{00402165 v 1 }

- **Friday, May 25, 2025**—Deadline for Hayward to respond to Debtor's instant motion for an expedited briefing schedule (The Debtor will forego an opportunity to reply to Hayward's response);

- **Tuesday, April 29, 2025**—Deadline for Hayward to respond to the Motion to Clarify;

- **Wednesday, April 30, 2025**—Deadline for the Debtor to respond to Hayward's opposition to the Motion to Clarify.

7.   For the reasons stated above, the Debtor respectfully requests the Court grant this motion for an expedited briefing schedule in connection with the concurrently filed Motion to Clarify.

8.   The Debtor conferred with counsel for Hayward, who objected to the relief sought.

This the 23rd day of April, 2025.

RAYBURN COOPER & DURHAM, P.A.

By:      /s/ Matthew L. Tomsic
Matthew L. Tomsic
N.C. State Bar No. 52431
Natalie E. Kutcher
N.C. State Bar No. 54888
Ashley B. Oldfield
N.C. State Bar No. 56552
Suite 1200, The Carillon
227 West Trade Street
Charlotte, NC 28202
(704) 334-0891

*Counsel to the Debtor*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this day **BLUEWORKS CORPORATION'S MOTION FOR EXPEDITED BRIEFING SCHEDULE ON EMERGENCY MOTION FOR CLARIFICATION OF CONTEMPT ORDER [DE 588] ENTERED MARCH 19, 2025** was electronically filed via the District Court's CM/ECF system, which will send notification of such filing to all counsel of record.

This the 23rd day of April, 2025.

By:     */s/ Matthew L. Tomsic*
Matthew L. Tomsic

## Exhibit D

**Memorandum in Support of Expedited Briefing Motion**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| HAYWARD INDUSTRIES, INC., <br><br>                    Plaintiff <br><br> v. <br><br> BLUEWORKS CORPORATION, BLUEWORKS INNOVATION CORPORATION, NINGBO C.F. ELECTRONIC TECH CO., LTD; NINGBO YISHANG IMPORT AND EXPORT CO., LTD. <br><br><br>                    Defendants. | Civil Action No. 3:20-CV-710 -MOC-SCR |

<u>**MEMORANDUM OF LAW IN SUPPORT OF BLUEWORKS CORPORATION'S MOTION FOR EXPEDITED BRIEFING SCHEDULE ON *EMERGENCY* MOTION FOR CLARIFICATION OF CONTEMPT ORDER [DE 588] ENTERED MARCH 19, 2025**</u>

Blueworks Corporation (the "Debtor"), by and through the undersigned counsel, hereby files the following Memorandum of Law in Support of Blueworks Corporation's Motion for Expedited Briefing. The Limited Powers Chapter 11 Trustee supports the relief requested.

<u>**PRELIMINARY STATEMENT**</u>

As noted by the Bankruptcy Court for the Western District of North Carolina, the relief sought in the Debtor's *Emergency* Motion for Clarification of Contempt Order [DE 588] Entered March 19, 2025 (the "Motion to Clarify"), "To the extent the Debtor files a motion seeking clarification of the Contempt Order, this court respectfully urges the District Court to consider such motion as soon as reasonably possible in light of the apparent impact the Contempt Order has

on the Debtor's ability to continue doing business." *Order Denying Debtor's Emergency Interim Motion to Enforce the Automatic Stay* [Docket No. 309].[1]

The Debtor respectfully requests that this Court expedite the briefing schedule so that it may quickly receive certainty as to whether it can continue operating and prosecuting its bankruptcy case in an effort to address the Judgment [DE 448] or whether the Contempt Order—ass Hayward Industries, Inc., now argues—is a *de facto* sales and import ban against the Debtor, forcing it into liquidation and ending its going-concern operations.

## **BACKGROUND**

On March 3, 2025, the Court held a show cause hearing (the "Show Cause Hearing") relating to the Debtor's non-debtor codefendant Ningbo C.F. Electronic Tech. Co., Ltd.'s ("NBCF") and Richard Chen's (collectively, the "Non-Debtor Defendants") violations of a temporary restraining order entered by the District Court roughly one year prior along with other court orders. Following the Show Cause Hearing, the Court entered an Order dated March 19, 2025, barring the "Ningbo Parties" from importing or selling any product in the United States (the "Contempt Order").

On or about March 29, 2025, the Debtor received notice that Amazon.com, Inc. ("Amazon"), had removed all of its product listings from its platform. During the next few days, Debtor's counsel was informed by counsel for Amazon that Hayward Industries, Inc. ("Hayward") had served Amazon a copy of the Contempt Order, resulting in Amazon's delisting of Debtor's products from its website. As result of Amazon removing the Debtor's listings, the Debtor's operations have come to a full and sudden halt. This unexpected cessation in Debtor's operations

---

[1] This document may be found on the docket of *In re Blueworks Corporation*, Bankruptcy Court for the Western District of North Carolina, Case No. 24-30494.

has resulted in irreparable harm to the Debtor's business and reorganization efforts in the Bankruptcy Court. The Debtor has filed[2] an Emergency Motion for Clarification contemporaneously herewith, seeking the Court's input on the proper interpretation of Contempt Order to prevent further and irreversible damage resulting from an incorrect interpretation thereof and to provide all the parties, including the Bankruptcy Court, certainty as to the Debtor's ability to operate.

## **ARGUMENT**

The Debtor seeks an expedited briefing schedule due to the disastrous impact of Hayward's new interpretation of the Contempt Order. Without the ability to sell its inventory, the Debtor's chances for a successful reorganization in the Bankruptcy Court are extinguished. As such, unless and until the Debtor's listings are reinstated on Amazon, the Debtor has been thrust into a forced liquidation without advance notice to any party to the Bankruptcy Case and without any party seeking such relief before the Bankruptcy Court.

With pool season now underway, the Debtor loses business each day its listings are removed from Amazon. The Debtor's inability to sell may also affect its ratings, customer reviews, and priority in searches for its products or similar products. To minimize the amount of time the Debtor's operations are improperly suspended, and irreparable harm accrues, the Debtor requests an expedited briefing schedule on the Motion for Clarification to obtain the Court's guidance.

---

[2] Due to the drastic, case- and enterprise-ending affect of Hayward's actions, the Debtor first sought emergency temporary relief before the Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court"). Its efforts in the Bankruptcy Court are more fully described in its memorandum in support of its clarification motion. Following the Bankruptcy Court's denial of the relief sought, the Debtor awaited entry of the Bankruptcy Court's formal order and sought to balance the care required for a bankruptcy case dispositive motion with the urgency required to file the various pleadings.

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtor respectfully submits that the Court should grant its motion and expedite briefing on the Motion for Clarification and order the following proposed schedule:

- **Friday, May 25, 2025**—Deadline for Hayward to respond to Debtor's Instant Motion for an expedited briefing schedule (The Debtor will forego an opportunity to reply to Hayward's response);

- **Tuesday, April 29, 2025**—Deadline for Hayward to respond to the Motion to Clarify;

- **Wednesday, April 30, 2025**—Deadline for the Debtor to respond to Hayward's opposition to the Motion to Clarify.

This the 23rd day of April, 2025.

RAYBURN COOPER & DURHAM, P.A.

By:    */s/ Matthew L. Tomsic*
Matthew L. Tomsic
N.C. State Bar No. 52431
Natalie E. Kutcher
N.C. State Bar No. 54888
Ashley B. Oldfield
N.C. State Bar No. 56552
Suite 1200, The Carillon
227 West Trade Street
Charlotte, NC 28202
(704) 334-0891

*Counsel to the Debtor*

## <u>ARTIFICIAL INTELLIGENCE (AI) CERTIFICATION</u>

I hereby certify the following:

1.     No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2.     Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 23rd day of April, 2025.

*/s/ Matthew L. Tomsic*
Matthew L. Tomsic

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this day **MEMORANDUM OF LAW IN SUPPORT OF BLUEWORKS CORPORATION'S MOTION FOR EXPEDITED BRIEFING SCHEDULE ON EMERGENCY MOTION FOR CLARIFICATION OF CONTEMPT ORDER [DE 588] ENTERED MARCH 19, 2025** was electronically filed via the District Court's CM/ECF system, which will send notification of such filing to all counsel of record.

This the 23rd day of April, 2025.

By:   */s/ Matthew L. Tomsic*
       Matthew L. Tomsic